UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, a New Jersey Corporation,<br><br>                    Plaintiff,<br><br>        v.<br><br>NICK BROWN, in his official capacity as ATTORNEY GENERAL OF WASHINGTON,<br><br>                    Defendant. | No.<br><br>VERIFIED COMPLAINT |

## VERIFIED COMPLAINT

Novartis Pharmaceuticals Corporation (Novartis) brings this complaint against Defendant Nick Brown, in his official capacity as Attorney General of Washington, seeking preliminary and permanent injunctive relief and a declaratory judgment preventing the enforcement of Washington's recently enacted S.B. 5981. Novartis alleges as follows:

## PRELIMINARY STATEMENT

1. When Congress carefully delineates the costs and benefits imposed on participants in a voluntary federal program, states are not free to second-guess its judgment. But S.B. 5981, a recently enacted Washington law, attempts to do just that. Federal law purposely limits the obligations imposed on manufacturers that participate in the 340B Drug

VERIFIED COMPLAINT – Page 1

Pricing Program, including by allowing manufacturers to impose reasonable conditions on access to discounted drugs. S.B. 5981 purports to outlaw the very same reasonable conditions that federal law authorizes. S.B. 5981 violates the Supremacy and dormant Commerce Clauses of the U.S. Constitution.

2. Drug manufacturers must participate in the 340B Program as a condition of having their drugs covered by Medicaid and Medicare Part B. The 340B Program requires manufacturers to offer to sell deeply discounted units of drugs to select non-profit hospitals and clinics called "covered entities." The 340B Program subsidizes these covered entities by allowing them to buy drugs cheaply—as low as a penny per unit—while charging patients the drug's full commercial price. Because covered entities can pocket the difference, they have sought to maximize the 340B Program; every additional transaction completed at the 340B price boosts their bottom line.

3. Congress, though, sought to balance two competing goals in creating the 340B Program: (1) subsidizing covered entities, but (2) not making the subsidy so large that it dissuades manufacturers from participating in Medicaid and Medicare Part B. To ensure careful calibration of these objectives, Congress gave a single federal agency centralized oversight of both Medicaid and the 340B Program. *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119–120 (2011).

4. In recent years, covered entities have tried to game the system. To supersize the number of 340B discounts they claim, covered entities started contracting with third-party pharmacies ("contract pharmacies") located all over the country—often large, for-profit chain pharmacies like CVS or Walgreens. Covered entities hire data-crunchers called "third-party administrators" to retroactively analyze prescriptions previously filled at contract pharmacies, looking for pharmacy customers that covered entities could argue they treated at some point in the past. For each such connection the third-party administrator purports to find, the covered entity (or one of its for-profit partners) arranges for the

VERIFIED COMPLAINT – Page 2

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

pharmacy to acquire a discounted drug—which the pharmacy then sells at full price to the next customer who walks in the door. The covered entity, third-party administrator, and pharmacy all split the resulting profit.

5. The 340B statute does not mention contract pharmacies. Four years after the 340B statute was enacted, however, the federal agency responsible for the 340B Program started allowing covered entities to use one contract pharmacy—primarily so entities without an in-house pharmacy could participate. The volume of 340B discount claims skyrocketed, ultimately leading some drug manufacturers (including Novartis) to introduce their own reasonable limits on the use of contract pharmacies as conditions of offering 340B pricing.

6. Two federal appeals courts have now confirmed that Congress intentionally preserved manufacturers' discretion to recognize only one contract pharmacy. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704–706 (3d Cir. 2023). Novartis crafted its contract pharmacy policy with those decisions in mind, and its policy has been found by the federal government to comply with federal law.

7. S.B. 5981 eliminates the discretion Congress preserved for manufacturers to impose reasonable limits on covered entities' purchases, including limits on the number of recognized contract pharmacy arrangements. And because the state law cannot be enforced without addressing a number of thorny questions regarding the federal 340B requirements, the new Washington law destroys the federal government's ability to administer the program "on a uniform, nationwide basis." *Astra*, 563 U.S. at 120.

8. S.B. 5981 cannot coexist with federal law. This state law consciously sets out to regulate the functioning of "the federal 340B drug pricing program." S.B. 5981 § 1(1). But the federal government has overriding interests in regulating manufacturers' 340B obligations and in preserving the uniformity of 340B enforcement. The federal 340B

VERIFIED COMPLAINT – Page 3

statute's pervasive regulation of the 340B Program also leaves no room for state supplementation. S.B. 5981 separately frustrates Congress's goals in four ways: outlawing conduct Congress chose to allow, tinkering with Congress's delicate balance of interests in the 340B Program, inviting inconsistent adjudications regarding manufacturers' 340B obligations, and backing up these modifications of the federal program with draconian new sanctions. Accordingly, the federal government itself has explained that laws like S.B. 5981 violate the Supremacy Clause.

9. S.B. 5981 independently violates the dormant Commerce Clause. The statute caps the price manufacturers may charge for drugs that end up at contract pharmacies in Washington. But manufacturers sell their drugs to wholesalers outside of Washington, and those wholesalers then resell the drugs to pharmacies. When covered entities located in Washington demand 340B pricing for drugs that were dispensed at contract pharmacies, the wholesaler provides the 340B discount and then asks the manufacturer for reimbursement in a distinct transaction that takes place wholly outside Washington's borders. Under S.B. 5981, manufacturers would be forced to provide that reimbursement. This extraterritorial regulation is impermissible.

10. Absent immediate judicial intervention enjoining S.B. 5981, Novartis will suffer irreparable harm. Once the law takes effect on **June 10, 2026**, Novartis will risk violating Washington law—and incurring serious penalties—merely by maintaining a 340B policy that has already been declared lawful by federal courts applying the federal 340B statute.

11. Novartis therefore requests preliminary and permanent injunctive relief preventing enforcement of S.B. 5981 against Novartis, as well as a declaratory judgment establishing that S.B. 5981 violates the Supremacy and dormant Commerce Clauses of the U.S. Constitution.

VERIFIED COMPLAINT – Page 4

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**PARTIES**

12.     Plaintiff Novartis Pharmaceuticals Corporation is a corporation organized in Delaware with its principal place of business at 59 Route 10, East Hanover, New Jersey 07936.  Novartis's mission is to reimagine medicine to improve and extend people's lives.

13.     Defendant Nick Brown is the Attorney General of Washington and is responsible for administering and enforcing S.B. 5981.  Defendant maintains an office at 1125 Washington Street SE, Olympia, WA 98504.  Defendant is sued in his official capacity only.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction under 28 U.S.C. § 1331 because this civil action arises under the laws and Constitution of the United States.  *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

15.     This Court also has inherent equitable power to enjoin the actions of state officials that violate the U.S. Constitution and federal law.  *Ex parte Young*, 209 U.S. 123, 159–160 (1908); *Duke Energy Trading & Mktg., LLC v. Davis*, 267 F.3d 1042, 1055 (9th Cir. 2001).

16.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because one or more defendants reside in this district and because a substantial part of the events giving rise to Novartis's claims occurred in this district.  The challenged state law also purports to govern contract pharmacy arrangements in this district.

**FACTUAL BACKGROUND**

**I.     Statutory and Regulatory Background**

17.     S.B. 5981 refers to the federal 340B statute eight times, and incorporates the federal 340B statute into key definitions, *see, e.g.*, S.B. 5981 §§ 2(1)–(2) (citing 42 U.S.C. § 256b).  To understand what S.B. 5981 requires, it is necessary to first understand the

VERIFIED COMPLAINT – Page 5

federal landscape into which it inserts itself.

**The 340B Program, Medicaid, and Medicare Part B**

18.     Congress created the Medicaid Drug Rebate Program (MDRP) in 1990 as a bargain between drug manufacturers, states, and the federal government.[1]  In exchange for near-universal Medicaid coverage of their products, manufacturers in the MDRP must offer state Medicaid plans the "best price" given to any other purchaser.  H.R. Rep. No. 102-384(II), *9–10 (1992).  This design inadvertently discouraged drug manufacturers from continuing their longstanding practices of offering steep discounts to charitable hospitals.  *Id.*; *see also* Milt Freudenheim, *Big Costs Imposed on Drug Makers*, N.Y. Times (Nov. 6, 1990) at D2, https://tinyurl.com/368umt5y.

19.     Congress created the 340B Program to eliminate that disincentive.  H.R. Rep. No. 102-384(II), *12 (1992).  As a condition of having their drugs covered by Medicaid and Medicare Part B, manufacturers must offer to sell their products to certain healthcare providers at rock-bottom prices.  *See* 42 U.S.C. § 256b(a)(1); *id.* §§ 1396r-8(a)(1), (a)(5)(A).

20.     The select providers entitled to these discounts—called "covered entities"—are carefully described in the 340B statute.  42 U.S.C. § 256b(a)(4).  340B prices, too, are set by federal law under a statutory formula that references MDRP pricing.  *Id.* §§ 256b(a)(1)–(2).

21.     340B prices can drop as low as a penny.  82 Fed. Reg. 1,210, 1,215 (Jan. 5, 2017).  Critically, though, covered entities need not pass on these discounts to their

---

[1] Medicaid & CHIP Payment & Access Comm'n, *The 340B Drug Pricing Program & Medicaid Drug Rebate Program: How They Interact* 1-2 (May 2018) (MACPAC Report), https://tinyurl.com/43uum74c.

VERIFIED COMPLAINT – Page 6

patients,[2] and they mostly do not.[3] Instead, a covered entity typically uses the 340B discount to generate a "spread": It bills "the patient's insurance—whether commercial, Medicare or Medicaid—at customary reimbursement rates that do not account for the 340B discount" and then pockets the difference.[4]

22.     Covered entities may use that revenue for purposes that have nothing to do with the 340B Program—or even with treating patients. Recent reporting has unearthed examples where covered entities used 340B revenue to make "deals with minor-league and college sports teams for naming rights," to launch "a film company," to fuel "consolidation" that "has increased prices and insurance premiums,"[5] and to build "a luxury apartment and office complex" while "slashing services" in lower-income areas.[6] All of this, of course, comes at a great cost to drug manufacturers.

23.     The 340B Program is deeply interwoven with other federal healthcare programs, especially Medicaid. When a unit of a drug is sold at the 340B price, that sale is exempted from the statutory formula that determines how much Medicaid pays for all units of the drug. *See* 42 C.F.R. § 447.508(a)(1). And manufacturers need not pay Medicaid rebates on a particular unit of a drug for which a covered entity paid the 340B price. 42 U.S.C. § 256b(a)(5)(A).

24.     For the latter reason, the federal government can be directly impacted when

[2] Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges, & Recent Developments* 2 (2021), https://tinyurl.com/5n6chhm6; Rena M. Conti & Peter B. Bach, *Cost Consequences of the 340B Drug Discount Program*, 309 JAMA 1995, 1995 (2013), https://tinyurl.com/yc2t8b35.

[3] Rory Martin & Kepler Illich, IQVIA, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?* 11–12 (2022), https://tinyurl.com/4bfbz7yz; *see also, e.g.*, Senate Health Educ. Lab. & Pensions Comm., *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 9–10 (April 2025) (HELP Comm. Report), https://tinyurl.com/2e642hru.

[4] Ryan Long et al., *Cui Bono? Misaligned Incentives in the 340B Program* § IV (Sep. 2025), https://tinyurl.com/msb3zn96.

[5] Editorial, *A Good Idea to Cut Drug Costs*, WALL ST. J. (Sep. 21, 2025), https://tinyurl.com/y3k63v3z

[6] Katie Thomas & Jessica Silver-Greenberg, *How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, N.Y. TIMES (Sep. 24, 2022), https://tinyurl.com/4cxjukf4.

