Hon. David G. Estudillo

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, a New Jersey Corporation,<br><br>       Plaintiff,<br><br> v.<br><br>NICK BROWN, in his official capacity as ATTORNEY GENERAL OF WASHINGTON,<br><br>       Defendant. | No. 3:26-cv-05302-DGE<br><br>NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION<br><br>NOTE ON MOTION CALENDAR: April 27, 2026<br><br>ORAL ARGUMENT REQUESTED |

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

MOTION ............................................................................................................................. 1

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 4

ARGUMENT ..................................................................................................................... 13

I.    NOVARTIS IS LIKELY TO PREVAIL ON THE MERITS. ....................................... 13

    A.  S.B. 5981 Violates the Supremacy Clause ............................................................. 13

        1.  Federal Law Occupies the Field. ...................................................................... 14

            i.    The Field Is the Scope of Manufacturers' 340B Obligations. ..................... 14

            ii.   The Field Implicates Dominant Federal Interests. ...................................... 15

            iii.  Federal Law Pervasively Regulates the Field. ............................................ 17

        2.  S.B. 5981 Obstructs Federal Law and Policy. ................................................. 19

            i.    S.B. 5981 Outlaws Conduct Congress Purposely Permits .......................... 19

            ii.   S.B. 5981 Upends Congress's Careful Balancing of Interests .................... 21

            iii.  S.B. 5981 Invites Conflicting Adjudications. ............................................. 23

            iv.  S.B. 5981 Introduces Novel Penalties ......................................................... 27

    B.  S.B. 5981 Discriminates Against Participants in a Federal Program. ..................... 27

    C.  S.B. 5981 Violates the Dormant Commerce Clause ............................................... 29

II.   NOVARTIS WILL SUFFER IRREPARABLE HARM ABSENT RELIEF. ............. 30

III.  THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION. ................ 32

CONCLUSION .................................................................................................................. 33

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page i

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

## TABLE OF AUTHORITIES

Page(s)

CASES:

*AbbVie Inc. v. Drummond*,
808 F. Supp. 3d 1266 (W.D. Okla. 2025) .......................5, 10, 15, 17, 21, 22, 25, 27, 28

*Abdullah v. American Airlines, Inc.*,
181 F.3d 363 (3d Cir. 1999).......................................................................................14

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ...............................................................................30, 33

*Arizona v. United States*,
567 U.S. 387 (2012)........................................................................ 13-15, 17, 18, 27

*Association for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025) .....................................................................................30

*Association for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) ......................................................................................30

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011)................................................................. 1, 2, 6, 16, 23, 24, 26, 28

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ..................................................................................13, 32

*Betschart v. Oregon*,
103 F.4th 607 (9th Cir. 2024) ....................................................................................13

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989)...................................................................................................23

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988).....................................................................................................17

## TABLE OF AUTHORITIES—CONTINUED

Page(s)

*Buckman Co. v. Plaintiffs' Legal Comm.*,

531 U.S. 341 (2001)..................................................................................16, 26

*Cohen v. Apple Inc.*,

46 F.4th 1012 (9th Cir. 2022) ...............................................................23

*Cummings v. Premier Rehab Keller, P.L.L.C.*,

596 U.S. 212 (2022)..........................................................................5, 14, 19

*Dawson v. Steager*,

586 U.S. 171 (2019).................................................................................28

*Edgar v. MITE Corp.*,

457 U.S. 624 (1982)..................................................................................29

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,

458 U.S. 141 (1982)...........................................................................13, 19

*Forest Park II v. Hadley*,

336 F.3d 724 (8th Cir. 2003) ...............................................................23

*Gade v. National Solid Wastes Mgmt. Ass'n*,

505 U.S. 88 (1992).............................................................................14, 15

*Geier v. American Honda Motor Co.*,

529 U.S. 861 (2000).........................................................................19, 21

*Geo Grp., Inc. v. Newsom*,

50 F.4th 745 (9th Cir. 2022) .................................................................27

*Goodyear Atomic Corp. v. Miller*,

486 U.S. 174 (1988)..................................................................................29

*Healy v. Beer Inst., Inc.*,

491 U.S. 324 (1989)..................................................................................30

*Idaho v. Coeur D'Alene Tribe*,

794 F.3d 1039 (9th Cir. 2015) ..............................................................31

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

## TABLE OF AUTHORITIES—CONTINUED

Page(s)

*International Paper Co. v. Ouellette*,

　479 U.S. 481 (1987)...................................................................................................19

*Lackey v. Stinnie*,

　604 U.S. 192 (2025)...................................................................................................31

*Livadas v. Bradshaw*,

　512 U.S. 107 (1994)...................................................................................................33

*Maine Forest Prods. Council v. Cormier*,

　51 F.4th 1 (1st Cir. 2022)..........................................................................................21

*McDaniel v. Wells Fargo Invs., LLC*,

　717 F.3d 668 (9th Cir. 2013) .....................................................................................21

*Montalvo v. Spirit Airlines*,

　508 F.3d 464 (9th Cir. 2007) ...............................................................................15, 16

*Morales v. Trans World Airlines, Inc.*,

　504 U.S. 374 (1992)...................................................................................................30

*National Fed'n of the Blind v. United Airlines, Inc.*,

　813 F.3d 718 (9th Cir. 2016) ........................................................................14, 15, 18

*National Pork Producers Council v. Ross*,

　598 U.S. 356 (2023)...................................................................................................29

*NFIB v. OSHA*,

　595 U.S. 109 (2022)...................................................................................................30

*North Dakota v. United States*,

　495 U.S. 423 (1990)...................................................................................................28

*Novartis Pharms. Corp. v. Espinosa*,

　No. 1:21-CV-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021) .................................10

*Novartis Pharms. Corp. v. Johnson*,

　102 F.4th 452 (D.C. Cir. 2024).......................................................2, 7, 8, 10, 15, 20, 21

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page iv

MᴄNᴀᴜʟ Eʙᴇʟ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

# TABLE OF AUTHORITIES—CONTINUED

Page(s)

*Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*,

760 F. Supp. 3d 439 (S.D. W. Va. 2024)..........................................................10, 21, 26

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,

944 F.2d 597 (9th Cir. 1991) .................................................................................31

*Rust v. Sullivan*,

500 U.S. 173 (1991)................................................................................................17

*Sanofi Aventis U.S. LLC v. HHS*,

58 F.4th 696 (3d Cir. 2023) ....................................................................2, 8, 11, 20

*Schneidewind v. ANR Pipeline Co.*,

485 U.S. 293 (1988)..........................................................................................18, 19

*United States v. Locke*,

529 U.S. 89 (2000)..................................................................................................18

*United States v. Washington*,

596 U.S. 832 (2022)..........................................................................................13, 28

*Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*,

539 F.3d 1159 (9th Cir. 2008) ...............................................................................21

*Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7 (2008)....................................................................................................13

*Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,

475 U.S. 282 (1986)................................................................................................27

**STATUTES:**

42 U.S.C. § 256b(a)(1)....................................................................................................4, 15

42 U.S.C. §§ 256b(a)(1)-(2).............................................................................................4, 17

42 U.S.C. § 256b(a)(3).........................................................................................................17

42 U.S.C. § 256b(a)(4).................................................................................................4, 17, 24

42 U.S.C. § 256b(a)(5).........................................................................................................17

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

## TABLE OF AUTHORITIES—CONTINUED

Page(s)

42 U.S.C. § 256b(a)(5)(A) ..............................................................................................4

42 U.S.C. § 256b(a)(5)(A)(i) ....................................................................................5, 16

42 U.S.C. §§ 256b(a)(5)(A)-(C) .....................................................................................9

42 U.S.C. § 256b(a)(5)(B) ............................................................................................25

42 U.S.C. § 256b(a)(8) .................................................................................................18

42 U.S.C. § 256b(d)(1)(B)(vi) ............................................................................6, 23, 27

42 U.S.C. § 256b(d)(1)(B)(vi)(II)-(III) ...........................................................................6

42 U.S.C. § 256b(d)(2)(B)(iv) ......................................................................................18

42 U.S.C. § 256b(d)(2)(B)(v) .......................................................................................18

42 U.S.C. § 256b(d)(3) ...................................................................................................6

42 U.S.C. § 256b(d)(3)(A) ..................................................................................6, 18, 23

42 U.S.C. § 1396r-8(a)(1) ...............................................................................................4

42 U.S.C. § 1396r-8(a)(5)(A) ..........................................................................................4

Wash. Rev. Code § 19.86.080 ...................................................................................13, 24

Wash. Rev. Code § 19.86.090 .............................................................................13, 24, 31

Wash. Rev. Code § 19.86.140 .............................................................................13, 24, 31

**REGULATIONS:**

42 C.F.R. §§ 10.1-10.25 ...............................................................................................18

42 C.F.R. §§ 10.11(a)-(b) .............................................................................................25

42 C.F.R. § 10.21(a)(1) ..............................................................................................7, 25

61 Fed. Reg. 43,549 (Aug. 23, 1996) .............................................................................8

61 Fed. Reg. 55,156 (Oct. 24, 1996) ............................................................................25

61 Fed. Reg. 65,406  (Dec. 12, 1996) .............................................................................9

82 Fed. Reg. 1,210 (Jan. 5, 2017) ...............................................................................4, 6

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**TABLE OF AUTHORITIES—CONTINUED**