VERIFIED COMPLAINT – Page 7

a unit of a drug is deemed 340B eligible.  When a covered entity claims a 340B discount on a unit of a drug that was dispensed to certain Medicaid recipients, the Medicaid plan faces a greater expenditure because it does "not receive drug rebates."[7]  States and the federal government share Medicaid rebates, so this effect directly increases what the federal government must spend to support Medicaid.[8]  The size of the effect can be substantial; one recent estimate found that 340B discounts displaced $6.5 *billion* in Medicaid rebates in a single year—of which "the federal government's share" would have been $4.2 *billion*.[9] Further "legislative expansion" of the 340B Program "increas[es] these costs by millions of dollars annually."[10]

25.    The 340B Program also serves as the "price of admission to participate in Medicaid and Medicare Part B."  *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1273 (W.D. Okla. 2025).  Because the 340B Program was enacted under Congress's spending power,[11] manufacturers' participation is voluntary and works "much in the nature of a contract," *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Congress must spell out program conditions unambiguously so participants can understand in advance what they are agreeing to do.  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022).  If 340B burdens become too large, manufacturers could withdraw from the program entirely—reducing participation in Medicaid and Medicare Part B, too. *Drummond*, 808 F. Supp. 3d at 1277 & n.65.

---

[7]  Long et al., *supra* n.4, § VI(C).

[8]  *See* MACPAC Report, *supra* n.1, at 1–2; Centers for Medicare & Medicaid Servs., *Medicaid Drug Rebate Program (MDRP)* (last updated Feb. 6, 2026), https://tinyurl.com/yaajfmvv.

[9]  Eleanor Blalock & Carlee Launsbach, *The Financial Impact to Medicaid from the 340B Drug Pricing Program* 2 (July 2025), https://tinyurl.com/s7p6u3z2; *see also* Kolton Gustafson et al., *Impacts of 340B on State Medicaid Programs & Patient OOP Costs*, Avalere (Feb. 12, 2025) (similar), https://tinyurl.com/54p2vnf7.

[10]  Chuan Sun, Harish Karne, & Rory Martin, *The Cost of 340B to State Employee Health Benefit Plans* 9 (Feb. 6, 2026), https://tinyurl.com/2vhy9djr.

[11]  *See Talevski ex rel. Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713, 724 (7th Cir. 2021) (noting that the 340B Program was created under the Spending Clause).

VERIFIED COMPLAINT – Page 8

**HRSA's Uniform, Nationwide Enforcement Mechanisms**

26.    To manage the interactions among these federal healthcare programs, Congress gave control over all three programs to one federal agency: the U.S. Department of Health and Human Services (HHS), which houses both the Centers for Medicare & Medicaid Services (CMS) and the Health Resources and Services Administration (HRSA).

27.    HRSA currently oversees the 340B Program's day-to-day administration. For example, HRSA enters into Pharmaceutical Pricing Agreements (PPAs) with manufacturers to memorialize the parties' 340B obligations, as required by federal law.  42 U.S.C. § 256b(a)(1); *see also* HHS, *Example PPA*, https://tinyurl.com/4nshe96y.  A PPA lists seven discrete responsibilities that manufacturers assume by joining the program, *Example PPA*, *supra* ¶ 27, § II, lays out three discrete responsibilities for HRSA, *id.* § III, and provides that these obligations must be "construed in accordance with Federal common law," *see id.* § VII(g).

28.    The Supreme Court has stressed the importance of leaving HRSA "in control of § 340B's drug-price prescriptions."  *Astra*, 563 U.S. at 114.  In *Astra*, a county that operated multiple covered entities sued drug manufacturers, alleging it had been deprived of access to 340B pricing it was entitled to receive.  *Id.* at 116.  All agreed that the 340B statute does not authorize private enforcement, but the county argued it could still enforce manufacturers' PPAs, supposedly helping HRSA by "spreading the enforcement burden." *Id.* at 119.  The Supreme Court rejected that view, concluding Congress intended the opposite: "centralized enforcement in the [federal] government."  *Id.* (quotation omitted).

29.    An amicus brief the Solicitor General filed on behalf of the United States in *Astra* highlights the interactions between Medicaid and the 340B Program.[12]  Given "[t]he interdependent nature" of the 340B Program and MDRP, he explained, "an adjudication of

---

[12] *See generally* Brief for the United States as Amicus Curiae Supporting Petitioners at 4–5, 29–35, *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011) (No. 09-1273) (*Astra* Amicus Brief), https://tinyurl.com/bdeah9c4.

VERIFIED COMPLAINT – Page 9

rights under one program must proceed with an eye towards any implications for the other." *Astra* Amicus Brief, *supra* n.12, at 34. A single, centralized federal administrator is therefore "best positioned to determine manufacturers' obligations in the first instance." *Id.* at 33.

30. The Supreme Court expressly adopted the Solicitor General's view. *Astra*, 563 U.S. at 119–120. Congress intended HRSA to "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 120. The county's lawsuit could not proceed because it would flout Congress's "unitary administrative and enforcement scheme" in favor of "a multitude of dispersed and uncoordinated lawsuits by 340B entities." *Id.*

31. Under *Astra*, HRSA's exclusive administrative scheme contains only two pathways. First, the agency has direct enforcement power. If a manufacturer fails to provide 340B pricing when due, HHS may impose "civil monetary penalties." 42 U.S.C. § 256b(d)(1)(B)(vi). But these penalties are carefully circumscribed: They apply only to "knowing[ ] and intentional[ ]" violations, and fines "shall not exceed $5,000" per violation, *id.* §§ 256b(d)(1)(B)(vi)(II)–(III).[13] When HRSA determines that a violation has occurred, it refers the matter to the HHS Office of Inspector General (OIG) to determine "on a case-by-case basis" whether monetary penalties are warranted. 82 Fed. Reg. 1,210, 1,221 (Jan. 5, 2017).

32. Second, HRSA maintains an Administrative Dispute Resolution (ADR) process for disputes between manufacturers and covered entities. 42 U.S.C. § 256b(d)(3). Manufacturers may bring ADR claims alleging that a covered entity has illegally diverted 340B-priced drugs to non-patients or claimed discounts that duplicate MDRP rebates. *Id.*; *see also id.* §§ 256b(a)(5)(A)–(B) (prohibiting these practices). Before bringing an ADR claim, though, manufacturers must complete a statutory audit process. *Id.* § 256b

---

[13] HHS adjusts this amount annually for inflation. 45 C.F.R. § 102.3.

VERIFIED COMPLAINT – Page 10

(d)(3)(B)(iv).

33.     Covered entities may bring ADR claims alleging that a manufacturer has overcharged the entity or unduly "limited [its] ability to purchase covered outpatient drugs at" the 340B price.  42 C.F.R. § 10.21(a)(1).  An overcharge occurs whenever an order for a 340B-eligible unit of a drug "results in [the] covered entity paying more" than the 340B price.  *See id.* § 10.11(b).

**Contract Pharmacies**

34.     A covered entity's profits from the 340B Program are driven by the number of drug units the covered entity can claim were dispensed to its patients.  Each time this occurs, it creates an opportunity for the covered entity to buy a unit at the 340B price and demand reimbursement at a much higher commercial rate.  Long et al., *supra* n.4, § IV.

35.     Originally, the only way to trigger 340B discounts was for a patient to purchase a drug from a covered entity's in-house pharmacy.  *See* 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996).  That is consistent with the 340B statute, which "suggests that [Congress] had in mind one-to-one transactions between a covered entity and a drug maker." *Sanofi*, 58 F.4th at 704–706.

36.     Not all covered entities have an in-house pharmacy, however.  61 Fed. Reg. at 43,550.  And even a covered entity with an in-house pharmacy can make more money from the 340B Program when more units of drug dispensed at more pharmacies are claimed by the covered entity to trigger the 340B discount.  That's where "contract pharmacies" come in.  A contract pharmacy is a for-profit, third-party pharmacy that contracts with covered entities to enable the latter to try to supercharge their ability to claim (rightly or wrongly) 340B discounts.

37.     A contract pharmacy dispenses drugs to any customer with a prescription. Some of these pharmacy customers will inevitably have visited one or more covered entities for medical care at one time or another.  The covered entity purports to match pharmacy

VERIFIED COMPLAINT – Page 11

customers to the names of people who have previously visited the covered entity—even if the visit was for an unrelated condition, or occurred many years earlier, or both—so that the covered entity can try to claim the pharmacy customer is also its "patient." To do that, the parties often employ a for-profit third-party administrator, whose job is to sift oceans of data, looking for these purported matches.

38. By the time a purported match is found, the customer has long since left the pharmacy with her drug. The covered entity therefore needs a *retroactive* method of claiming 340B pricing for that unit. Multiple retroactive pricing mechanisms exist, and they have become the dominant way for covered entities to claim 340B pricing.

39. The most common retroactive pricing method is called the replenishment model. HELP Comm. Report, *supra* n.3, at 31. It works like this:

a. The pharmacy first purchases units of a drug at the commercial price. The pharmacy places these units in its common inventory—that is, the pharmacy maintains no distinction between "340B" drugs and other drugs.

b. Over time, the pharmacy dispenses these units from its common inventory whenever a customer arrives at the pharmacy counter with a prescription. The pharmacy does so without regard to whether the customer is a patient of the covered entity or whether the prescription is 340B-eligible.

c. A third-party administrator gathers claims data from both covered entities and contract pharmacies to analyze prior dispenses to assess which of them it thinks *could* have been 340B-eligible. That call is made through an opaque algorithm that drug manufacturers never see. And the third-party administrator is incentivized to "find" 340B eligibility as often as possible because it (like contract pharmacies) gets paid based on the number of "matches" it reports.

d. When the third-party administrator purports to identify a certain number of 340B-eligible transactions, the covered entity (or sometimes the contract

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

pharmacy or third-party administrator) orders "replenishment" units of the drug at the discounted 340B price.

e.     The pharmacy places the replenishment drug purchased at the 340B price in its common inventory, to be dispensed to the next customer who walks in the door with that prescription—whether the new customer is a supposed patient of the covered entity or not. And the cycle begins all over again.

40.     The replenishment model (like all retroactive pricing models) is based on an accounting trick. The upshot is that 340B drugs are dispensed without regard to 340B eligibility. A unit may receive 340B pricing based on the identification of a previously dispensed drug—often one dispensed long ago—as ostensibly 340B-eligible. But a pharmacy that receives 340B-priced drugs does not treat that inventory as belonging to the 340B Program, and it acquires the same drugs at commercial prices irrespective of the 340B Program.

41.     Pharmacy customers, for their part, almost always pay whatever price their insurance ordinarily requires, without regard to whether their prescription was the trigger for 340B eligibility. Indeed, pharmacy customers "are often unaware that they have participated in the 340B Program at all."[14]

42.     Because the replenishment model is based on a retroactive price adjustment implemented through a separate purchase of a different unit of drug, there is no such thing as a singular "340B drug" for all purposes. The discounted nature of a single unit of drug shifts over time, because drugs bought at the commercial price are later deemed to be eligible for 340B pricing, and drugs purchased at 340B pricing are dispensed in transactions that are not eligible for the discount.

---

[14] Neal Masia, Alliance for Integrity & Reform, *340B Drug Pricing Program: Analysis Reveals $40 Billion in Profits in 2019* 2 (May 2021), https://tinyurl.com/7cc3dw2t.