Page(s)

**EXECUTIVE MATERIALS:**

HRSA, *General Instructions for Completing the Pharmaceutical Pricing Agreement (Example PPA)*, https://tinyurl.com/4nshe96y .................................................................6

**LEGISLATIVE MATERIALS:**

H.R. Rep. No. 102-384(II) (1992) .....................................................................................4

S.B. 5981 § 1(1) ...............................................................................................................28

S.B. 5981 § 1(7) ..........................................................................................................11, 21

S.B. 5981 § 1(8) ...............................................................................................................11

S.B. 5981 § 2(1) ............................................................................................12, 24, 26, 28

S.B. 5981 §§ 2(1)-(2) .......................................................................................................14

S.B. 5981 § 2(2) ...............................................................................................................24

S.B. 5981 § 3(1) ....................................................................................................12, 20, 22

S.B. 5981 §§ 3(1)-(2) ..................................................................................................21, 24

S.B. 5981 § 3(2) ...............................................................................................................20

S.B. 5981 § 4(1) ..........................................................................................................13, 26

S.B. 5981 § 4(2) ..........................................................................................................12, 24

**OTHER AUTHORITIES:**

Apexus, *About Apexus*, https://tinyurl.com/yck4v9aj ....................................................18

Editorial, *A Good Idea to Cut Drug Costs*, Wall St. J. (Sep. 21, 2025),
     https://tinyurl.com/y3k63v3z ...................................................................................32

Ellen Gabler, *How a Company Makes Millions off a Hospital Program
     Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025),
     https://tinyurl.com/yv7akn6t ...................................................................................33

Ryan Long et al., *Cui Bono? Misaligned Incentives in the 340B Program
     (Sep. 2025)*, https://tinyurl.com/msb3zn96 ...............................................................4

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page vii

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**MOTION**

Novartis seeks a preliminary injunction barring enforcement of Washington S.B. 5981 against Novartis pending a final decision on the merits.  Novartis respectfully requests a ruling on this motion before the law's upcoming effective date: **June 10, 2026**.

**INTRODUCTION**

More than thirty years ago, Congress offered drug manufacturers a deal.  In exchange for having their drugs reimbursed by Medicaid and Medicare Part B, manufacturers must provide a limited subsidy to types of healthcare providers identified in Section 340B of the federal Public Health Service Act.  This subsidy works in an unusual way:  Manufacturers must offer to sell their drugs to these healthcare providers (called covered entities) at heavily discounted prices—as low as a penny—and the covered entities may generate revenue by dispensing those drugs at full price to patients.  To keep this subsidy from spiraling out of control, federal law purposely limits the scope of this requirement, including by allowing manufacturers to impose reasonable conditions on these discounted offers.

Washington just enacted a new law, S.B. 5981, that purports to alter the terms of Congress's bargain.  S.B. 5981 grafts parasitically onto the federal 340B statute, referring to it eight times in the bill's text and incorporating federal law into key definitions.  This is not a free-standing or generally applicable state law; it is a conscious attempt to alter the terms of a federal program.  The contours of the federal program, however, are not open to state-by-state renegotiation.  The 340B Program is supposed to be overseen by one federal agency that is capable of uniform, nationwide management of the program's interactions with Medicaid and Medicare Part B.  *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119-120 (2011).

S.B. 5981 works primarily by forcing manufacturers to tolerate unlimited gamesmanship between covered entities and for-profit intermediaries.  To supersize the number of 340B discounts they claim, covered entities often hire third-party "contract pharmacies"

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 1

located all over the country—often large, for-profit chain pharmacies like CVS.  Covered entities also hire data-crunchers called "third-party administrators" to retroactively analyze prescriptions previously filled at contract pharmacies, looking for pharmacy customers that covered entities could argue they treated at some point in the past.  For each such connection the third-party administrator purports to find, the covered entity (or one of its partners) arranges for the pharmacy to acquire a discounted drug—which the pharmacy then sells to the next customer who walks in the door.  The covered entity, third-party administrator, and pharmacy all split the resulting profit.

The 340B statute does not contemplate contract pharmacies.  Some drug manufacturers (including Novartis) have therefore introduced limits on the use of contract pharmacies as conditions of offering 340B pricing.  Two federal circuit courts then confirmed that Congress intentionally preserved manufacturers' discretion to do so, including limiting covered entities to one contract pharmacy and requiring them to submit claims data as a condition of seeking a discount.  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460-464 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704-706 (3d Cir. 2023).

S.B. 5981 eliminates the discretion Congress preserved for manufacturers to impose reasonable limits on covered entities' 340B-priced purchases.  In fact, S.B. 5981 forbids manufacturers from limiting a covered entity's contract pharmacy arrangements or from requiring claims data—the same policies endorsed by *Novartis* and *Sanofi*.  The new state law also requires state actors to enforce provisions that require application of *federal* 340B requirements, destroying the federal government's ability to administer the program "on a uniform, nationwide basis."  *Astra*, 563 U.S. at 120.  These changes could have serious consequences for federal healthcare programs, as the federal government has warned:  By making it costlier to participate in the 340B Program, S.B. 5981 increases the risk that manufacturers will withdraw from 340B, Medicaid, and Medicare Part B.

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 2

S.B. 5981 runs afoul of the Supremacy Clause. The new state law regulates into a field—the scope of manufacturers' obligations under the federal 340B statute—that must be regulated exclusively by the federal government. S.B. 5981 also frustrates Congress's goals in four ways: outlawing conduct Congress chose to allow within a federal program, tinkering with Congress's delicate balance of interests in the 340B Program, inviting inconsistent adjudications regarding manufacturers' 340B obligations, and backing up these modifications of the federal program with draconian new sanctions. And S.B. 5981 impermissibly discriminates against manufacturers that participate in the 340B Program by imposing burdensome requirements on them—but not on otherwise-identical manufacturers who decline to participate in this federal initiative. The federal government has confirmed as much by filing amicus briefs supporting manufacturers' challenges to state laws like S.B. 5981 on Supremacy Clause grounds.

S.B. 5981 separately violates the dormant Commerce Clause. The state law caps the price manufacturers may charge for drugs that end up at contract pharmacies in Washington. But manufacturers sell their drugs to wholesalers outside of Washington, and those wholesalers resell those drugs to pharmacies. Because S.B. 5981 governs the prices that manufacturers may charge in those out-of-state transactions, it is unlawfully extraterritorial.

Absent immediate judicial intervention enjoining S.B. 5981, Novartis will suffer irreparable harm. Once the law takes effect on **June 10, 2026**, Novartis will risk violating Washington law—and incurring serious penalties—merely by maintaining a 340B contract pharmacy policy whose elements multiple courts have already found lawful. If S.B. 5981 is not enjoined, Novartis will suffer an ongoing loss of its constitutional rights and unrecoverable financial costs, among other irreparable injuries. In contrast, the public interest will not be harmed by an injunction. The new state law seeks only to move dollars from one group of businesses to another; it has no impact on patients' ability to access their medicines

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 3

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

or on the prices they pay.  Novartis therefore requests a preliminary injunction enjoining enforcement of S.B. 5981 pending a decision on the merits.

## STATEMENT OF FACTS

### *The 340B Program, Medicaid, and Medicare*

Congress created the Medicaid Drug Rebate Program (MDRP) in 1990 as a bargain between drug manufacturers, states, and the federal government.  Verified Compl. ¶ 18.  In exchange for near-universal Medicaid coverage of their products, manufacturers in the MDRP agree to offer Medicaid plans the "best price" given to any other purchaser.  H.R. Rep. No. 102-384(II), *9-10 (1992).  This design inadvertently discouraged drug manufacturers from continuing their longstanding practice of offering steep discounts to charitable hospitals.  Verified Compl. ¶ 18.

Congress created the 340B Program in 1992 to address that disincentive.  H.R. Rep. No. 102-384(II), *12 (1992).  Under the 340B Program, as a condition of having their drugs covered by Medicaid and Medicare Part B, manufacturers must offer to sell all of their drug products to certain healthcare providers at rock-bottom prices.  *See* 42 U.S.C. §§ 256b(a)(1), (a)(4), 1396r-8(a)(1), (a)(5)(A).  The select non-profit providers entitled to these discounts—called "covered entities"—are carefully delineated in the 340B statute.  *Id.* § 256b(a)(4).  340B prices, too, are set by a federal statutory formula that references MDRP pricing.  *Id.* §§ 256b(a)(1)-(2).  Prices on a unit of drug sold to a covered entity can drop as low as a penny.  82 Fed. Reg. 1,210, 1,215 (Jan. 5, 2017).  But covered entities need not pass on these discounts to their patients, and they mostly do not.  Verified Compl. ¶ 21.

Instead, the 340B Program is intended to provide a limited subsidy to covered entities.  Verified Compl. ¶¶ 21-22.  Covered entities purchase heavily discounted medicines and then charge "the patient's insurance—whether commercial, Medicare or Medicaid—at customary reimbursement rates that do not account for the 340B discount."  Ryan Long et al., *Cui Bono?  Misaligned Incentives in the 340B Program* § IV (Sep. 2025),

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 4

https://tinyurl.com/msb3zn96.  Covered entities then pocket the difference and can generally use the revenue generated for any purpose.  Verified Compl. ¶ 22 (collecting examples).