VERIFIED COMPLAINT – Page 13

McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**HRSA's Contract Pharmacy Guidance**

43.    In 1996, HRSA issued guidance allowing covered entities to use *one* contract pharmacy as a way of permitting covered entities without an in-house pharmacy to access 340B pricing.  61 Fed. Reg. at 43,555.  This system persisted until 2010, when "HRSA swerved" by opining that covered entities could instead "contract with an *unlimited* number of outside pharmacies . . . regardless of whether the entities have in-house pharmacies." *Novartis*, 102 F.4th at 457 (citing 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010)) (emphasis added).[15]

44.    HRSA's 2010 guidance had dramatic consequences for the 340B Program. When this guidance was issued, total 340B spending was about $6.6 billion.[16]  By 2024 (the last year of data available) that spending had multiplied more than *twelvefold*, reaching over $81.4 billion.[17]  In the last seven years of data alone, the 340B Program grew by over 174 percent—far outpacing the growth rate for drug sales in general.[18]  The 340B Program is now significantly larger than Medicaid and Medicare Part B, even though access to those

---

[15] HRSA's 1996 guidance still requires that contract pharmacies act as a covered entity's agent in dispensing 340B-priced drugs, with the covered entity maintaining title until the drug is dispensed.  61 Fed. Reg. at 43,553–54.  But the replenishment model may make it impossible for covered entities to abide these strictures.  A covered entity cannot necessarily maintain title to a "replenishment" unit of a drug, for example, because the unit may later be dispensed to a non-patient of that covered entity, *supra* ¶ 39(e)—and if that unit were deemed to still belong to the covered entity, this sale would be illegal diversion, *see* 42 U.S.C. § 256b(a)(5)(B).  Accordingly, the few public examples of contract pharmacy agreements appear to disclaim compliance with these agency-and-title requirements.  *E.g.*, 340B Contract Pharmacy Services Agreement – ReCept Pharmacy for the DCHHS Sexual Health Clinic, 340B Drug Pricing Program § 3.2 (Oct. 1, 2019) ("[The covered entity] shall purchase 340B Drugs . . . and shall hold title to such drugs from the time the Supplier fills the order from [the contract pharmacy] made on behalf of the [covered entity] *until the time that* [*the contract pharmacy*] *takes delivery of the drugs*." (emphasis added)), https://tinyurl.com/4x2hssf4; Pharmacy Services Agreement Between the County of Monterey & CVS Pharmacy, Inc. § 26 (Oct. 4, 2019) (denying that the contract creates an "agency . . . relationship among or between the parties"), https://tinyurl.com/crzwcvyw.

[16] Rebecca Sachs & Joshua Varcie, Congressional Budget Off., *Spending in the 340B Drug Pricing Program, 2010 to 2021* 2 (June 17, 2024), https://tinyurl.com/ykt2d4v9.

[17] Adam Fein, *340B Hit $81 Billion in 2024 (+23%): Why CMS and the IRA Are Poised to Cool the Program's Runaway Growth* (Dec. 15, 2025), https://tinyurl.com/bdhd6rh2.

[18] Rory Martin & Harish Karne, *The Size & Growth of the 340B Program in 2024* 2 (May 2025), https://tinyurl.com/22hsx4sj.

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

programs is supposed to be the incentive for manufacturers to participate in the 340B Program.[19]

45.     There can be no doubt that HRSA's 2010 guidance triggered much of this growth.  The number of contract pharmacy arrangements exploded during the same period.  In 2010, covered entities collectively had about 1,300 contract pharmacy locations;[20] now, that figure is about 35,000.[21]  Multiple independent analyses—including from a Senate committee and the Congressional Budget Office—have also confirmed that the increase in contract pharmacy arrangements "fueled rapid program growth."[22]

46.     This connection between unlimited contract pharmacy arrangements and 340B Program growth is also unsurprising.  Each party that facilitates retroactive 340B pricing has a strong incentive to claim as many 340B-eligible transactions as possible:  As the D.C. Circuit has explained, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Novartis*, 102 F.4th at 457–458.  More contract pharmacies and third-party administrators participating in the 340B Program means more middlemen seeking their cut of these profits.

47.     This incentive structure has made big business out of purporting to identify 340B-eligible transactions.  A handful of massive for-profit pharmacy chains and pharmacy

---

[19]  *See* 42 U.S.C. §§ 1396r-8(a)(1), (5)(A); Long et al., *supra* n.4, § II.

[20]  Government Accountability Off. (GAO), *340B Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement*, GAO-20-212 at 2 (Jan. 2020) (GAO 2020 Report), https://www.gao.gov/assets/gao-20-212.pdf

[21]  *See* Milena Sullivan et al., *Contract Pharmacy Trends May Help Inform 340B Reform Debate*, Avalere Health (June 10, 2024), https://tinyurl.com/3umyyrvc.

[22]  Long et al., *supra* n.4, at § II; *see also, e.g.*, HELP Comm. Report, *supra* n.3, at 32–33 (finding "significant increases in 340B sales to contract pharmacies compared to direct sales to [covered entities]"); Congressional Budget Off., *Growth in the 340B Drug Pricing Program* 19 (Sep. 2025) ("The expanded use of contract pharmacies increased the proportion of prescriptions for which 340B facilities received a 340B discount."), https://tinyurl.com/4j45ybvn.

VERIFIED COMPLAINT – Page 15

MᴄNᴀᴜʟ Eʙᴇʟ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

benefit managers now dominates the contract pharmacy industry.[23]   These corporate interests siphon about 16 percent of *all* 340B revenue—a share so large that some covered entities have reported a "net loss" on 340B transactions "as a result of their high external operational costs."[24]   Meanwhile, major pharmacy chains CVS and Walgreens have warned investors that changes to contract pharmacy arrangements would materially hurt their bottom lines.[25]

48.   These intermediaries' work occurs largely in secret.   Under retroactive pricing models, covered entities typically do not tell manufacturers which specific transactions they have identified as 340B-eligible or why—either before or after demanding 340B pricing for a past purchase.   In other words, the covered entities and their for-profit partners demand that manufacturers offer massive discounts without providing basic documentation showing the sale's eligibility.

49.   Predictably, the increase in contract pharmacy arrangements has also spawned increasing compliance failures in the 340B Program, as the federal government has repeatedly recognized.   HHS OIG, for example, found that the proliferation of contract pharmacies "create[s] complications in preventing" both unlawful "diversion" and "duplicate discounts."[26]   GAO, too, has noted that drug dispenses at contract pharmacies often do not produce data that allows manufacturers "to detect potential duplicate discounts."   GAO 2020 Report, *supra* n.20, at 32–33.   In short, 340B "discount errors" have

---

[23] Adam Fein, *EXCLUSIVE: For 2023, Five For-Profit Retailers & PBMs Dominate an Evolving 340B Contract Pharmacy Market*, Drug Channels (July 11, 2023), https://tinyurl.com/5n6hfmtd.

[24] Minnesota Dep't of Health, *340B Covered Entity Report* 9, 25 (Nov. 25, 2024), https://www.health.state.mn.us/data/340b/docs/2024report.pdf.

[25] CVS Health, *2025 Annual Report* 22 (Feb. 10, 2026) ("A reduction in Covered Entities' participation in contract pharmacy arrangements, a reduction in the use of the Company's administrative services by Covered Entities . . . could materially and adversely affect the Company."), https://tinyurl.com/ynrvt7vn; Walgreens Boots Alliance, *2024 Annual Report* 35 (Oct. 15, 2024) (similar), https://tinyurl.com/32nssxjm.

[26] HHS OIG, *Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431 at 5 (Feb. 4, 2014), https://tinyurl.com/2nmdrcey.

VERIFIED COMPLAINT – Page 16

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

become "likely" and "duplicate discounts" are now "quite common."[27]   And these "transparency and oversight concerns . . . prevent 340B discounts from translating to better access or lower costs for patients."  HELP Comm. Report, *supra* n.3, at 38.

**The Importance of Claims Data**

50.     The retroactive nature of the replenishment model means that manufacturers have little information about covered entities' purported bases for claiming 340B pricing on any particular units.  Manufacturers typically are unable to tell which unit of drug nominally triggered the need for a retroactive discount, let alone which pharmacy customer the unit was associated with.  Manufacturers therefore lack basic insight into which covered entities are stretching the bounds of federal 340B requirements to claim discounts to which they are not entitled.

51.     Claims data also are necessary for manufacturers to access the federal ADR process.  Before a manufacturer can bring an ADR claim, it must first complete an audit.  42 U.S.C. § 256b(d)(3)(A).  The 340B statute gives manufacturers the right "to audit . . . the records of [a covered] entity that directly pertain to the entity's compliance" with the statute's prohibitions on duplication and diversion.  *Id.* § 256b(a)(5)(C).  By regulation, however, HRSA requires manufacturers to first show "reasonable cause" to initiate an audit.  61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996).  To do that, a manufacturer must adduce "sufficient facts and evidence in support" of its belief that the covered entity has violated a compliance obligation.  *Id.*  Thus, Congress's entire remedial system for manufacturers— audits and ADR claims—is gated behind this initial information-gathering requirement.

52.     Claims data can alert manufacturers in the first instance of the need "to ask [HRSA] for an audit."  *Drummond*, 808 F. Supp. 3d at 1278.  Claims data can help persuade HRSA that the manufacturer has demonstrated the "reasonable cause" necessary to begin

---

[27]  House Energy & Com. Comm*., Review of the 340B Drug Pricing Program* 36 (Jan. 10, 2018), https://tinyurl.com/58rpjkfv.

VERIFIED COMPLAINT – Page 17

McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

an audit. *Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 453 (S.D. W. Va. 2024). And if HRSA finds sufficient cause to initiate an audit, the covered entity may sue to challenge HRSA's finding of "reasonable cause."[28] Possessing robust claims data that illuminate the covered entity's 340B activities can help the agency—or the manufacturer as an intervenor—defend this decision, ensuring that manufacturers may access statutory remedial processes as Congress intended.

53.     Historically, this system has proven difficult for manufacturers to navigate. According to HRSA's Director of the Office of Pharmacy Affairs, the agency approved just 37 audit plans in *over a decade*—and only 18 of those audits were successfully completed.[29] HRSA's recent rulemaking thus noted the "infrequency of finalized manufacturer audit reports," identifying only *two* between November 2022 and April 2024. 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024).

## II.     Novartis's Contract Pharmacy Policies and Related Litigation

54.     Following HRSA's 2010 contract pharmacy guidance, Novartis became concerned about the seemingly endless growth of contract pharmacy arrangements and their abuses of the 340B Program. As that growth rapidly accelerated in recent years, Novartis implemented policies placing reasonable limitations on contract pharmacy arrangements, aiming to mitigate their harms and to restore contract pharmacies to the place they historically occupied in the 340B Program.

55.     Novartis implemented its first contract pharmacy policy in late 2020. Under that policy, Novartis honored contract pharmacy arrangements only if the third-party

---

[28] *See, e.g.*, *Oregon Health & Sci. Univ. v. Engels*, 24-CV-2184 (D.D.C. filed July 24, 2024); *Maine General Med. Ctr. v. Engels*, 24-CV-2187 (D.D.C. filed July 24, 2024); *University of Rochester v. Engels*, 24-CV-2268 (D.D.C. filed Aug. 1, 2024); *Children's Nat'l Med. Ctr. v. Engels*, 24-CV-2563 (D.D.C. filed Sept. 6, 2024); *University of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (D.D.C. filed Oct. 22, 2024); *University of Kan. Hosp. Auth. v. Kennedy*, No. 25-CV-549 (D.D.C. filed Feb. 24, 2025).

[29] Declaration of Chantelle Britton, *University of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (D.D.C. Dec. 20, 2024), ECF No. 22-1 ¶ 15.

VERIFIED COMPLAINT – Page 18

MᴄNᴀᴜʟ Eʙᴇʟ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

pharmacy was within 40 miles of the covered entity. But Novartis exempted federal grantees[30] and permitted other covered entities to request exemptions if justified by a specific need. Novartis also requested—but did not require—that covered entities give Novartis basic claims data.