Congress had multiple reasons for cabining this subsidy.  For one, 340B discounts can directly impact the federal government.  When a unit of drug receives the 340B price, it is not eligible for a Medicaid rebate.  42 U.S.C. § 256b(a)(5)(A)(i).  States and the federal government share Medicaid rebates, so the loss of Medicaid rebates in this way directly increases what the federal government must spend to support Medicaid.  Verified Compl. ¶ 24.  The size of this effect can be substantial; one recent estimate found that 340B discounts displaced $6.5 *billion* in Medicaid rebates in a single year—of which "the federal government's share" would have been $4.2 *billion*.  *Id*. (quotation omitted).

For another, 340B discounts are costly for manufacturers, but the program depends on their voluntary participation.  Verified Compl. ¶¶ 22, 25.  Because Congress created the 340B Program under its spending power, it had to spell out program conditions unambiguously so participants could understand in advance what they were agreeing to do.  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022).  This rationale also extends to other federal healthcare programs:  The 340B Program serves as the "price of admission to participate in Medicaid and Medicare Part B."  *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1273 (W.D. Okla. 2025).  Thus, if 340B burdens become too large, manufacturers could withdraw their participation entirely—hurting Medicaid and Medicare Part B, too.  *Id.* at 1277 & n.65.

### HRSA's Uniform, Nationwide Enforcement Mechanisms

Congress gave the Department of Health and Human Services (HHS) exclusive authority to oversee the 340B Program.  Verified Compl. ¶¶ 26-33.  This centralization is critical to both the 340B Program and the MDRP.  "The interdependent nature of the two programs' requirements means," as HHS has explained, that governance of "one program

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 5

MᴄNᴀᴜʟ Eʙᴇʟ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

must proceed with an eye towards any implications for the other."[1]  For this reason, Congress directed HHS to "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 120.

HHS currently administers 340B through its subagency the Health Resources and Services Administration (HRSA).  HRSA enters into Pharmaceutical Pricing Agreements (PPAs) with manufacturers to memorialize the parties' 340B obligations.  HRSA, *General Instructions for Completing the Pharmaceutical Pricing Agreement (Example PPA)*, https://tinyurl.com/4nshe96y.  A PPA lists seven discrete responsibilities that manufacturers assume by joining the program, as well as three discrete responsibilities for HRSA.  *Id.* §§ II-III.  It also provides that all of these obligations must be "construed in accordance with Federal common law."  *Id.* § VII(g).

The federal 340B statute lays out two enforcement methods.  The first is HHS's direct enforcement power.  If a manufacturer fails to provide 340B pricing, HHS may impose "civil monetary penalties."  42 U.S.C. § 256b(d)(1)(B)(vi).  But these penalties apply only to "knowing[ ] and intentional[ ]" violations and "shall not exceed $5,000" per violation.  *Id.* § 256b(d)(1)(B)(vi)(II)-(III).  When HRSA finds a violation, it refers the matter to the HHS Office of Inspector General to determine "on a case-by-case basis" whether monetary penalties are warranted.  82 Fed. Reg. at 1,221.

The second enforcement method is the Administrative Dispute Resolution (ADR) process.  Congress instructed HHS to create an ADR system to resolve specific categories of 340B disputes between covered entities and manufacturers.  *See* 42 U.S.C. § 256b(d)(3).  Manufacturers may bring ADR claims alleging that a covered entity has diverted 340B-priced drugs to non-patients or claimed discounts that duplicate MDRP rebates.  *Id.* § 256b(d)(3)(A).  Covered entities may bring claims alleging that a manufacturer has

---

[1]  Brief for the U.S. as Amicus Curiae Supporting Pet'rs at 34, *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011) (No. 09-1273), 2010 WL 4717264 (Nov. 19, 2010) (*Astra* Amicus Brief), https://tinyurl.com/bdeah9c4.

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 6

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

overcharged the entity or unduly "limited [its] ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1).

***Contract Pharmacies***

Covered entities' profits from the 340B Program are driven by the number of units for which they claim the discount. Verified Compl. ¶ 34. Covered entities have thus devised creative ways to associate themselves with more and more transactions, facilitating claims that a manufacturer was required to sell a particular unit at the 340B price.

That's where "contract pharmacies" come in. A contract pharmacy is a for-profit, third-party pharmacy that dispenses drugs to any customer with a prescription. Verified Compl. ¶¶ 36-37. Some of these pharmacy customers will inevitably have visited one or more covered entities at some point. A contract pharmacy helps a covered entity supercharge 340B profits by purporting to match pharmacy customers to the names of people who have visited the covered entity—even if the visit was for an unrelated condition, or was many years ago, or both—allowing the covered entity to claim the pharmacy customer is also its "patient." *Id.* ¶¶ 37, 39(c). To do so, the parties often employ a for-profit third-party administrator to sift oceans of data, looking for purported matches. *Id.*

When it finds a supposed match, the covered entity retroactively claims 340B pricing for the unit previously bought by the pharmacy and dispensed to its customer. "The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Novartis*, 102 F.4th at 457. The covered entity and its for-profit partners thus have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Id.* at 457-458. These self-interested parties almost never reveal to manufacturers *why* they have claimed 340B pricing or even identify the specific drug sales or patients that prompted the claim. Verified Compl. ¶ 39(c).

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

The timing of all this is key.  By the time anyone claims 340B eligibility for a drug dispensed at a contract pharmacy, the customer has long since received the drug, paid full price, and returned home.  Verified Compl. ¶¶ 37-38.  Contract pharmacies are thus based on various retroactive accounting fictions to effectuate 340B pricing after the fact.  The predominant method of doing so is called the "replenishment model."  *Id.* ¶ 39.  Because of these backward-looking pricing methods—and the fact that covered entities keep 340B discounts for themselves—contract pharmacies do not affect patient access to drugs or the prices people pay.  *Id.* ¶¶ 40-41.  The same drugs are delivered to the same pharmacies and sold to their customers at the same prices, whether or not a covered entity later shoehorns itself into the transaction.  *Id.* ¶ 40.  These "patients" often have no idea they were ever part of the 340B Program.  *Id.* ¶ 41.

The 340B Program has not always worked this way.  In fact, the 340B statute says nothing about contract pharmacies; its text suggests Congress "had in mind one-to-one transactions between a covered entity and a drug maker."  *Sanofi*, 58 F.4th at 704.  But some covered entities lack an in-house pharmacy, and so HRSA in 1996 permitted covered entities to designate *one* contract pharmacy.  61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996).  That guidance persisted until 2010, when "HRSA swerved" by opining that covered entities "may contract with an unlimited number of outside pharmacies … regardless of whether the entities have in-house pharmacies."  *Novartis*, 102 F.4th at 457.

HRSA's 2010 contract pharmacy guidance had dramatic consequences.  Since 2010, the volume of 340B-priced sales has rocketed to over *twelve times* its former size—going from about $6.6 billion to *over $81.4 billion*.  Verified Compl. ¶ 44.  At the same time, the number of contract pharmacy arrangements exploded from about 1,300 in 2010 to about 35,000 today.  *Id.* ¶ 45.  The increase in the number of contract pharmacy arrangements has driven much of the growth in 340B discounts.  *Id.* ¶¶ 45-49.

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 8

McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Patients have felt little (if any) benefit from this growth. Covered entities have used 340B revenue to make "deals with minor-league and college sports teams for naming rights, to launch a film company, to fuel consolidation that has increased prices and insurance premiums, and to build a luxury apartment and office complex while slashing services in lower-income areas." Verified Compl. ¶ 22 (quotations omitted). Middlemen take their cut, too—about 16 percent of all 340B revenue now goes to for-profit contract pharmacies and third-party administrators. *Id.* ¶ 47.

### *The Importance of Claims Data*

Predictably, the increase in contract pharmacy arrangements has also spawned increasing compliance failures in the 340B Program, as the federal government has repeatedly recognized. Verified Compl. ¶ 49. Despite these accelerating compliance failures, manufacturers have mostly been unable to access the statutory ADR process for holding covered entities accountable. *Id.* ¶¶ 50-53. That is largely because of the interaction between federal regulatory requirements and the opacity of covered entities' demands for 340B pricing.

Before a manufacturer can bring an ADR claim, it must complete an audit. 42 U.S.C. § 256b(d)(3)(B)(iv). The 340B statute gives manufacturers the right "to audit … the records of [a covered] entity that directly pertain to the entity's compliance" with the statute's prohibitions on discount duplication and drug diversion. *Id.* § 256b(a)(5)(A)-(C). By regulation, however, HRSA requires manufacturers to first show "reasonable cause" to initiate an audit. 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996). To do that, a manufacturer must adduce "sufficient facts and evidence in support" of its belief that the covered entity has violated a compliance obligation. *Id.* Thus, Congress's entire remedial system for manufacturers is gated behind this initial information-gathering requirement.