56. Covered entities complained to HRSA. Letter from HRSA to Novartis at 1 (May 17, 2021), https://tinyurl.com/d34r9ajp. In response, HRSA initially took the position that Novartis's policy violated the federal 340B statute. *Id.* HRSA claimed that "[n]othing in the 340B statute grants a manufacturer the right to place conditions" on offers to provide drugs at 340B prices. *Id.* So HRSA threatened Novartis with civil monetary penalties and ordered Novartis to "plan to restart selling, without restriction, 340B covered outpatient drugs at the 340B price to covered entities with contract pharmacy arrangements." *Id.* at 2.

**Federal Litigation**

57. Novartis challenged HRSA's 2021 letter as inconsistent with the federal 340B statute. *Novartis Pharms. Corp. v. Espinosa*, No. 1:21-CV-1479 (D.D.C. filed May 31, 2021). The U.S. District Court for the District of Columbia set aside HRSA's letter. *Id.*, 2021 WL 5161783 (D.D.C. Nov. 5, 2021). It rejected HRSA's position that the federal 340B statute "prohibit[s] . . . manufacturers from imposing any conditions on their offers of 340B-priced drugs to covered entities." *Id.* at *9 (emphasis omitted).

58. Novartis updated its contract pharmacy policy in 2023. Under that policy, Novartis would provide 340B-priced drugs directly to covered entities with an in-house pharmacy. Covered entities without an in-house pharmacy could select one contract

---

[30] Federal grantees are specific types of covered entities, most notably federally qualified health centers (FQHCs) and FQHC lookalikes. *See generally* 42 U.S.C. § 1396d(*l*)(2)(B); Janet Weiner, *Community Health Centers & Value-Based Payment* 2 (April 2024), https://tinyurl.com/bdd5zb78. Novartis exempts grantees because—unlike other covered entities—they often *do* pass on 340B discounts to their patients. HELP Committee Report, *supra* n.3, at 2.

VERIFIED COMPLAINT – Page 19

pharmacy where Novartis would provide 340B pricing. Novartis also again requested that covered entities provide claims data.

59. About a year later, the U.S. Court of Appeals for the D.C. Circuit affirmed the district court's decision setting aside HRSA's 2021 letter. *Novartis*, 102 F.4th 452. It "reject[ed] HRSA's position that section 340B prohibits drug manufacturers from imposing any conditions" on the use of contract pharmacies. *Id.* at 459. HRSA had argued that the statute does not expressly tell manufacturers they may impose such conditions. But the D.C. Circuit concluded that Congress acted deliberately, and "this silence preserves—rather than abrogates"—manufacturers' discretion to impose reasonable conditions. *Id.* at 460. Among other problems, HRSA's contrary reading would have "categorically requir[ed] manufacturers to deal with an unlimited number of contract pharmacies"—an obligation not found in the federal statute. *See id.* at 462.

60. Despite referring to statutory "silence," the D.C. Circuit did not suggest that the federal 340B statute leaves manufacturers' ability to condition 340B pricing *unregulated*. Rather, the federal 340B statute requires manufacturers to "offer each covered entity covered outpatient drugs for purchase" at or below the "ceiling price." 42 U.S.C. § 256b(a)(1). That requirement prevents manufacturers from imposing conditions so onerous that they amount to a failure to make a "bona fide offer"—for example, if the conditions "effectively increase the contract 'price,' thus perhaps nudging it above the statutory ceiling." *Novartis*, 102 F.4th at 462. But within the range of bona fide offers, Congress affirmatively and intentionally granted "private parties" the right to "act freely" in agreeing to contractual terms. *See id.* at 460.

61. The D.C. Circuit expressly held Novartis's updated contract pharmacy policy lawful. It reasoned that limiting covered entities to in-house pharmacies or to "a single contract pharmacy . . . neither precludes Novartis from making a bona fide 'offer'

VERIFIED COMPLAINT – Page 20

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

nor increases its contract 'price.' " *Novartis*, 102 F.4th at 463–464.  That condition on 340B sales is "consistent with historic practices under the section 340B Program." *Id.* at 464.

62.     The Third Circuit reached a similar conclusion regarding other manufacturers' policies.  Surveying the text, context, and history of the 340B statute, it concluded that federal law does not "requir[e] delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 704–706.  The court pointed out, for example, that Congress had rejected a bill that would have required manufacturers to provide discounts at contract pharmacies, and that "Section 340B's statutory neighbor" contains a similar requirement, showing that Congress purposely rejected the requirement HRSA advocated.  *Id.* at 704–705.

**Novartis's Current Policy**

63.     Novartis has since updated its contract pharmacy policy to reflect these decisions.  Ex. 1 (Novartis Contract Pharmacy Policy).  Three aspects of this policy are most relevant here.

64.     First, consistent with the D.C. Circuit's decision, Novartis recognizes that a covered entity without an in-house pharmacy may use one contract pharmacy, but Novartis otherwise provides 340B pricing only on covered entities' direct purchases.

65.     Second, and also consistent with the D.C. Circuit's decision, a covered entity must provide basic claims data—such as the specific transaction for which the discount is claimed, the drug dispensed, the pharmacy name, and the prescriber name—showing that the pharmacy customer actually was a patient of the covered entity.

66.     Third, federal grantees are still exempted from Novartis's policy. *See supra* n.30.

III.    **Washington Enacts Its Own 340B Legislation**

67.     The Washington State Legislature recently enacted S.B. 5981, explicitly creating new state-level 340B obligations.  S.B. 5981 does not even try to conceal its federal

VERIFIED COMPLAINT – Page 21

subject matter; it defines its key terms solely by reference to "42 U.S.C. Sec. 256b." S.B. 5981 §§ 2(1)–(2). In short, S.B. 5981 attempts to outlaw contract pharmacy policies like Novartis's—the same kinds of contract pharmacy policies approved by the courts in *Novartis* and *Sanofi*.

**Contract Pharmacy Requirements**

68. S.B. 5981 regulates drug pricing. It does this by requiring manufacturers to provide a *discounted* drug in situations where they would otherwise provide a commercially priced drug.

69. The first section of the new law explains the legislature's reasons for acting. The legislature claimed that "prohibiting drug manufacturers from imposing restrictions on 340B covered entities is necessary to ensure the integrity of the 340B program." S.B. 5981 §1(8). The legislature then set about to alter the requirements imposed on manufacturers who participate in the federal 340B program by layering new state requirements on top of federal law, purportedly to shore up the federal program and to increase covered entities' "financial savings." *Id.* § 1(7)–(8).

70. Start with S.B. 5981's definition of a "340B drug." This term is defined in the state statute to mean a "drug that has been subject to an offer for reduced prices by a manufacturer under" *federal* law. S.B. 5981 § 2(1). In other words, the term "340B drug" is a stand-in for a discounted unit of a drug—a drug that is otherwise identical to commercially priced units of the same drug. *Drummond*, 808 F. Supp. 3d at 1276; *Morrisey*, 760 F. Supp. 3d at 455–456.

71. To put this in concrete terms: Novartis's drug ENTRESTO® is sold at commercial prices to most purchasers. But when ENTRESTO is sold to 340B covered entities and dispensed to their patients, Novartis sells it at the 340B price. In those circumstances (and only those circumstances), individual units of ENTRESTO count as a "340B drug" under the state's definition. S.B. 5981 § 2(1). In this way, ENTRESTO can

VERIFIED COMPLAINT – Page 22

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

be either a "340B drug" or a non-340B drug under the state statute, depending on the purchaser and other fact-specific circumstances. The same is true of almost all drugs in Novartis's portfolio.

72. The state law's key language then forbids manufacturers to "directly or indirectly" "deny, restrict, or prohibit" a contract pharmacy's "acquisition of a *340B drug*." S.B. 5981 § 3(1) (emphasis added). The use of the defined term "340B drug" is key because manufacturers like Novartis are already selling the same drugs to the same pharmacies at commercial prices, even under their contract pharmacy policies. By requiring manufacturers to provide a "340B drug" instead of a commercially priced drug, S.B. 5981 requires manufacturers to *charge 340B prices* for drugs delivered to those pharmacies. That is so even though federal law purposely allows manufacturers to provide 340B pricing at only one contract pharmacy per covered entity.

73. Although the state law also uses the term "delivery" in reference to 340B-priced drugs, S.B. 5981 § 3(1), it is critical to understand that S.B. 5981 would change nothing about physical delivery of drugs—not the volume of drugs dispensed in Washington, not the places where those drugs are dispensed, and not the methods used to transport those drugs. Under Novartis's contract pharmacy policy, the same units of the same drugs are already being delivered to the same pharmacies at commercial prices, where they will be dispensed to the same customers at the prices normally paid.

74. Nor does S.B. 5981 affect Washington patients' access to drugs. Recall that under retroactive pricing models, contract pharmacy arrangements are based on an accounting fiction. Pharmacies do not try to identify 340B-eligible drugs until long after a drug has been dispensed. A third-party administrator culls through data after the fact and tries to match up *prior* dispenses to pharmacy customers with the names of covered entities' patients. And when the covered entity claims the discount based on that prior dispense, it is not shared or passed on to the pharmacy customer.

VERIFIED COMPLAINT – Page 23

75. A concrete example of S.B. 5981's operation might look like this:

a. Suppose a person visits a Washington clinic for a routine checkup. Years later, the same person fills an unrelated prescription for a Novartis product at a CVS pharmacy—but not the clinic's one designated contract pharmacy.

b. Under federal law alone, the transaction remains simple: The pharmacy pays the commercial price for the drug; the customer pays the co-pay set by her insurer; and the clinic pays nothing—because it plays no role in the transaction.

c. But under S.B. 5981, the clinic can use the replenishment model to retroactively transmogrify the same transaction into a fictional 340B-priced sale. The clinic can demand that a 340B-priced "replenishment" unit be shipped to the pharmacy instead of a commercially priced drug, and the pharmacy would then pay the clinic for the drug (minus a finder's fee).

d. The pharmacy customer would have paid the same co-pay. But the manufacturer would have been forced to give a 340B discount that was not owed under federal law, and the clinic and its middlemen could then "divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Novartis*, 102 F.4th at 457.

76. The purpose and effect of S.B. 5981 are to provide a greater subsidy to covered entities in Washington. When a covered entity is free to leverage an unlimited number of contract pharmacy arrangements, it may engage in more of these buy-low-sell-high transactions that earn revenue for the covered entity (and its for-profit, middleman partners). Long et al., *supra* n.4, at §§ III–V(A); *supra* ¶¶ 34–42. Even the state law itself recognizes this: The Legislature found that S.B. 5981 would increase "the financial savings" that Washington covered entities extract from the 340B Program. *See* S.B. 5981 § 1(7).

VERIFIED COMPLAINT – Page 24

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

77.     In this way, S.B. 5981 seeks to expand the subsidy manufacturers are required to provide under the federal 340B Program—using Medicaid and Medicare Part B as leverage.

**Restrictions on Data Collection**

78.     S.B. 5981 also purports to make it unlawful for a manufacturer to "require a covered entity to submit any claims, utilization, purchasing, or other data as a condition" of the manufacturer's offers to sell 340B-priced drugs.  S.B. 5981 § 3(2).  This provision targets the part of Novartis's contract pharmacy policy requiring covered entities to "upload their claims data" to an electronic platform."  Ex. 1 at 1.

79.     The Washington law exempts "data sharing" that is *required* by the federal government.  S.B. 5981 § 3(2).  But this narrow carve-out does not include data that federal law authorizes, or even encourages, manufacturers to obtain.  For example, the D.C. Circuit has recognized that manufacturers *may* require claims data as a condition of purchasing 340B-priced drugs.  *Novartis*, 102 F.4th at 463–464.  S.B. 5981 would overturn that principle in Washington.  By forbidding collection of claims data specifically allowed under federal law, S.B. 5981 conflicts with federal law.