Manufacturers may need independently gathered data at three stages of this process. First, retroactive pricing models give manufacturers so little information about covered entities' justifications for claiming 340B pricing that, without claims data, manufacturers often

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 9

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

are not able to tell which covered entities are behaving suspiciously. *Drummond*, 808 F. Supp. 3d at 1278. Claims data, in other words, may alert manufacturers in the first instance of the need to "ask [HRSA] for an audit[.]" *Id.* Second, claims data can help persuade HRSA that the manufacturer has demonstrated the "reasonable cause" necessary to begin an audit. *Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 453 (S.D. W. Va. 2024). Third, if HRSA approves the audit, the covered entity may challenge HRSA's finding of "reasonable cause." Verified Compl. ¶ 52 & n.8 (collecting examples). Possessing robust claims data can help defend this decision, ensuring that manufacturers may access statutory remedial processes as Congress intended. *Id.*

### *Novartis's Contract Pharmacy Policy*

Following HRSA's 2010 contract pharmacy guidance, Novartis became concerned about the seemingly endless growth of contract pharmacy arrangements and their abuses of the 340B Program. Verified Compl. ¶ 54. Beginning in 2020, Novartis implemented policies placing reasonable limitations on contract pharmacy arrangements, aiming to mitigate their harms and to restore contract pharmacies to the place they historically occupied in the 340B Program. *Id.* ¶ 55. HRSA initially issued a violation letter, claiming the 340B statute required Novartis to provide discounted pricing on transactions at unlimited contract pharmacies. *Id.* ¶ 56. But Novartis challenged that position in federal court as unlawful. *Id.* ¶ 57. The court vacated HRSA's violation letter, concluding the agency's argument "rest[ed] upon an erroneous reading of Section 340B." *Novartis Pharms. Corp. v. Espinosa*, No. 1:21-CV-1479, 2021 WL 5161783, at *9 (D.D.C. Nov. 5, 2021).

The D.C. Circuit agreed. It pointed out that the federal statute says nothing about contract pharmacies, concluding that this "silence preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions." *Novartis*, 102 F.4th at 460. Manufacturers need only make a "bona fide offer" to sell covered entities 340B-priced drugs, which may include reasonable limits on the circumstances in which they will do so.

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 10

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

*Id.* at 462-463.  Limiting covered entities to one contract pharmacy and requiring that pharmacy to share data explaining the basis for claiming 340B pricing is reasonable, lawful, and "consistent with historic practices under the section 340B program." *Id.* at 463-464.

In 2023, the Third Circuit reached a similar conclusion regarding other manufacturers' policies, holding that federal law does not "requir[e] delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 704-706.  The court pointed out, for example, that Congress had rejected a bill that would have required manufacturers to provide discounts at contract pharmacies, and that "Section 340B's statutory neighbor" contains a similar requirement, showing that Congress purposely rejected the requirement HRSA advocated.  *Id.* at 704-705.

Novartis has since updated its contract pharmacy policy to reflect these decisions.  Verified Compl. ¶¶ 63-66.  Three aspects of that policy are most relevant here:  First, covered entities without an in-house pharmacy may designate one contract pharmacy, but Novartis will otherwise provide 340B pricing only on purchases made directly by covered entities.  *Id.* ¶ 64.  Second, to receive 340B pricing at a designated contract pharmacy, a covered entity must provide basic claims data.  *Id.* ¶ 65.  Third, these conditions do not apply to certain covered entities called federal grantees.  *Id.* ¶ 66; *see also id.* ¶ 55 & n.30.

### *Washington's Attempt to Modify the 340B Program*

Against that federal backdrop, Washington enacted S.B. 5981.  The new state law purports to directly regulate the federal 340B Program by imposing new conditions on participation in 340B.  The Legislature acknowledged that S.B. 5981 would modify "the 340B program" by "prohibiting drug manufacturers from imposing restrictions on 340B covered entities."  S.B. 5981 § 1(8).  The goal of S.B. 5981 is to increase the subsidy that Washington covered entities receive under the federal 340B Program by outlawing contract pharmacy policies like Novartis's.  *See id.* § 1(7) (finding that S.B. 5981 would increase Washington covered entities' "financial savings").

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 11

S.B. 5981 is a mandate to provide 340B pricing on more transactions. The law forbids manufacturers to "directly or indirectly" "deny, restrict, or prohibit" a contract pharmacy's "acquisition of a *340B drug.*" S.B. 5981 § 3(1) (emphasis added). The substance of this provision comes from the state-law definition of a 340B drug: a "drug that has been subject to an offer for reduced prices by a manufacturer under" *federal* law. *Id.* § 2(1). Take, for example, Novartis's drug ENTRESTO®. When ENTRESTO is sold to a non-340B purchaser, the unit is sold at normal commercial prices. But if it is sold to a 340B covered entity and dispensed to one of the entity's patients, the unit is sold at the heavily discounted 340B price. In this way, ENTRESTO can be either a "340B drug" or a non-340B drug under Washington law, depending on fact-specific circumstances. The same is true of almost all drugs in Novartis's portfolio. By requiring "delivery" of a "340B drug" to a contract pharmacy, S.B. 5981 mandates 340B *pricing* on any unit of drug delivered to that pharmacy—units that would be delivered with or without the law.

S.B. 5981 also impedes manufacturers' efforts to make the 340B Program more transparent. The law forbids manufacturers to "directly or indirectly" "require a covered entity to submit any claims, utilization, purchasing, or other data as a condition" of the manufacturer's offers to sell 340B-priced drugs. S.B. 5981 § 3(2). This provision targets Novartis's policy requiring covered entities to "upload their claims data" to an electronic platform. ECF No. 1-2 at 1.

Finally, S.B. 5981 ratchets up the potential penalties facing manufacturers for refusing to provide the 340B discount on any given transaction. Violations are treated as "an unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose of applying the consumer protection act." S.B. 5981 § 4(2). This provision opens a panoply of potential penalties: civil penalties up to $7,500 per violation, parens patriae suits for treble damages, injunctions, and even private lawsuits from covered entities with

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 12

McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

the potential to impose penalties of $5,000 *per day*. *Id.* § 4(1); RCW 19.86.080, 19.86.090, 19.86.140. All of this far exceeds anything contemplated by federal law.

### ARGUMENT

To obtain a preliminary injunction, Novartis must show: (1) that it is "likely to succeed on the merits," (2) that it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities" favors an injunction, and (4) "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Likelihood of success on the merits is the "most important (and usually decisive)" factor "in cases where a plaintiff brings a constitutional claim." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). Where a state official is the non-moving party, the third and fourth factors merge into a single consideration of where the public interest lies. *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024).

Novartis satisfies these requirements here.

## I. NOVARTIS IS LIKELY TO PREVAIL ON THE MERITS.

### A. S.B. 5981 Violates the Supremacy Clause.

Congress may implicitly preempt state law by occupying a legislative field so thoroughly "as to make reasonable the inference that Congress left no room for the States to supplement it." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (quotation omitted). State laws are also "preempted when they conflict with federal law," including by posing "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation omitted). Relatedly, the Supremacy Clause prevents states from "discriminat[ing] against the Federal Government or those with whom it deals" by "regulat[ing] them unfavorably on some basis related to their governmental status." *United States v. Washington*, 596 U.S. 832, 838-839 (2022) (quotations omitted and alteration adopted).

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 13

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

S.B. 5981 is invalid under all three of these Supremacy Clause principles.  As the United States has explained in multiple amicus briefs in similar cases, laws like S.B. 5981 are "preempted by Section 340B" because they "interfere[ ] with Congress's design for the 340B Program."  ECF No. 1-3 (U.S. Amicus Brief) at 11, 15 (emphasis omitted).

### 1. Federal Law Occupies the Field.

State laws are field preempted in either of two scenarios: (1) where a "federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," and (2) where federal law creates "a framework of regulation so pervasive … that Congress left no room for the States to supplement it."  *Arizona*, 567 U.S. at 399 (quotation omitted).  Both of those things are true here.

### i. The Field Is the Scope of Manufacturers' 340B Obligations.

The first step is to define the relevant field.  *National Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 734 (9th Cir. 2016).  To do so, courts look "to the effects of the [state] law" and assess its actual "impact … on the federal scheme."  *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105 (1992).  Because this inquiry is focused on how state and federal law interact, "the scope of a field deemed preempted by federal law may be narrowly defined."  *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 367 (3d Cir. 1999).

S.B. 5981 targets manufacturers' obligations under the federal 340B Program; it does not apply generally to all drug sales or to all transactions at Washington pharmacies.  S.B. 5981 §§ 2(1)-(2); *see also* U.S. Amicus Brief, *supra*, at 20-21 (noting that a similar state law is not "generally applicable").  That topic is already covered by federal law:  If a manufacturer wishes to have its drugs reimbursed by Medicaid and Medicare Part B, it must accept the conditions imposed by the federal 340B statute—which Congress was required to spell out in advance.  *Cummings*, 596 U.S. at 219.  That is, the manufacturer must "offer each covered entity covered outpatient drugs for purchase at or below the [340B] price," 42

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 14

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

U.S.C. § 256b(a)(1), subject to reasonable limitations the manufacturer may place on that offer, *Novartis*, 102 F.4th at 462-463.

Under S.B. 5981's regime, manufacturers would have to give 340B pricing on a larger volume of sales. That makes it costlier to participate in the federal 340B Program, *supra* pp. 12-13. S.B. 5981's "impact … on the federal scheme," *Gade*, 505 U.S. at 105, is therefore to "raise[ ] a manufacturer's price of admission to participate in Medicaid and Medicare Part B." *Drummond*, 808 F. Supp. 3d at 1273. The target of the law—and the field into which it steps—is the contours of manufacturers' 340B obligations.