80.     S.B. 5981's claims data provisions also would frustrate efforts to make the federal 340B Program more transparent in Washington.  This would effectively create, as one court put it, "a system where the fox guards the hen house."  *Morrisey*, 760 F. Supp. 3d at 453.

**Enforcement Mechanisms and Penalties**

81.     S.B. 5981 backs up these changes to the 340B Program with severe penalties.

82.     The Washington law provides that violations of its 340B mandates shall be treated as "an unfair or deceptive act in trade or commerce and an unfair method of

VERIFIED COMPLAINT – Page 25

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

competition for the purpose of applying the consumer protection act."  S.B. 5981 § 4(2).  This finding opens a panoply of potential penalties:

a. First, a manufacturer can be subject to "a civil penalty of not more than $7,500 for *each* violation"—which could be interpreted to mean *each* drug sale the State deems subject to S.B. 5981.  *See* RCW 19.86.140 (emphasis added).

b. Defendant also has statutory power to "bring an action . . . as parens patriae on behalf of" Washington residents.  S.B. 5981 § 4(2).  Such actions can include treble damages plus attorney's fees and costs.  RCW 19.86.090.

c. Defendant has further power to enjoin violations of S.B. 5981. RCW 19.86.080.  This amounts to allowing the Washington Attorney General to *compel* manufacturers to offer 340B discounts on their drugs—a power not even HRSA possesses.  *See* 42 U.S.C. § 256b(d)(1)(B)(vi) (providing for monetary penalties).

d. A violation of an injunction can lead to a civil penalty of up to $125,000, far exceeding any sanction contemplated by federal law. RCW 19.86.140; *see, e.g.*, 42 U.S.C. § 256b(d)(1)(B)(vi)(II) (capping civil penalties at $5,000 for manufacturers' lack of compliance with the federal 340B Program).

83. On top of those potential penalties, S.B. 5981 authorizes private actions directly by covered entities.  S.B. 5981(4)(1).  These suits can lead to injunctions and civil penalties of "up to $5,000 *per day* for *each violation*," as well as attorneys' fees and costs. *Id.* (emphasis added).  The statute expressly provides that every "package of 340B drugs" sold at commercial prices or conditioned on claims data "constitutes a separate violation." *Id.*

84. Given the huge volume of drug transactions that could be deemed to fall within the 340B Program, *see supra* ¶¶ 44–49, these penalties could stack up to staggering amounts.

VERIFIED COMPLAINT – Page 26

## S.B. 5981 VIOLATES THE SUPREMACY CLAUSE

85.    "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme law of the land . . . anything in the . . . laws of any State to the contrary notwithstanding.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. art. VI, cl. 2).

86.    As relevant here, Congress may implicitly preempt state law by occupying a legislative field so thoroughly "as to make reasonable the inference that Congress left no room for the States to supplement it." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (quotation omitted).  State laws are also "preempted when they conflict with federal law," including by posing "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotation omitted). And states may not "discriminate against the Federal Government or those with whom it deals" by "regulat[ing] them unfavorably on some basis related to their governmental status." *United States v. Washington*, 596 U.S. 832, 838–839 (2022) (quotations omitted and alteration adopted).

87.    S.B. 5981 is unconstitutional under all of these principles.  The federal government agrees:  It has filed multiple amicus briefs explaining that laws like S.B. 5981 are "preempted by Section 340B" because they "interfere[ ] with Congress's design for the 340B Program."  Ex. 2 (U.S. Amicus Briefs) at 11, 15 (emphasis omitted).

**Federal Law Occupies the Field.**

88.    State laws are field-preempted in either of two scenarios: (1) where a "federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," and (2) where federal law creates "a framework of regulation so pervasive . . . that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (quotation omitted).  Both of those things are true here.

VERIFIED COMPLAINT – Page 27

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

89.    The first step, though, is to define the relevant field. *National Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 734 (9th Cir. 2016). To do so, courts look "to the effects of the [state] law" and assess its actual "impact . . . on the federal scheme." *See Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105 (1992); *see also Kurns v. Railroad Friction Prods. Corp.*, 565 U.S. 625, 632 (2012) (defining the field "on the basis of the physical elements regulated"). Because the inquiry is focused on how state and federal law interact, "the scope of a field deemed preempted by federal law may be narrowly defined." *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 367 (3d Cir. 1999); *see also, e.g.*, *Arizona*, 567 U.S. at 401 (defining the field as "alien registration"—not immigration more broadly).

90.    S.B. 5981 targets manufacturers' obligations under the federal 340B Program. It does not apply generally to all drug sales or to all transactions at Washington pharmacies. S.B. 5981 §§ 2(1)–(2). This, of course, is a subject already covered by federal law: If a manufacturer wishes to have its drugs reimbursed by Medicaid and Medicare Part B, it must accept the conditions imposed by the federal 340B statute—which Congress was required to spell out in advance. *Supra* ¶ 25. That is, the manufacturer must "offer each covered entity covered outpatient drugs for purchase at or below the [340B] price," 42 U.S.C. § 256b(a)(1), subject to reasonable conditions the manufacturer may place on that offer. *Novartis*, 102 F.4th at 462–463.

91.    Under S.B. 5981's regime, manufacturers would have to accept additional 340B burdens. Indeed, that was the entire point of the new law. S.B. 5981 § 1(8) ("The legislature . . . finds that prohibiting drug manufacturers from imposing restrictions on 340B covered entities is necessary to ensure the integrity of the 340B program"). In Washington, manufacturers must now recognize an unlimited number of contract pharmacy arrangements, S.B. 5981 § 3(1), and cannot require claims data, S.B. 5981 § 3(2), which increases the cost of participating in the federal 340B Program, *supra* ¶¶ 44–47. The effect

VERIFIED COMPLAINT – Page 28

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

of S.B. 5981, in other words, would be to "raise[ ] a manufacturer's price of admission to participate in Medicaid and Medicare Part B." *Drummond*, 808 F. Supp. 3d at 1273.

92. Thus, the relevant field is the scope of manufacturers' 340B obligations.

***Manufacturers' 340B Obligations Implicate Dominant Federal Interests.***

93. That field implicates two dominant federal interests.

94. First, as established by *Astra*, the federal government has a dominant interest in maintaining the nationwide uniformity of the 340B Program. When Congress intends federal law to operate the same way nationwide, state law must yield. In *Arizona*, for instance, the Supreme Court pointed to the "comprehensive and unified" nature of federal alien-registration requirements in finding the field "occupied by federal law." 567 U.S. at 401–402. Likewise, in *Montalvo v. Spirit Airlines*, the Ninth Circuit examined the "purpose, history, and language" of a federal statutory scheme, inferring field preemption from Congress's intent "to have a single, uniform system." 508 F.3d 464, 471 (9th Cir. 2007). And in *National Federation of the Blind*, the Ninth Circuit not only pointed to Congress's desire for nationwide consistency, but also explained why that desire matters for field preemption: A statute cannot "determine entirely the rights and obligations of affected parties" if a competing system might impose yet "another set of comprehensive regulations covering the same area." 813 F.3d at 732–733.

95. There can be no doubt that Congress intended the 340B Program to operate uniformly nationwide; that is exactly what the Supreme Court held in *Astra*. The Court rejected any effort to enforce purported 340B obligations outside of Congress's "unitary administrative and enforcement scheme." 563 U.S. at 120. Congress intended "centralized enforcement in the government," allowing HHS to "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 119–120 (quoting *Astra* Amicus Brief, *supra* n.12, at 32).

VERIFIED COMPLAINT – Page 29

MᴄNᴀᴜʟ Eʙᴇʟ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

96.     S.B. 5981 intrudes on this field by both creating *and* enforcing 340B obligations outside of the centralized system Congress designed.  This effect is underscored by the fact that S.B. 5981 has no force or meaning outside of the federal 340B Program.  If Congress were to repeal the federal 340B statute, S.B. 5981 would cease to have any effect.  *See, e.g.*, S.B. 5981 § 2(1) (citing 42 U.S.C. § 256b).  This state law, in other words, "is inherently federal in character" because it regulates relationships that "originate[ ] from, [are] governed by, and terminate[ ] according to federal law."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

97.     The federal government also has a dominant interest in the functioning of Medicaid and Medicare Part B.  S.B. 5981 would hurt that interest in two ways.  On the unit-by-unit level, this would occur as more drug sales are swept into the 340B Program's discounting requirement.  That means fewer transactions that would be eligible for Medicaid rebates, 42 U.S.C. § 256b(a)(5)(A)(i), which in turn means significantly less revenue to the federal government.  *Supra* ¶¶ 23–24.  This direct financial impact on the federal government would harm a "uniquely federal interest."  *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 507, 512 (1988) (state law preempted where it could "raise [the] price" of equipment purchased by the government).

98.     At the macro level, S.B. 5981 risks disincentivizing manufacturers from participating in these federal healthcare programs altogether.  By increasing the burdens of participating in the federal 340B Program, this state law risks "the deleterious effect of causing drug manufacturers to opt out of Medicaid and Medicare Part B."  *Drummond*, 808 F. Supp. 3d at 1277.  The federal government is concerned that this is already happening, Ex. 2 at 17 (noting that a manufacturer attributed its withdrawal to "recent legislative changes" (quotation omitted)).  As a result, the federal "interest in determining the costliness of Medicare and Medicaid participation could hardly be stronger."  *Id.* at 28.

VERIFIED COMPLAINT – Page 30

*Federal Law Regulates Manufacturers' 340B Obligations Pervasively.*

99.     As a separate basis for field preemption, federal law also already regulates manufacturers' 340B obligations pervasively.

100.    Federal law governs the 340B Program from soup to nuts.  The statute starts by defining the prices of drugs purchased under the program, 42 U.S.C. §§ 256b(a)(1)–(2), the drugs eligible for that pricing, *id.* § 256b(a)(3), the entities entitled to receive that pricing, *id.* § 256b(a)(4), and the compliance obligations those entities accept, *id.* § 256b(a)(5).

101.    From there, the statute directs HHS to create a program to effectuate "distribution" of 340B-priced drugs, 42 U.S.C. § 256b(a)(8), and a "single, universal, and standardized" system for "facilitating the ordering, purchasing, and delivery" of 340B-priced drugs, *id.* § 256b(d)(2)(B)(iv).  HHS has done so via the Prime Vendor Program, intended to be a "central source overseeing distribution" under HRSA's ultimate oversight.[31]

102.    On the back end, federal law creates a comprehensive enforcement system, including direct enforcement by HHS, 42 U.S.C. § 256b(d)(2)(B)(v), and adjudications of both "claims by covered entities" and "claims by manufacturers" in the ADR process, *id.* § 256b(d)(3)(A).

103.    HHS has expanded on these requirements by regulation.  42 C.F.R. §§ 10.1–10.25.

104.    This regulatory suite "provide[s] a full set of standards . . . , including the punishment for noncompliance."  *Arizona*, 567 U.S. at 401.  Through these comprehensive tools, Congress has already "equipped [HHS] adequately to address the precise concerns S.B. 5981 purports to manage."  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 309 (1988).  Field preemption follows directly from that conclusion.  *E.g.*, *id.*; *National Fed'n*

---

[31] Apexus, *About Apexus* (last visited March 25, 2026), https://tinyurl.com/yck4v9aj.

VERIFIED COMPLAINT – Page 31

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

*of the Blind*, 813 F.3d at 735 (noting that federal law addressed the relevant question "in great detail"); *Montalvo*, 508 F.3d at 472–473 (noting that federal law comprehensively addressed the relevant subjects).