### ii.    The Field Implicates Dominant Federal Interests.

This field implicates two dominant federal interests: (1) maintaining the nationwide uniformity of the 340B Program, and (2) regulating the operations of Medicaid and Medicare Part B. Either interest is enough to show that S.B. 5981 is field preempted.

Start with uniformity. When Congress intends federal law to operate the same way nationwide, state law must yield. In *Arizona*, for instance, the Supreme Court pointed to the "comprehensive and unified" nature of federal alien-registration requirements in finding the field "occupied by federal law." 567 U.S. at 401-402. Likewise, in *Montalvo v. Spirit Airlines*, the Ninth Circuit examined the "purpose, history, and language" of a federal statutory scheme, inferring field preemption from Congress's intent "to have a single, uniform system." 508 F.3d 464, 471 (9th Cir. 2007). And in *National Federation of the Blind*, the Ninth Circuit not only pointed to Congress's desire for nationwide consistency but also explained why that desire matters for field preemption: A statute cannot "determine entirely the rights and obligations of affected parties" if a competing system might impose yet "another set of comprehensive regulations covering the same area." 813 F.3d at 732-733.

There can be no doubt that Congress intended the 340B Program to operate uniformly nationwide—that is exactly what the Supreme Court held in *Astra*. There, a county had sued drug manufacturers claiming its covered entities had not received required 340B

MᴄNᴀᴜʟ Eʙᴇʟ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

pricing.  563 U.S. at 116.  The Court rejected those claims, holding that Congress intended "centralized enforcement in the government."  *Id.* at 119 (quoting *Astra* Amicus Brief, *supra* n.1, at 32).  Given 340B's connections to Medicaid, "an adjudication of rights under one program must proceed with an eye towards any implications for the other."  *Id.* at 120 (quotation omitted).  HHS must therefore "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis."  *Id.*

*Astra* was not a preemption case; the county claimed to be enforcing manufacturers' federal PPAs rather than a state law.  *See* 563 U.S. at 117.  But *Astra*'s analysis cuts to the heart of the preemption inquiry because the Supreme Court held that Congress intended to foreclose outside influence over the 340B Program that would leave "HHS unable to hold the control rein."  *Id.* at 120.  That conclusion is confirmed by the federal government's brief in *Astra*, which relied on a key preemption case to demonstrate that its enforcement power is exclusive.  *Astra* Amicus Brief, *supra* n.1, at 34-35 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001)).  Put another way, *Astra* answers the critical legal question that determines whether field preemption applies:  Congress created a "unitary administrative and enforcement scheme," in which HHS must implement the 340B Program "on a uniform, nationwide basis."  563 U.S. at 120; *see also Montalvo*, 508 F.3d at 471 (inferring field preemption from a "single, uniform system").  As the federal government put it more recently, *Astra* is "particularly applicable in [the] context" of state laws like S.B. 5981.  U.S. Amicus Brief, *supra* p.14, at 15-16.

S.B. 5981's impacts on other federal healthcare programs reinforce this conclusion.  For individual units of drugs, S.B. 5981 may impact Medicaid by forcing manufacturers to provide 340B discounts on more transactions—displacing rebates that manufacturers would otherwise pay under the MDRP.  42 U.S.C. § 256b(a)(5)(A)(i).  The federal government receives the majority of Medicaid rebates, meaning S.B. 5981 would effectively divert revenue from the federal government to covered entities in Washington to the tune of "millions

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 16

of dollars annually." Verified Compl. ¶ 24 (quotation omitted). Sweeping more drug sales into the 340B Program's discounting mandate therefore impinges on "a "uniquely federal interest." *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 507, 512 (1988) (state law preempted where it could "raise [the] price" of equipment purchased by the government).

S.B. 5981's effects also extend to participation in federal healthcare programs more generally. By increasing the burdens of participating in the federal 340B Program, this state law risks "the deleterious effect of causing drug manufacturers to opt out of Medicaid and Medicare Part B." *Drummond*, 808 F. Supp. 3d at 1277. The federal government has voiced concerns that this is already happening. U.S. Amicus Brief, *supra* p.14, at 17.

Manufacturers' 340B obligations fall within the sole province of the federal government. "[W]hen the Government appropriates public funds to establish a program," the federal government—not any individual state—"is entitled to define the limits of that program." *Rust v. Sullivan*, 500 U.S. 173, 194 (1991). S.B. 5981 prevents federal law from governing the 340B Program, Medicaid, and Medicare Part B as "a harmonious whole." *Arizona*, 567 U.S. at 401 (quotation omitted). The federal government's interest in avoiding this outcome "could hardly be stronger." *See* U.S. Amicus Brief, *supra* p.14, at 22.

### iii.    Federal Law Pervasively Regulates the Field.

The density of federal 340B regulation also provides an independent basis for field preemption. Courts infer field preemption from "a framework of regulation so pervasive … that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (quotation omitted). Federal 340B law amply qualifies.

Federal law governs the 340B Program from soup to nuts. The statute starts by defining the prices of drugs purchased under the program, 42 U.S.C. §§ 256b(a)(1)-(2), the drugs eligible for that pricing, *id.* § 256b(a)(3), the entities entitled to receive that pricing, *id.* § 256b(a)(4), and the compliance obligations those entities accept, *id.* § 256b(a)(5). From there, the statute directs HHS to create a program to effectuate "distribution" of 340B-

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

priced drugs, *id.* § 256b(a)(8), and a "single, universal, and standardized" system for "facilitating the ordering, purchasing, and delivery" of 340B-priced drugs, *id.* § 256b(d)(2)(B)(iv). HHS has done so via the Prime Vendor Program, intended to be a "central source overseeing distribution" under HRSA's ultimate oversight.[2] On the back end, federal law creates a comprehensive enforcement system, including direct enforcement by HHS, 42 U.S.C. § 256b(d)(2)(B)(v), and adjudications of both "claims by covered entities" and "claims by manufacturers" in the ADR process, *id.* § 256b(d)(3)(A). HHS has expanded on these statutory requirements by regulation. 42 C.F.R. §§ 10.1-10.25.

That regulatory suite bears all the hallmarks of field preemption. Federal law addresses manufacturers' 340B obligations in "great detail" and tells them "*exactly* what [they] must do" to qualify for Medicaid and Medicare Part B. *See National Fed'n of the Blind*, 813 F.3d at 735. As the federal government has explained, "Congress left no role for States in determining manufacturers' 340B obligations." U.S. Amicus Brief, *supra* p.14, at 12. Federal law already "provide[s] a full set of standards … , including the punishment for noncompliance." *Arizona*, 567 U.S. at 401. With these standards, Congress has equipped HHS "adequately to address the precise concerns" S.B. 5981 "purports to manage." *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 1155 (1988).

The federal statute's comprehensiveness is not undercut by the fact that S.B. 5981 purports to create novel 340B obligations not found in federal law. A comprehensive federal scheme often reflects not only affirmative requirements, but also "considered decisions to *refrain* from mandating certain actions." *National Fed'n of the Blind*, 813 F.3d at 733 (emphasis added). Respecting Congress's decision not to impose a particular requirement is critical to effectuating Congress's intent: Establishing a comprehensive federal system would be impossible if its requirements could be deemed "cumulative to those enacted by each political subdivision." *United States v. Locke*, 529 U.S. 89, 116 (2000).

---

[2] Apexus, *About Apexus*, https://tinyurl.com/yck4v9aj (last visited Mar. 30, 2026).

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 18

This point is especially important here because of the 340B Program's Spending Clause nature.  Regulated parties need clear, advance notice of what they are agreeing to do by joining the program.  *Cummings*, 596 U.S. at 219.  What the 340B statute does *not* require is just as important as what it *does* require.  Both equally determine the sum total of Congress's conditions for accessing Medicaid and Medicare Part B.  If states could alter that total at will, Congress could never provide the required advance notice.  Thus, when a requirement is absent from a list of conditions for participating in a federal Spending Clause program, the best inference is that Congress decided such "regulation simply should not be employed."  *See Schneidewind*, 108 S.Ct. at 1154.

### 2.  S.B. 5981 Obstructs Federal Law and Policy.

S.B. 5981 also impedes "the full purposes and objectives of Congress" and "interferes with the methods by which the federal statute was designed to reach [its] goal[s]." *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987) (quotation omitted). S.B. 5981 does this in four main ways:  (1) forbidding what federal law allows; (2) altering Congress's balance of benefits and burdens among 340B, Medicaid, and Medicare Part B; (3) inviting inconsistent adjudications regarding 340B obligations; and (4) heightening the penalties associated with 340B compliance.

### i.  S.B. 5981 Outlaws Conduct Congress Purposely Permits.

Where federal law deliberately gives regulated parties a choice, state law is preempted if it seeks to restrict that choice.  *E.g.*, *Geier v. American Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state-law tort claim preempted where it would have imposed a duty to install airbags despite "the variety and mix of [passive-restraint] devices that the federal regulation sought"); *Fidelity Fed. Sav. & Loan*, 458 U.S. at 156 (state law preempted where it "limit[ed] the availability of an option the [federal regulator] considers essential").  That principle resolves this case.  Federal law purposely gives manufacturers discretion to set reasonable limits on the use of contract pharmacies to claim 340B pricing, and Novartis has

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 19

done just that.  ECF No. 1-2 at 1.  S.B. 5981 attempts to restrict that discretion in two ways: prohibiting manufacturers from limiting the number of contract pharmacy arrangements they will recognize, S.B. 5981 § 3(1), and forbidding manufacturers to condition access to 340B pricing on submission of claims data, *id.* § 3(2).