105. The federal statute's comprehensiveness is not undercut by the fact that S.B. 5981 purports to create novel obligations not found in federal law. A comprehensive federal scheme often reflects not only affirmative requirements, but also "considered decisions to refrain from mandating certain actions or protections." *National Fed'n of the Blind*, 813 F.3d at 733.

106. That is especially true of the 340B Program because of its Spending Clause nature. Regulated parties need clear, advance notice of what they are agreeing to do by joining the program. That is precisely why manufacturers who elect to participate in 340B sign a PPA spelling out the terms of the bargain. In this bargain, the things the 340B statute and PPA do *not* require are just as important as the things they *do* require: Both equally determine the sum total of Congress's conditions for accessing Medicaid and Medicare Part B. Any requirement not imposed by federal law reflects Congress's judgment that such "regulation simply should not be employed." *Schneidewind*, 485 U.S. at 306; *see* Ex. 2 at 12 ("Congress left no role for States in determining manufacturers' 340B obligations.").

**S.B. 5981 Obstructs Federal Law Several Times Over.**

107. S.B. 5981 is also invalid under obstacle-preemption principles. This state law impedes "the full purposes and objectives of Congress" and "interferes with the methods by which the federal statute was designed to reach [its] goal[s]." *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987) (quotation omitted).

108. S.B. 5981 obstructs Congress's purposes and objectives in four main ways: (1) forbidding what federal law allows; (2) altering Congress's balance of benefits and burdens among 340B, Medicaid, and Medicare Part B; (3) inviting inconsistent

VERIFIED COMPLAINT – Page 32

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

adjudications regarding 340B obligations; and (4) heightening the penalties associated with 340B compliance.

**S.B. 5981 Outlaws Conduct That Federal Law Intentionally Permits.**

109. Federal law purposely gives manufacturers discretion to set reasonable limits on the use of contract pharmacies to claim 340B pricing, and Novartis has done just that. Ex. 1 at 1.

110. S.B. 5981 attempts to restrict that discretion by prohibiting manufacturers from limiting the number of contract pharmacies that they will recognize, and by forbidding manufacturers to condition access to 340B pricing on submission of claims data. S.B. 5981 § 3(1)–(2).

111. There can be no dispute that federal law allows Novartis to maintain its contract pharmacy policy. Two circuit courts have already held as much. In *Novartis*, the D.C. Circuit explained that manufacturers may restrict 340B pricing to drugs dispensed at "a covered entity's in-house pharmacy or [at] a single contract pharmacy designated by the covered entity." 102 F.4th at 463–464. And it confirmed that manufacturers may condition 340B pricing at contract pharmacies on the receipt of claims data, consistent with longstanding record-retention policies governing the 340B Program. *Id.* at 463. The Third Circuit approved the same requirements. *See Sanofi*, 58 F.4th at 701 (summarizing the contested policies).

112. HRSA is now applying the same understanding of federal law, and it has therefore recently rejected two ADR claims submitted by covered entities challenging Novartis's contract pharmacy policy as unlawful. Ex. 3 (November 2025 ADR Ruling) at 2 (finding "no overcharge violation" under "court rulings with respect to Novartis's policy"); Ex. 4 (June 2025 ADR Ruling) at 2 (similar); *see also* HRSA, 340B ADR Decision Summaries (last updated Mar. 9, 2026) (HRSA uniformly finding "no overcharge" in ADR petitions brought against Novartis and other manufacturers), https://tinyurl.com/5dht28c9.

VERIFIED COMPLAINT – Page 33

MᴄNᴀᴜʟ Eʙᴇʟ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

113.    These rulings reflect Congress's purposeful decision to give manufacturers discretion to implement policies like Novartis's.  After observing that federal law does not require delivery of 340B-priced drugs to unlimited contract pharmacies, the D.C. Circuit concluded "that this silence preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions."  *Novartis*, 102 F.4th at 460.  The Third Circuit likewise held that Congress "chose not to" require what S.B. 5981 requires, explaining that federal law "leav[es] drug makers discretion on delivery" of 340B-priced drugs.  *Sanofi*, 58 F.4th at 704–705.  As the federal government has explained, states cannot "achieve a contrary result" by passing their own laws.  Ex. 2 at 12.

114.    Permitting manufacturers to require basic claims data about the unit of drug on which the discount is claimed also serves vital federal objectives.  Manufacturers need these data to ensure access to the statutory audit and ADR procedures Congress created.  *Supra* ¶¶ 51–53.  As other courts have concluded in finding similar laws preempted, requiring claims data is "*the* way to detect possible [compliance violations]."  *Drummond*, 808 F. Supp. 3d at 1278; *see also Morrisey*, 760 F. Supp. 3d at 453.  Federal law therefore allows manufacturers to require covered entities to submit basic claims data demonstrating that transactions at contract pharmacies are eligible for 340B pricing.  *Novartis*, 102 F.4th at 463–464.

115.    When federal law intentionally gives regulated parties a choice, state law cannot take away that choice.  *See, e.g.*, *Geier v. American Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state could not mandate airbags where federal law permitted a "variety and mix of [passive-restraint] devices"); *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 675 (9th Cir. 2013) (state law cannot restrict options conferred pursuant to "significant federal regulatory objective[s]"); *Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473, 486 (state could not "disfavor[ ] the formation of [arbitration] agreements" allowed by federal law);

VERIFIED COMPLAINT – Page 34

*Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1167 (9th Cir. 2008) (state law cannot undermine a program's "federally-approved operation").

**S.B. 5981 Upsets Congress's Careful Balance of Interests.**

116.    S.B. 5981 also expands the universe of transactions for which manufacturers must provide 340B discounts, disrupting the delicate balance Congress created between burdens and benefits of participating in the 340B Program. *Supra* ¶¶ 24–25, 44–49.

117.    The primary purpose and effect of this state law is to expand the subsidy manufacturers must provide to Washington covered entities through the 340B Program. S.B. 5981 §§ 1(7)–(8).  No need to take our word for it.  In the text of the bill itself, the legislature found it "necessary" to prohibit manufacturers from "imposing restrictions on 340B covered entities"—to purportedly "ensure the integrity of the 340B program" and to increase covered entities' "financial savings." *Id.*  The problem with this stated purpose is that Congress "struck a delicate balance with the federal 340B Program." *Drummond*, 808 F. Supp. 3d at 1277; *see also* Ex. 2 at 23 ("When Congress set out the terms of the 340B Program, it made a series of policy choices concerning how much of a burden to impose on manufacturers and what benefits to offer covered entities.").

118.    The extent to which federal law requires manufacturers to offer 340B discounts is part of that balance.  "The Program is a bargain between drug manufacturers and the federal government whereby" manufacturers agree to this subsidy "in exchange for access to . . . Medicaid and Medicare Part B." *Drummond*, 808 F. Supp. 3d at 1277.  Thus, Congress "limited the scope of the 340B Program to ensure that the price of admission wasn't too high." *Id.*

119.    S.B. 5981 not only disturbs the policy tradeoffs Congress made, but also jeopardizes the entire interrelated scheme of federal healthcare programs. *Drummond*, 808 F. Supp. 3d at 1277.  As the federal government has noted in voicing its view that state 340B laws violate the Supremacy Clause:  When the costs of 340B participation increase,

VERIFIED COMPLAINT – Page 35

"rational manufacturers can be expected to withdraw"—as at least one manufacturer appears to have done already. Ex. 2 at 17. "Only the federal government can determine the extent to which it will tolerate [the] risk" to program stability caused by "manufacturer withdrawal." *Id.* "Patchwork state regulation" is no substitute for the "wide-angle study" HHS can employ, and the Government's "interest in determining the costliness of Medicare and Medicaid participation could hardly be stronger." *Id.* at 18, 22. This is precisely why Congress gave HHS exclusive 340B enforcement power. *Astra*, 563 U.S. at 119–120; Ex. 2 at 15.

120. State law "must yield to the extent that it clashes with the balance struck by Congress." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989); *see also, e.g.*, *Cohen v. Apple Inc.*, 46 F.4th 1012, 1029 (9th Cir. 2022) (state law preempted if it disrupts Congress's "balance among overlapping and potentially conflicting policies").

***S.B. 5981 Creates Conflicting Enforcement Procedures.***

121. S.B. 5981's parallel enforcement scheme independently obstructs federal law.

122. When a manufacturer's 340B compliance is questioned, federal law channels the claim down one of two paths: HHS may assess the appropriateness of sanctions, or a covered entity may bring an ADR claim. 42 U.S.C. §§ 256b(d)(1)(B)(vi), (d)(3)(A). Those two paths are exclusive. *Astra*, 563 U.S. at 121–122.

123. Washington now purports to create third *and* fourth enforcement paths: The Attorney General can surmise that a manufacturer should have provided 340B pricing on a particular drug and seek to enforce that view with hefty fines, treble damages, or even an injunction. S.B. 5981 § 4(2); RCW 19.86.080, 19.86.090, 19.86.140. Or—in entirely separate proceedings—Washington covered entities can try to enforce *their* view that a manufacturer should have provided 340B pricing on a particular drug, backed by the threat of colossal per-day damages and injunctions. S.B. 5981(4)(1).

VERIFIED COMPLAINT – Page 36

McNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

124.   This outcome is exactly the kind of "dispersed and uncoordinated" 340B enforcement effort *Astra* rejected for fear of producing "conflicting adjudications."  563 U.S. at 120.  That is particularly true here because of S.B. 5981's express provision for a private right of action—making the need for a declaratory judgment especially pressing in this case.  *See* Fed. R. Civ. P. 57.

125.   The overlap between state and federal law arises primarily from S.B. 5981's definitions of a "340B drug" and a "covered entity."  A 340B drug is defined under state law to mean "a drug that has been subject to an offer for reduced prices by a manufacturer under 42 U.S.C. Sec. 256b."  S.B. 5981 § 2(1).  A "covered entity" is defined under state law to mean "an entity authorized to participate in the federal 340B drug pricing program, as defined in 42 U.S.C. Sec. 256b(a)(4) as of the effective date of this section."  S.B. 5981 § 2(2).   Both state-law terms are thus defined solely by incorporating federal 340B requirements.

126.   These terms are incorporated into both of the statute's main mandates to manufacturers.  S.B. 5981 § 3(1)–(2).  For *every* alleged violation of these requirements, the State must prove that *every* federal 340B condition was satisfied, plus the additional conditions of state law.  The only way the Attorney General could prove that a manufacturer failed to deliver a 340B drug is to prove that the "the covered entity or contract pharmacy in question was [not] delivered drugs at the discounted rate."  *Drummond*, 808 F. Supp. 3d at 1278–79.  Put differently, S.B. 5981 is "an attempt by Washington to police potential overcharges."  *Id.*

127.   HRSA's ADR proceedings already cover the same conduct.   Covered entities may bring claims alleging they have been "overcharged by a manufacturer" or that the manufacturer has unduly "limited the covered entity's ability to purchase" 340B-priced drugs.  42 C.F.R. § 10.21(a)(1); *see also* Ex. 2 at 16 (federal government citing the same regulation).  In fact, proceedings to enforce S.B. 5981 may involve precisely the same units

VERIFIED COMPLAINT – Page 37

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

as ADR claims before HRSA.  In such instances, both the Washington Attorney General and HRSA would be attempting to answer the same question:  Was the manufacturer required to provide 340B pricing on a particular unit of a drug?