There can be no dispute that federal law permits Novartis's contract pharmacy policy.  In *Novartis*, the D.C. Circuit explained that manufacturers may restrict 340B pricing to drugs dispensed at "a covered entity's in-house pharmacy or [at] a single contract pharmacy designated by the covered entity."  102 F.4th at 463-464.  And it confirmed that manufacturers may condition 340B pricing at contract pharmacies on the receipt of claims data, consistent with longstanding record-retention policies governing the 340B Program.  *Id.* at 463.  The Third Circuit approved the same requirements.  *See Sanofi*, 58 F.4th at 701 (summarizing the contested policies).  HRSA is now applying the same understanding of federal law, and it has therefore recently rejected two ADR claims challenging Novartis's contract pharmacy policy.  ECF Nos. 1-4 and 1-5.

Congress intentionally gave manufacturers discretion in these areas.  After observing that federal law does not require delivery of 340B-priced drugs to unlimited contract pharmacies, the D.C. Circuit concluded "that this silence *preserves*—rather than abrogates—the ability of sellers to impose at least some delivery conditions."  *Novartis*, 102 F.4th at 460 (emphasis added).  The Third Circuit likewise held that federal law "leav[es] drug makers discretion on delivery" of 340B-priced drugs.  *Sanofi*, 58 F.4th at 705.  The Third Circuit reasoned that Congress *has* required the sale of "discounted drugs through contract pharmacies" in a related context and expressly rejected a bill that would have adopted this requirement for the 340B Program.  *Id.* at 704-706.

Permitting manufacturers to require basic claims data about the unit of drug on which the discount is claimed serves vital federal objectives.  The D.C. Circuit has held that manufacturers may request claims data from covered entities in order to police contract

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 20

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

pharmacy arrangements.  *See Novartis*, 102 F.4th at 463-464.  Manufacturers need these data to ensure access to the statutory audit and ADR procedures Congress created.  Verified Compl. ¶¶ 50-53.  As other courts have concluded in finding similar laws preempted, requiring claims data is "*the* way to detect possible [compliance violations]." *Drummond*, 808 F. Supp. 3d at 1278; *see also Morrisey*, 760 F. Supp. 3d at 453.

"It is difficult to envision a more perfect collision of purposes" than for "state law … to forbid" what "federal law authorizes." *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022).  Yet S.B. 5981 expressly targets the same reasonable conditions on access to 340B pricing that were approved by the *Novartis* and *Sanofi* courts.  S.B. 5981 §§ 1(7), 3(1)-(2).  This case fits squarely in the line of authority invalidating state efforts to abridge implicit rights created when federal law intentionally authorizes conduct.  *See, e.g.*, *Geier*, 529 U.S. at 881; *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 675 (9th Cir. 2013) (state law cannot restrict options conferred pursuant to "significant federal regulatory objective[s]") (quotation omitted and alteration adopted); *Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1167 (9th Cir. 2008) (state law cannot undermine a program's "federally-approved operation").

### ii.    S.B. 5981 Upends Congress's Careful Balancing of Interests.

S.B. 5981 also expands the universe of transactions for which manufacturers must provide 340B discounts.  Verified Compl. ¶¶ 24-25, 44-49.  The primary purpose and effect of this state law is to expand the subsidy manufacturers must provide to Washington covered entities through the 340B Program.  *Id.* ¶ 117.

Congress "struck a delicate balance with the federal 340B Program." *Drummond*, 808 F. Supp. 3d at 1277.  In doing so, it "made a series of policy choices concerning how much of a burden to impose on manufacturers and what benefits to offer covered entities." U.S. Amicus Brief, *supra* p.14, at 23.  The extent to which manufacturers must offer 340B discounts sits at the heart of that balance:  "The Program is a bargain between drug

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 21

McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

manufacturers and the federal government whereby" manufacturers agree to this subsidy "in exchange for access to … Medicaid and Medicare Part B." *Drummond*, 808 F. Supp. 3d at 1277. Thus, Congress "limited the scope of the 340B Program to ensure that the price of admission wasn't too high." *Id.*

S.B. 5981 ratchets up that price of admission. A concrete example of how S.B. 5981 works might look like this: Suppose a person visits a Washington clinic for a routine checkup. Years later, the same person fills an unrelated prescription for a Novartis product at a CVS pharmacy—but not the clinic's one designated contract pharmacy. Under federal law alone, the transaction remains simple: The pharmacy pays the commercial price for the drug; the customer pays the co-pay set by her insurer; and the clinic pays nothing—because it plays no role in the transaction. But if Novartis is forbidden to "indirectly[ ] deny, restrict, or prohibit" the pharmacy's "acquisition of a 340B drug," S.B. 5981 § 3(1), the clinic can use the replenishment model to retroactively transmogrify the same transaction into a fictional 340B-priced sale: The clinic can demand that a 340B-priced "replenishment" unit be shipped to the pharmacy instead of a commercially priced drug, and the pharmacy would then pay the clinic for the drug (minus a finder's fee). The pharmacy customer would have paid the same co-pay. But the manufacturer would have been forced to give a 340B discount that was not owed under federal law, increasing the cost of its 340B participation. Verified Compl. ¶ 75.

This increased burden on manufacturers not only disturbs the policy tradeoffs Congress made but also jeopardizes the entire interrelated scheme of federal healthcare programs. *Drummond*, 808 F. Supp. 3d at 1277. When the costs of 340B participation increase, "rational manufacturers can be expected to withdraw"—as at least one manufacturer appears to have done already. U.S. Amicus Brief, *supra* p.14, at 17. "Only the federal government can determine the extent to which it will tolerate the risk" to program stability caused by "manufacturer withdrawal." *Id.* "Patchwork state regulation" is no substitute for

McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

the "wide-angle study" HHS can employ, *id.* at 18, which is precisely why Congress gave HHS exclusive 340B enforcement power. *Astra*, 563 U.S. at 119-120.

The Eighth Circuit's decision in a similar Spending Clause case is instructive. In *Forest Park II v. Hadley*, Congress had incentivized private developers to provide low-income housing by subsidizing construction loans. 336 F.3d 724, 728 (8th Cir. 2003). Once the developers repaid those loans, they were no longer subject to the program's require-ments, so Congress specified the conditions under which a participating developer could prepay its loan and exit the program. *Id.* at 728-730. Wishing to further subsidize low-income housing in the state, Minnesota added further conditions restricting prepayment. *Id.* at 730. That law was preempted, the court explained, because it "would directly interfere with Congress's original intent of offering prepayment as an incentive." *Id.* at 733. States cannot "place additional requirements on federal program participants[ or] restrict the ex-ercise of the participants' federally granted … rights." *Id.* at 734.

S.B. 5981 similarly tinkers with the incentive structure Congress designed. Verified Compl. ¶¶ 68-77. As the federal government has made clear, the volume of required dis-counts was a deliberate "policy choice[ ]." U.S. Amicus Brief, *supra* p.14, at 23. That choice was for Congress alone; state law "must yield to the extent that it clashes with the balance struck by Congress." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989); *see also, e.g.*, *Cohen v. Apple Inc.*, 46 F.4th 1012, 1030 (9th Cir. 2022) (state law disrupted federal law's "balance [between] overlapping and potentially competing fac-tors").

### iii.    S.B. 5981 Invites Conflicting Adjudications.

S.B. 5981's duplicative enforcement scheme further frustrates Congress's objec-tives. When a manufacturer's 340B compliance is questioned, federal law channels the claim down one of two paths:  HHS may assess the appropriateness of sanctions or a covered entity may bring an ADR claim. 42 U.S.C. §§ 256b(d)(1)(B)(vi), (d)(3)(A). Those two

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

paths are exclusive. *Astra*, 563 U.S. at 121-122. Washington now purports to create third *and* fourth enforcement paths: The state Attorney General can surmise that a manufacturer should have provided 340B pricing on a particular drug and seek to enforce that view with a hefty fines, treble damages, or even an injunction. S.B. 5981 § 4(2); RCW 19.86.080, 19.86.090, 19.86.140. Separately, Washington covered entities can try to enforce *their* view that a manufacturer should have provided 340B pricing on a particular drug, backed by the threat of colossal per-day damages and injunctions. S.B. 5981 § (4)(1).

This possibility is exactly the kind of "dispersed and uncoordinated" 340B enforcement effort *Astra* rejected for fear of producing "conflicting adjudications." 563 U.S. at 120. Laws like S.B. 5981 therefore "conflict[ ] with the scheme Congress designed." U.S. Amicus Brief, *supra* p.14, at 15-16. Because S.B. 5981 incorporates federal law, it is impossible to enforce the state law without applying federal 340B eligibility standards. Take the state-law definitions of a "340B drug" and a "covered entity," for example. A 340B drug is "a drug that has been subject to an offer for reduced prices by a manufacturer under 42 U.S.C. Sec. 256b." S.B. 5981 § 2(1). A covered entity is "an entity authorized to participate in the federal 340B drug pricing program, as defined in 42 U.S.C. Sec. 256b(a)(4)." *Id.* § 2(2). These federal-law-based terms are essential to both of the state law's core mandates to manufacturers. *See id.* §§ 3(1)-(2). So for *every* alleged violation of these requirements, the State must prove that *every* federal 340B condition was satisfied, plus the additional conditions of state law.