128.    This question is far from straightforward.  Federal law is riddled with nuanced eligibility issues implicating HRSA's unique expertise.  For just one example, consider the patient definition.  A unit of drug is not eligible for 340B pricing if it is dispensed to anyone who is not a "patient" of the covered entity.  42 U.S.C. § 256b(a)(5)(B).  The federal statute, however, does not define a "patient."  HRSA deems a person an entity's patient if

> [1] the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; and
>
> [2] the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements . . . such that responsibility for the care provided remains with the covered entity; and
>
> [3] [for federal grantees,] the individual receives a health care service or range of services from the covered entity which is consistent with the . . . range of services for which . . . funding . . . has been provided to the entity.

61 Fed. Reg. 55,156, 55,157–58 (Oct. 24, 1996).

129.    Needless to say, two decisionmakers could apply that fact-driven standard differently to the same transaction.  Yet to enforce S.B. 5981, the State must prove—transaction by transaction—that a commercially priced drug was dispensed by a contract pharmacy to a person who qualifies as a patient of the covered entity.  If the standard is not met, the drug is not a 340B drug because it cannot be "subject to an offer for reduced prices" under the 340B Program.  S.B. 5981 § 2(1).  And this singular eligibility condition is just the tip of the iceberg.

130.    S.B. 5981 therefore puts the Washington Attorney General on a collision course with nuanced federal questions that only HRSA can answer.  For example, how will

VERIFIED COMPLAINT – Page 38

McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Washington handle a pharmacy customer who had an appendectomy at a covered entity hospital two years ago, and who is now filling an antibiotic prescription for a sinus infection? What if that customer also gave birth at a different covered entity hospital five years ago? And what if *both* covered entities claim the discount on that same sale? There is no telling what position Defendant will take on questions like these—but take a position he must.

131. Moreover, S.B. 5981 provides no guidance about how to handle practical problems arising from these overlapping enforcement procedures. What will the State do if it is attempting to enforce S.B. 5981 against an alleged violation, but an ADR claim is already pending before HRSA regarding exactly the same units of a drug? Will the State await the outcome of the federal process before imposing sanctions? And what will Washington do if it punishes a violation, but HRSA later finds the manufacturer was *not* required to offer 340B pricing on the same unit? *See Morrisey*, 760 F. Supp. 3d at 458 (risk of conflicting adjudications was substantial because there can be no "assurances" that "state actors would adopt a 'wait and see' approach" and defer state enforcement until after federal ADR proceedings had concluded).

132. Only one thing is certain: Contrary to Congress's design, HRSA will no longer "hold the control rein" if S.B. 5981 is permitted to take effect. *Astra*, 563 U.S. at 120. Congress intended to leave HRSA—not any state—"in control of § 340B's drug-price prescriptions." *Id.* at 114. Thus, as the federal government has explained, *Astra* "is particularly applicable in this context" because laws like S.B. 5981 "arrogat[e] to the State enforcement authority that properly belongs to the federal government alone." Ex. 2 at 16; *see also Morrisey*, 760 F. Supp. 3d at 458 (finding a similar state law preempted because it "runs counter to *Astra*'s holding").

133. State law is preempted when it detracts from exclusive enforcement authority Congress gave to a federal agency. *See, e.g.*, *Buckman*, 531 U.S. at 350 (state

VERIFIED COMPLAINT – Page 39

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

attempts to enforce federal law "inevitably conflict with [the agency's] responsibility to police [the same subject matter] consistently with the [agency's] judgment and objectives"); *Nexus Pharms., Inc. v. Central Admixture Pharm. Servs., Inc.*, 48 F.4th 1040, 1048 (9th Cir. 2022) (state law preempted where it "facilitate[d] enforcement beyond what the FDA has deemed appropriate"); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 762 (9th Cir. 2022) (en banc) ("Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption."); *Valle del Sol v. Whiting*, 732 F.3d 1006, 1027 (9th Cir. 2013) (state law "conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute"); *Chlorine Inst., Inc. v. California Highway Patrol*, 29 F.3d 495, 497–498 (9th Cir. 1994) (finding that state regulation contrary to "DOT's extensive regulation" of the same subjects would "foster[ ] confusion and frustrat[e] Congress' goal of developing a uniform, national scheme of regulation" (quotation omitted)).

***S.B. 5981 Introduces Novel Penalties.***

134.    Finally, harsh penalties exacerbate S.B. 5981's overlapping-enforcement problem.

135.    Congress carefully calibrated the consequences of 340B noncompliance: penalties for violations of 340B "shall not exceed $5,000"—and only for a manufacturer that "knowingly and intentionally" overcharges a covered entity.    42 U.S.C. § 256b(d)(1)(B)(vi).

136.    S.B. 5981 now raises the stakes:  huge per-day, per-transaction fines, treble damages, injunctions, attorney's fees, costs—and all with no indication of any scienter requirement.  S.B. 5981 §§ 4(1)–(2); RCW 19.86.080, 19.86.090, 19.86.140.

137.    When Congress selects a penalty, it has necessarily determined that a higher penalty "would be inappropriate."  *Arizona*, 567 U.S. at 406.

VERIFIED COMPLAINT – Page 40

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

138.   Yet again, S.B. 5981 second-guesses Congress's judgment.   This creates another basis for preemption:  S.B. 5981's additional penalties add further disincentives to 340B participation, putting Medicaid and Medicare Part B at greater risk.  *See Drummond*, 808 F. Supp. 3d at 1277; Ex. 2 at 16–18.

139.   State law is preempted where it brings "separate remedies . . . to bear on the same activity" for which federal law already specifies a penalty.  *Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (quotation omitted); *see also Crosby v. National Foreign Trade Council*, 530 U.S. 363, 380 (2000); *Arizona*, 567 U.S. at 406.

**S.B. 5981 Discriminates Against Participants in a Federal Program.**

140.   The Washington law also violates the Supremacy Clause by singling out manufacturers that participate in the 340B Program for "less favorable treatment" than manufacturers who do not participate.  *Washington*, 596 U.S. at 839 (quotation omitted).

141.   The oldest Supremacy Clause principle is the one Chief Justice Marshall set forth over 200 years ago in *McCulloch v. Maryland*:  States cannot "impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government."  17 U.S. (4 Wheat.) 316, 436 (1819).   This principle covers states' treatment of "those who deal with the federal government"—thus helping carry out federal legislative initiatives.  *Dawson v. Steager*, 586 U.S. 171, 177 (2019) (quotation omitted); *see also Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 387 (1960) (states cannot "discriminate against the Government or those with whom it deals").

142.   In agreeing to participate in the 340B Program, manufacturers deal directly with the federal government.  To "effectuate[ ] the statutory scheme" Congress created, manufacturers sign a PPA with the HHS Secretary.  *Example PPA*, *supra* ¶ 27, § VII(g). Pursuant to the PPAs, HHS exercises direct control over manufacturers' 340B conduct.  *See*

VERIFIED COMPLAINT – Page 41

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

*Astra*, 563 U.S. at 115–116. And for certain covered entities that receive federal grants, the subsidy manufacturers provide through the 340B Program also helps serve a federal function by helping to "stretch scarce federal resources." *See* H.R. Rep. No. 102-384(II), *12 (1992).

143. S.B. 5981 treats drug manufacturers that have signed a PPA differently from those that have not. The law's mandates apply only to sales that a manufacturer makes "under 42 U.S.C. Sec. 256b." S.B. 5981 §§ 2(1), 3(1)–(2). Even on its face, this state law targets "the federal 340B drug pricing program." S.B. 5981 § 1(1). But drug sales within the 340B Program represent just one part of overall drug spending. *See* HRSA, 2024 340B Covered Entity Purchases (last updated Dec. 2025), https://tinyurl.com/yuavb733. S.B. 5981 therefore leaves a large swath of drug sales, healthcare providers, and pharmacy transactions untouched.

144. S.B. 5981's requirements are also very costly for manufacturers. *Supra* ¶¶ 44–45. By imposing these additional burdens on manufacturers that participate in the federal 340B Program—but no other manufacturers—this Washington law "regulates [340B participants] unfavorably on some basis related to their governmental 'status.'" *Washington*, 596 U.S. at 839 (quoting *North Dakota v. United States*, 495 U.S. 423, 438 (1990) (plurality op.)).

145. This differential treatment of participants in a federal program might be permissible if Congress had clearly authorized it. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988). But the opposite is true here: "Congress left no role for States in determining manufacturers' 340B obligations." Ex. 2 at 12. And the federal government has explained that laws like S.B. 5981 are unconstitutional because they "impermissibly target[ ] and discriminate[ ] against" "manufacturers with 340B agreements," treating them "worse than manufacturers who do not participate in the 340B Program." *Id.* at 19–21. That is the core of what the Supremacy Clause forbids.

VERIFIED COMPLAINT – Page 42

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**S.B. 5981 VIOLATES THE DORMANT COMMERCE CLAUSE**

146.    S.B. 5981 is also an unlawful extraterritorial regulation in violation of the dormant Commerce Clause.

147.    The Commerce Clause grants Congress the power to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3.  That power carries with it a "negative" or "dormant" restriction:  Even where Congress has not exercised its commerce power, states are prohibited from unduly burdening or interfering with interstate commerce.  *See generally Comptroller of the Treasury of Md. v. Wynne*, 575 U.S. 542, 549–550 (2015) (quotation omitted).

148.    This principle "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642–643 (1982).  States must respect "the territorial limits of [their] authority under the Constitution's horizontal separation of powers." *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 n.1 (2023).

149.    S.B. 5981 attempts to regulate wholly out-of-state conduct by capping the prices of transactions between manufacturers and wholesalers.  To see how, it is necessary to carefully trace each step in the series of transactions that effectuate 340B pricing:

   a.    Rather than attempt to deal directly with many thousands of pharmacies, manufacturers sell their drugs to a handful of national wholesale distributors.  These sales occur at commercial prices, and at this point, no one can know which units of a drug may ultimately be subject to 340B pricing.

   b.    Wholesalers then resell those drugs to pharmacies.  As explained above, pharmacies place these drugs in their common inventories and do not attempt to segregate units that will ultimately be dispensed to alleged patients of a covered entity.

VERIFIED COMPLAINT – Page 43

McNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

c.      Pharmacies then dispense units of the drugs to their customers as they arrive at the pharmacy counter with a prescription—regardless of potential 340B eligibility.

d.      Some time after the pharmacy dispenses the drug, the covered entity—or maybe its contract pharmacy or third-party administrator—claims a prior dispense as 340B eligible.  When that occurs, it is the *wholesaler* who provides the 340B discount, often by shipping the pharmacy a new, discounted "replenishment" drug.

e.      The wholesaler then requests a refund from the manufacturer so the wholesaler can profit by selling the replenishment unit at the 340B price.

150.    S.B. 5981 regulates only the actions of manufacturers.  Like most manufacturers, Novartis is located outside of Washington, and upon information and belief, so are all of its wholesalers.  All transactions between Novartis and its wholesalers therefore occur outside of Washington.  By ordering manufacturers like Novartis to charge no more than a certain price in their transactions with wholesalers, S.B. 5981 seeks to "directly control[ ] commerce occurring wholly outside the boundaries of [the] State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

151.    Two federal courts of appeals have recently invalidated state laws that regulate the conduct of drug manufacturers taking place outside of the state.  In *Association for Accessible Meds. v. Ellison*, the court enjoined enforcement of a law insisting "that out-of-state manufacturers sell their drugs to wholesalers for a certain price."  140 F.4th 957, 960–961 (8th Cir. 2025).  Likewise, in *Association for Accessible Medicines v. Frosh*—a decision cited favorably by the Supreme Court in *Pork Producers*, 598 U.S. at 374—the Fourth Circuit held that a state price-control statute violated the dormant Commerce Clause because it targeted the "price the manufacturer or wholesaler charge[d] *in the initial sale of*

VERIFIED COMPLAINT – Page 44

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

*the drug*," rather than the "the price the . . . consumer ultimately pays." 887 F.3d 664, 671 (4th Cir. 2018).