Proving that a unit of a drug is a 340B drug is purely a question of price. S.B. 5981 § 2(1). The same drugs are already being delivered to the same pharmacies under Novartis's contract pharmacy policy. Verified Compl. ¶¶ 40, 72-73. The only difference between a "340B drug" and a non-340B unit of the same drug is the price the manufacturer charges. *Drummond*, 808 F. Supp. 3d at 1276. The only way to prove that a manufacturer failed to deliver a 340B drug is to demonstrate that "the covered entity or contract pharmacy in

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 24

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

question was [not] delivered drugs *at the discounted rate*." *Id.* at 1278-79 (emphasis added). S.B. 5981 is "an attempt by [Washington] to police potential overcharges." *Id.*

State enforcement in this area is impermissible because HHS is already policing the same conduct. The agency can impose civil monetary penalties for intentional over-charges—a broad term including *any* conduct that "results in a covered entity paying more" than the 340B price. *See* 42 C.F.R. §§ 10.11(a)-(b). In HRSA's ADR proceedings, covered entities can bring even broader "claims that a manufacturer has *limited* the covered entity's ability to purchase" 340B-priced drugs. *Id.* § 10.21(a)(1) (emphasis added); *see also* U.S. Amicus Brief, *supra* p.14, at 16. In fact, proceedings to enforce S.B. 5981 may involve the same units at issue in ADR claims before HRSA. In such instances, the Washington Attorney General and HRSA would be attempting to answer the same question: Was the manu-facturer required to provide 340B pricing on this particular unit of a drug?

It is all but impossible for two separate adjudicators—HHS and the state Attorney General—to apply federal 340B eligibility standards uniformly. That is because federal law is riddled with nuanced eligibility issues implicating HRSA's unique expertise. For just one example, consider the patient definition. A covered entity may not divert 340B-priced drugs to anyone "who is not [its] patient." 42 U.S.C. § 256b(a)(5)(B). The federal statute, however, does not define a "patient." HRSA deems a person an entity's patient if

> [1] the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; and [2] the individual receives health care services from a health care profes-sional who is either employed by the covered entity or provides health care under contractual or other arrangements … such that responsibility for the care provided remains with the covered entity; and [3] [for federal grantees,] the individual receives a health care service or range of services from the covered entity which is consistent with the … range of services for which … funding … has been provided to the entity.

61 Fed. Reg. 55,156, 55,157-58 (Oct. 24, 1996).

Needless to say, two decisionmakers could apply that standard differently to the same set of facts. Yet to enforce S.B. 5981, the State must prove—transaction by

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 25

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

transaction—that each unit of drug otherwise meets the federal requirements for 340B pricing. If the federal standards are not met, the drug is not a 340B drug because it cannot be "subject to an offer for reduced prices" under the 340B Program. S.B. 5981 § 2(1).

S.B. 5981 also provides no guidance about how to handle practical problems arising from these overlapping enforcement procedures. What will the state Attorney General do if he attempts to enforce S.B. 5981 against an alleged violation, but an ADR claim is already pending before HRSA regarding the same units of a drug? Will the State await the outcome of the federal process before imposing sanctions? And what will Washington do if it punishes a violation, but HRSA later finds the manufacturer was *not* required to offer 340B pricing on the same units? Without "assurances" that state enforcement will *always* take a " 'wait and see' approach" that *always* respects federal 340B adjudications, S.B. 5981 creates an unacceptable risk of conflicting adjudications. *See Morrisey*, 760 F. Supp. 3d at 458.

S.B. 5981's private right of action makes this quagmire of overlapping procedures even worse. S.B. 5981 § 4(1). With federal ADR proceedings, state parens patriae actions, and private covered entity suits all in the mix, there is no hope for achieving the nationwide uniformity Congress intended. *See Astra*, 563 U.S. at 118-119. The Supreme Court could not have been clearer that Congress set out to avoid this "multitude of dispersed and uncoordinated lawsuits by 340B entities." *Id.* at 120. By enacting a state law that "supplants" the federal statute's enforcement mechanisms, Washington has "arrogat[ed] … enforcement authority that properly belongs to the federal government alone." U.S. Amicus Brief, *supra* p.14, at 16; *see also Morrisey*, 760 F. Supp. 3d at 458 (similar state law preempted because it "runs counter to *Astra*'s holding").

All of this is impermissible under the Supremacy Clause. State law is preempted when it detracts from exclusive enforcement authority Congress gave to a federal agency. *See, e.g.*, *Buckman*, 531 U.S. at 350; *Nexus Pharms., Inc. v. Central Admixture Pharm. Servs., Inc.*, 48 F.4th 1040, 1048 (9th Cir. 2022); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745,

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 26

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

762 (9th Cir. 2022) (en banc) ("Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption.").

### iv.    S.B. 5981 Introduces Novel Penalties.

S.B. 5981's harsh penalties exacerbate its overlapping-enforcement problem.  Congress carefully calibrated the consequences of 340B noncompliance: penalties that "shall not exceed $5,000"—and only for a manufacturer that "knowingly and intentionally" overcharges a covered entity.  42 U.S.C. § 256b(d)(1)(B)(vi).  Washington law now raises the stakes: huge per-day, per-transaction fines, treble damages, injunctions, attorney's fees, costs—and all with no indication of a scienter requirement.  *Supra* pp.12-13.

"[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity."  *Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (quotation omitted).  When Congress selects a penalty, it has necessarily determined that a higher penalty "would be inappropriate."  *Arizona*, 567 U.S. at 406.  Yet again, S.B. 5981 second-guesses Congress's judgment.  The severity of the state law creates another obstacle-preemption problem:  It adds disincentives to 340B participation, putting Medicaid and Medicare Part B at further risk.  *Supra* p.22; *see also Drummond*, 808 F. Supp. 3d at 1277; U.S. Amicus Brief, *supra* p.14, at 16-18.

### B.    S.B. 5981 Discriminates Against Participants in a Federal Program.

S.B. 5981's third Supremacy Clause defect is its differential regulation of manufacturers that participate in the federal 340B Program compared to those that do not.  States have long been forbidden to "impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the national government."  *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819).  This principle covers states' treatment of "those who deal with the federal government"—thereby helping to carry out federal legislative initiatives.  *Dawson v. Steager*, 586 U.S. 171, 177 (2019) (quotation omitted).  When they agree to participate in the 340B Program,

MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

manufacturers begin dealing directly with the federal government, including by signing a PPA with the HHS Secretary. Verified Compl. ¶¶ 27, 106. Pursuant to the PPAs, HHS exercises direct control over manufacturers' 340B conduct. *See Astra*, 563 U.S. at 115-116.

On its face, the state law targets the federal 340B Program. S.B. 5981's mandates apply only to drug manufacturers that have signed a PPA. *See, e.g.*, S.B. 5981 §§ 1(1) (targeting "the 340B drug pricing program"), 2(1) (targeting drugs covered by "42 U.S.C. Sec. 256b"). But drug sales within the 340B Program represent just one part of nationwide drug spending, Verified Compl. ¶ 143, and the only thing that distinguishes drug sales within the 340B Program is their sale at discounted prices to federally defined covered entities, *see Drummond*, 808 F. Supp. 3d at 1276. S.B. 5981 therefore leaves a large swath of drug sales, healthcare providers, and pharmacy transactions untouched.

Compliance with S.B. 5981's requirements will be costly for manufacturers. Verified Compl. ¶¶ 76, 156. By imposing these additional burdens on manufacturers that participate in the federal 340B Program—but no other manufacturers—this Washington law "regulates [340B participants] unfavorably on some basis related to their governmental 'status.'" *Washington*, 596 U.S. at 839 (quoting *North Dakota v. United States*, 495 U.S. 423, 438 (1990) (plurality op.)).

Discrimination against participants in a federal program might be permissible if Congress has clearly authorized it. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988). But the opposite is true here: "Congress left no role for States in determining manufacturers' 340B obligations." U.S. Amicus Brief, *supra* p.14, at 12. And the federal government has explained that laws like S.B. 5981 "impermissibly target[ ] and discriminate[ ] against" "manufacturers with 340B agreements," treating them "worse than manufacturers who do not participate in the 340B Program." *Id.* at 13-14. That is the core of what the Supremacy Clause forbids.

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 28

### C.      S.B. 5981 Violates the Dormant Commerce Clause.

S.B. 5981 is also unenforceable under the dormant Commerce Clause. States must respect "the territorial limits of [their] authority under the Constitution's horizontal separation of powers." *National Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023). This principle "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642-643 (1982).