152.    S.B. 5981 is invalid for the same reasons as the laws in *Ellison* and *Frosh*.

**IV.    S.B. 5981 Will Cause Novartis Imminent, Irreparable Harm.**

153.    Novartis will be irreparably harmed if S.B. 5981 is enforced.

154.    S.B. 5981 puts Novartis in a lose-lose situation:  If the law's enforcement is not enjoined, Novartis must decide whether to comply.  If Novartis does so, it will be forced to expend significant resources to achieve the law's mandates.  If it does not comply, it will risk significant penalties, including a fine of up to $125,000—on top of additional per-day, per-violation sanctions.  S.B. 5981 §§ 4(1)–(2); RCW 19.86.080, 19.86.090, 19.86.140. Being put to that choice by an unconstitutional law is an irreparable harm that warrants injunctive relief.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

155.    Being subject to an unconstitutional law is itself a significant irreparable harm. *See American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009) (finding irreparable harm from a risk of enforcement against "parties who were affected by an unconstitutional act").  That is especially so here, where S.B. 5981 undermines Novartis's ability to rely on rights conferred by federal law to structure its conduct. *See Novartis*, 102 F.4th at 463–464; *Sanofi*, 58 F.4th at 703–706.

156.    S.B. 5981 will also cause Novartis unrecoverable financial harms.  If Novartis is forced to comply with the law, it will lose millions of dollars annually by providing additional 340B discounts not required by federal law, as well as the administrative costs of compliance.  If Novartis does not comply—or even if the State ever takes the position that Novartis has not fully complied—Novartis must expend significant resources defending itself or its employees, on top of financial penalties that may be imposed. S.B. 5981 §§ 4(1)–(2); RCW 19.86.080, 19.86.090, 19.86.140.  Even if S.B. 5981

VERIFIED COMPLAINT – Page 45

MᴄNᴀᴜʟ Eʙᴇʟ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

is later deemed unlawful, Washington cannot be held directly liable for these damages because of its sovereign immunity.

157.   These unrecoverable financial losses constitute irreparable harm that supports an injunction.  *See, e.g.*, *NFIB v. OSHA*, 595 U.S. 109, 120 (2022); *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).

158.   For the same reasons, Novartis must divert substantial resources from research and development of new drug therapies whether or not it complies with S.B. 5981. These opportunity costs can never be regained.  Because these losses are impossible to measure, they constitute irreparable harm that supports an injunction.  *See, e.g.*, *Ameriprise Fin. Servs., LLC v. Kenoyer*, No. 2:24-CV-1675, 2024 WL 4591258, at *3 (W.D. Wash. Oct. 25, 2024) (granting a TRO where damages would be "difficult, if not impossible, to accurately calculate").

159.   Finally, S.B. 5981 would cause irreparable harm to Novartis's reputation and goodwill.  Notwithstanding the lawfulness of Novartis's policy under federal law, S.B. 5981 seeks to stigmatize Novartis and label it a wrongdoer.  This damage, too, is irreparable and supports an injunction.  *See, e.g.*, *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

160.   Injunctive relief will preserve the status quo and cause Defendants no harm. Washington has no interest in enforcing an unconstitutional law.  *April in Paris v. Becerra*, 494 F. Supp. 3d 756, 771 (E.D. Cal. 2020).   And the public interest is harmed by enforcement of unconstitutional laws.  *See Valle del Sol*, 732 F.3d at 1029 (it is not "equitable or in the public interest" for a State "to violate the requirements of federal law"); *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) (recognizing that "the public interest favors applying federal law correctly").

161.   Injunctive relief will also serve the public interest by maintaining the integrity of a carefully planned federal program.  *See, e.g.*, *American Trucking Ass'ns*, 559

VERIFIED COMPLAINT – Page 46

F.3d at 1059–60 (finding "the public interest represented in Congress' decision" and in "the Constitution's declaration that federal law is to be supreme"); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest.").

162. Finally, the public will benefit from an injunction ensuring Novartis can direct its resources where they are most needed: researching and developing new drug therapies for patients.

### COUNT I

### (Federal Field Preemption—U.S. Const. art. VI, cl. 2)

163. Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

164. Federal law is "the supreme Law of the Land; . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

165. Congress created the federal 340B Drug Pricing Program under its spending power, which required Congress to clearly spell out the conditions of participation in advance. Manufacturers' obligations under the 340B Program must therefore be determined entirely by the requirements of federal law—the requirements manufacturers accepted when joining the program.

166. S.B. 5981 expressly targets manufacturers' obligations under "the federal 340B drug pricing program," S.B. 5981 § 1(1), adding new conditions of participating in the 340B Program—and, by extension, Medicaid and Medicare Part B.

167. The field S.B. 5981 seeks to regulate is the scope of manufacturers' 340B obligations.

168. Congress intended the scope of manufacturers' 340B obligations to be regulated exclusively by federal law. As evidence of that intent, manufacturers' 340B obligations implicate dominant federal interests, including national uniformity in the 340B

VERIFIED COMPLAINT – Page 47

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Program and the operations of Medicaid and Medicare Part B. As further evidence, manufacturers' 340B obligations are already regulated pervasively by federal law, leaving no room for state supplementation.

169. S.B. 5981 therefore violates the Supremacy Clause of the U.S. Constitution.

### COUNT II

### (Federal Obstacle Preemption—U.S. Const. art. VI, cl. 2)

170. Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

171. S.B. 5981 repeatedly frustrates Congress's full purposes and objectives, as well as the means by which Congress designed the federal 340B Program to achieve its goals.

172. Under federal law, manufacturers may impose reasonable conditions on access to 340B-priced drugs, including limitations on the number of contract pharmacy arrangements a manufacturer will recognize and a requirement that covered entities provide claims data. Congress intentionally left this discretion to manufacturers.

173. S.B. 5981 nevertheless seeks to abrogate that discretion by outlawing the same contract pharmacy policies that have been deemed compliant with federal law.

174. S.B. 5981 also requires that manufacturers subsidize covered entities in Washington beyond the level required by federal law. This interferes with the careful balance Congress struck in setting the appropriate subsidy for the 340B Program—large enough to serve the program's purposes, but not so large as to discourage participation in Medicaid and Medicare Part B.

175. S.B. 5981 further frustrates Congress's uniform, nationwide design the 340B Program by inviting inconsistent rulings regarding manufacturers' 340B obligations. Whether a manufacturer has complied with S.B. 5981 is ultimately a question of whether

VERIFIED COMPLAINT – Page 48

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

the manufacturer charged the correct price for a unit of its drug.  Through its ADR process and direct-enforcement authority, HRSA has the sole power to resolve the same question.

176.    Moreover, S.B. 5981 incorporates federal law to determine whether a manufacturer was required to provide a discount on a particular unit of its drug.  That incorporation carries with it numerous difficult questions of federal law, such that S.B. 5981 can never be enforced without resolving nuanced and subjective federal issues already committed to HRSA's exclusive jurisdiction.  This guarantees conflicting adjudications concerning manufacturers' 340B obligations—exactly what Congress intended to prevent, as the Supreme Court explained in *Astra*.

177.    Finally, S.B. 5981 increases the potential penalties associated with 340B noncompliance beyond what Congress provided for in the federal 340B statute.

178.    S.B. 5981 therefore violates the Supremacy Clause of the U.S. Constitution.

## COUNT III

### (Federal Discrimination—U.S. Const. art. VI, cl. 2)

179.    Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

180.    In its capacity as a 340B participant, Novartis deals directly with the federal government.  Novartis has signed a PPA with the Secretary of Health and Human Services, which lays out Novartis's and the federal government's respective obligations under the 340B statute.  Novartis's participation also helps the federal government carry out its statutory obligations under 42 U.S.C. § 256b(a)(1) and, for certain covered entities that receive federal grants, the subsidies Novartis provides under the 340B Program help stretch scarce federal resources further.

181.    S.B. 5981 discriminates against Novartis because of Novartis's dealings with the federal government.  The state law expressly targets manufacturers like Novartis

VERIFIED COMPLAINT – Page 49

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

who participate in the 340B Program and subjects them to costly compliance requirements, such as requiring the manufacturers to provide steep discounts not mandated by federal law.

182. S.B. 5981 does not apply to manufacturers who abstain from the 340B Program. The law does not regulate otherwise-identical drug sales that occur between manufacturers, wholesalers, healthcare providers, and pharmacies outside the 340B Program. In this way, S.B. 5981 singles out Novartis and other 340B Program participants for unfavorable treatment.

183. Congress has not authorized Washington to discriminate against manufacturers that participate in the 340B Program. In fact, the federal government has argued that laws like S.B. 5981 are unconstitutional for precisely this reason.

184. S.B. 5981 therefore violates the Supremacy Clause of the U.S. Constitution.

**COUNT IV**

**(Extraterritorial Regulation―U.S. Const. art. I, § 8, cl. 3)**

185. Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

186. Under the Commerce Clause, Congress has the power to regulate commerce among the several states. U.S. Const. art. I, § 8, cl. 3. The corresponding "dormant" Commerce Clause prevents states from regulating conduct that occurs wholly outside their borders.

187. S.B. 5981 violates this principle by capping the prices of sales between manufacturers like Novartis and their wholesalers.

188. Novartis is not located in Washington and, upon information and belief, neither are any of its wholesalers. As a result, these transactions occur wholly outside of Washington.

189. S.B. 5981 therefore violates the Commerce Clause of the U.S. Constitution.

VERIFIED COMPLAINT – Page 50

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**PRAYER FOR RELIEF**

For the foregoing reasons, Novartis prays for the following relief:

A.   A declaration under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that S.B. 5981 violates the Supremacy Clause and is thus null, void, and unenforceable;

B.   A declaration under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that S.B. 5981 violates the dormant Commerce Clause and is thus null, void, and unenforceable;

C.   Preliminary and permanent injunctive relief preventing Defendant from implementing or enforcing S.B. 5981 against Novartis or any of its affiliates, officers, agents, representatives, wholesalers, distributors, or contractors;

D.   Preliminary and permanent injunctive relief preventing Defendant from seeking any remedy arising from an alleged violation of S.B. 5981 by Novartis or any of its affiliates, officers, agents, representatives, wholesalers, distributors, or contractors;

E.   An order awarding Novartis its costs, expenses, and attorney's fees incurred in these proceedings; and

F.   Such other and further relief as the Court deems proper.

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

DATED this 25th day of March, 2026.

McNAUL EBEL PLLC

By: s/ Gregory J. Hollon
    Gregory J. Hollon, WSBA No. 26311

By: s/ Curtis C. Isacke
    Curtis C. Isacke, WSBA No. 49303

600 University Street, Suite 2700
Seattle, Washington 98101
Phone:  (206) 467-1816
Fax:      (206) 624-5128
Email:   ghollon@mcnaul.com
             cisacke@mcnaul.com

Susan Cook*
Jessica L. Ellsworth*
Marlan Golden*
Jacob T. Young*
Claire A. Rhodes*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Phone: (202) 637-5600
Fax:     (202) 637-5910
Email: susan.cook@hoganlovells.com
          jessica.ellsworth@hoganlovells.com
          marlan.golden@hoganlovells.com
          jake.young@hoganlovells.com
          claire.rhodes@hoganlovells.com
*Application for admission pro hac vice
forthcoming

Attorneys for Plaintiff

VERIFIED COMPLAINT – Page 52

**VERIFICATION**

I, the undersigned, having read the allegations of the foregoing Verified Complaint, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the factual allegations asserted in the Verified Complaint are true and correct.

_____
Shannon McCrudden
Vice President, Managed Markets Finance
Novartis Pharmaceuticals Corporation

VERIFIED COMPLAINT – Page 53