By targeting the prices charged by manufacturers to wholesalers, S.B. 5981 attempts to regulate wholly out-of-state conduct. That becomes clear once the law is situated within the chain of transactions that effectuate 340B discounts. *See* Verified Compl. ¶ 149 (explaining these transactions in further detail). First, manufacturers sell units of their drugs to wholesale distributors at commercial prices. *Id.* Wholesalers resell these units to pharmacies, again at commercial prices, and the pharmacies place these units in a common inventory and dispense them to any patient who arrives at the pharmacy counter with a prescription. *Id.* Up to this point, no one has attempted to determine whether any unit is eligible for 340B pricing, and the units have always been sold at commercial prices. *See id.* Some time later, the covered entity or one of its for-profit partners claims that a previously dispensed unit was 340B eligible, and the *wholesaler* then effectuates that discount, often by shipping the pharmacy a new, discounted "replenishment" drug. *Id.* To enable that retroactive discount, the wholesaler then requests a refund from the manufacturer. *Id.*

By regulating the prices charged by manufacturers, S.B. 5981 targets the sales between manufacturers and wholesalers. Novartis is located outside of Washington, and so are the main national wholesalers. Verified Compl. ¶ 150. The transactions between Novartis and its wholesalers therefore occur outside of Washington. *Id.* By ordering Novartis to charge no more than a certain price in these transactions, S.B. 5981 seeks to "directly

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 29

M<small>C</small>N<small>AUL</small> E<small>BEL</small> <small>PLLC</small>
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

control[ ] commerce occurring wholly outside the boundaries of [the] State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

Two federal courts of appeals have invalidated state laws targeting manufacturers' sales to wholesalers. In *Association for Accessible Medicines. v. Ellison*, the court enjoined enforcement of a law insisting "that out-of-state manufacturers sell their drugs to wholesalers for a certain price." 140 F.4th 957, 960-961 (8th Cir. 2025). Likewise, in *Association for Accessible Medicines v. Frosh*, the Fourth Circuit invalidated a state price-control statute because it targeted the "price the manufacturer or wholesaler charge[d] *in the initial sale of the drug*," rather than the "the price the … consumer ultimately pays." 887 F.3d 664, 671 (4th Cir. 2018). This case is no different.

## II.  NOVARTIS WILL SUFFER IRREPARABLE HARM ABSENT RELIEF.

A preliminary injunction is necessary to protect Novartis from immediate irreparable harm. S.B. 5981 puts Novartis in a lose-lose situation: If the law's enforcement is not enjoined, Novartis must decide whether to comply. If Novartis does so, it must expend significant resources to achieve the law's mandates. Verified Compl. ¶¶ 154-158. If Novartis does not comply, it risks significant penalties, including a fine of up to $125,000— plus additional per-day, per-violation sanctions. *Supra* pp.12-13. Being put to this dilemma by an unconstitutional law is an irreparable harm that warrants injunctive relief. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992); *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009) (finding irreparable harm from a risk of enforcement against "parties who were affected by an unconstitutional act").

S.B. 5981's financial harms to Novartis provide another basis for injunctive relief. It is well established that unrecoverable financial losses constitute irreparable injury. *E.g.*, *NFIB v. OSHA*, 595 U.S. 109, 120 (2022); *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). These losses come in multiple forms here: If Novartis complies with S.B. 5981, it will lose millions of dollars annually by providing additional 340B discounts

not required by federal law. Verified Compl. ¶ 156; Ex. 1 (McCrudden Decl.) ¶ 17. Those additional expenditures come with administrative costs, too. *Id.* If Novartis does not comply with S.B. 5981—or if the State takes the position that Novartis has not fully complied—Novartis must expend significant resources defending itself or its employees, on top of any financial penalties that may be imposed. RCW 19.86.090, 19.86.140; Verified Compl. ¶ 156; McCrudden Decl. ¶¶ 17, 24. Even if Novartis ultimately succeeds in demonstrating S.B. 5981's unconstitutionality, these costs likely can never be recovered.

Novartis's financial injuries also extend to less-quantifiable areas. For instance, S.B. 5981's financial burdens on Novartis will force it to divert substantial resources from research and development of new drug therapies. Verified Compl. ¶ 158; McCrudden Decl. ¶¶ 18-19. The resulting opportunity costs can neither be regained nor measured precisely. *Id.* S.B. 5981 also threatens to stigmatize Novartis by branding the company as a wrongdoer—even though Novartis's policy is permitted by federal law. *Supra* pp.20. In this way, S.B. 5981 hurts Novartis's reputation and goodwill, Verified Compl. ¶ 159; McCrudden Decl. ¶ 25—classic irreparable harms. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

Injunctive relief will preserve the status quo and cause Defendant no harm. Novartis has limited the contract pharmacy arrangements it will recognize in Washington since 2020. *See* Verified Compl. ¶ 55. Even under these reasonable limitations, the volume of 340B-priced sales has continued to grow rapidly year after year. *Id.* ¶ 44. Allowing S.B. 5981 to take effect would upend this status quo by declaring these longstanding guardrails unlawful. *Supra* pp.11-12. The purpose of a preliminary injunction is to "preserve the relative positions of the parties" pending a merits decision. *Lackey v. Stinnie*, 604 U.S. 192, 200-201 (2025) (quotation omitted). That is exactly what the Court should do here by preliminarily enjoining S.B. 5981's enforcement against Novartis.

McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

### III.   THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION.

The remaining factors also support injunctive relief.  The State will suffer no harm from a preliminary injunction because it has no interest in enforcing an unconstitutional law.  *April in Paris v. Becerra*, 494 F. Supp. 3d 756, 771 (E.D. Cal. 2020).  Similarly, the public interest would be harmed by enforcement of S.B. 5981 because the law is unconstitutional.  *Baird*, 81 F.4th at 1042.

Defendant may claim that S.B. 5981 promotes the public interest by providing a greater subsidy to Washington covered entities.  Not so.  First, this increased subsidy does not help Washington residents access drugs.  S.B. 5981 would not change anything about patient access to drugs—not the volume of drugs dispensed in Washington, not the places where those drugs are dispensed, and not the methods used to transport those drugs.  Verified Compl. ¶ 73.  Under the status quo, the same units of the same drugs are already being delivered to the same pharmacies, where they will be dispensed to the same customers.  *Id.*  Nor would S.B. 5981 change the prices those customers pay.  340B discounts are provided to covered entities retroactively, and generally are not shared with the pharmacy customers that bought the drugs—who will likely never even know about the discount.  *Id.* ¶¶ 39-41.

Second, it is far from clear that expanding the 340B Program in Washington will benefit the public.  The types of covered entities subject to Novartis's policy can generally use the revenue they extract from the 340B Program for any purpose they choose.  *See, e.g.*, Verified Compl. ¶ 22 (sponsorship of sports teams, launching a film company, and luxury real-estate development).  Increasing the volume of 340B discounts also causes a cascade of downstream harms.  For instance, 340B discounts can displace Medicaid rebates.  *Supra* p.5.  Ever-expanding 340B discounts have also helped fuel healthcare-industry "consolidation" that "has increased prices and insurance premiums."[3]  When a drug sale may be

---

[3] Editorial, *A Good Idea to Cut Drug Costs*, Wall St. J. (Sep. 21, 2025), https://tinyurl.com/y3k63v3z.

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 32

McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

deemed 340-eligible, a covered entity is incentivized to prescribe the most expensive drug possible, which helps maximize the pricing "spread." Long et al., *supra* pp.4-5, § VI.A. These extra costs are often passed along to patients and health plans.[4]

Last—but most importantly—Congress has already weighed these policy tradeoffs and selected the appropriate level of subsidy to be provided through the 340B Program. *See* U.S. Amicus Brief, *supra* p.14, at 23. In other words, the Court need not independently assess whether S.B. 5981 is good policy or furthers the public interest. *See Livadas v. Bradshaw*, 512 U.S. 107, 120 (1994) (Supremacy Clause analysis is not "an open-ended balancing act"). The real public interest here is in deferring to Congress regarding the optimal scope of the federal 340B Program. *American Trucking Ass'ns*, 559 F.3d at 1059-60 (finding "the public interest represented in Congress' decision" and in "the Constitution's declaration that federal law is to be supreme"). Enjoining S.B. 5981 would further the public interest by respecting Congress's policy judgment—as the Supremacy Clause requires.

## CONCLUSION

For all those reasons, the Court should preliminarily enjoin Defendant from enforcing S.B. 5981 against Novartis or any of its affiliates, officers, agents, representatives, wholesalers, distributors, or contractors pending a final merits decision.

I certify that this memorandum contains 10,879 words, in compliance with this Court's Order, ECF No. 12 and the Local Civil Rules.

---

[4] Ellen Gabler, *How a Company Makes Millions off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://tinyurl.com/yv7akn6t.

PL.'S MOT. FOR PRELIM. INJ.
(Case No. 3:26-cv-05302-DGE) – Page 33

McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

DATED this 30th day of March, 2026.

McNAUL EBEL PLLC

By:  /s/ Curtis C. Isacke
      Gregory J. Hollon, WSBA No. 26311
      Curtis C. Isacke, WSBA No. 49303
      600 University Street, Suite 2700
      Seattle, Washington 98101
      Phone:  (206) 467-1816
      Fax:     (206) 624-5128
      Email:  ghollon@mcnaul.com
              cisacke@mcnaul.com

Susan Cook*
Jessica L. Ellsworth*
Marlan Golden*
Jacob T. Young*
Claire A. Rhodes*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Phone: (202) 637-5600
Fax:   (202) 637-5910
Email: susan.cook@hoganlovells.com
       jessica.ellsworth@hoganlovells.com
       marlan.golden@hoganlovells.com
       jake.young@hoganlovells.com
       claire.rhodes@hoganlovells.com
*Admitted pro hac vice

Attorneys for Plaintiff