The Honorable David G. Estudillo

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

NOVARTIS PHARMACEUTICALS
CORPORATION, et al.,

                    Plaintiffs,

  v.

NICK BROWN, et al.,

                    Defendants.

NO. 3:26-cv-05302-DGE

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION

NOTE ON MOTION CALENDAR:
MAY 27, 2026 at 10:30 a.m.

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS ............................................................................................................... 3

      A.    The Federal 340B Program: A Safety Net for Safety-Net Providers ...................... 3

      B.    Contract Pharmacies Are Necessary for 340B Drug Distribution ........................... 7

      C.    Drug Manufacturers' Current Restrictions ................................................. 11

      D.    Washington Responds to Restrictive Manufacturer Policies ................................. 13

III.  LEGAL STANDARD ...................................................................................... 15

IV.   ARGUMENT ................................................................................................... 15

      A.    Plaintiffs Are Not Likely to Succeed on the Merits ....................................... 15

            1.    SB 5981 does not violate the Supremacy Clause ............................................. 15

                  a.    Plaintiffs have failed to establish field preemption .................................. 17

                        (1)    The field is the distribution of drugs by pharmacies ...................... 17

                        (2)    The field does not implicate dominant federal interests ................ 18

                        (3)    Federal law does not pervasively regulate the field ....................... 20

                  b.    Plaintiffs have failed to establish obstacle preemption ............................ 23

                        (1)    SB 5981 may regulate activities that federal law does not ............ 24

                        (2)    SB 5981 is not an obstacle to Medicaid and Medicare ................ 27

                        (3)    SB 5981 does not invite conflicting adjudications ........................ 28

                        (4)    SB 5981 does not obstruct 340B audits ....................................... 31

                  c.    SB 5981 does not violate the intergovernmental immunity doctrine ....... 33

                        (1)    SB 5981 does not directly regulate the federal government .......... 34

                        (2)    SB 5981 does not discriminate against the federal government
                               or those with whom it deals .......................................................... 34

                        (3)    The United States's statement of interest is unpersuasive ............ 37

            2.    SB 5981 does not violate the dormant Commerce Clause .............................. 39

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

3. SB 5981 does not effect unconstitutional takings ............................................. 41

    a. There is no taking in a voluntary program................................................. 42

    b. There is no physical taking ........................................................................ 44

    c. There is no regulatory taking .................................................................... 45

4. SB 5981 does not violate the First Amendment................................................ 47

    a. Strict scrutiny does not apply.................................................................... 47

    b. SB 5981 easily withstands intermediate scrutiny .................................... 50

B. Plaintiffs Will Not Suffer Irreparable Harm Absent Relief...................................... 52

C. The Equities and the Public Interest Weigh Against an Injunction......................... 55

D. Any Injunction Should be Narrowly Tailored and Stayed Pending Appeal............ 60

V. CONCLUSION ................................................................................................................... 60

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*AbbVie Inc. v. Drummond*,
    808 F. Supp. 3d 1266 (W.D. Okla. 2025) .................................................................... 23

*AbbVie Inc. v. Fitch*,
    No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss.
    July 22, 2024), *aff'd*, 152 F.4th 635 (5th Cir. 2025) ........................ 16, 17, 19, 22, 23, 29, 45

*AbbVie Inc. v. Neronha*,
    No. 1:25-cv-00388-JJM-AEM (D.R.I. Sept. 30, 2025)
    (included as Ex. B to McGinty Decl.) .................................................................... 16

*AbbVie Inc. v. Skrmetti*,
    No. 3:25-cv-00519, 2026 WL 542712
    (M.D. Tenn. Feb. 26, 2026) .................................................................... 30

*AbbVie Inc. v. Skrmetti*,
    No. 3:25-cv-00519, 2025 WL 1805271
    (M.D. Tenn. June 30, 2025) .................................................... 16, 23, 31, 32, 33, 42, 44

*AbbVie Inc. v. Murrill*,
    166 F.4th 528 (5th Cir. 2026) ......................................... 16, 17, 18, 29, 44, 45

*AbbVie Inc. v. Weiser*,
    811 F. Supp. 3d 1264 (D. Colo. 2025) ................................... 16, 23, 29, 34, 46

*AIDS Healthcare Found. v. Douglas*,
    457 F. App'x 676 (9th Cir. 2011) ..................................................... 16, 21, 25

*Alexander v. Choate*,
    469 U.S. 287 (1985) .................................................................... 39

*Amylin Pharms., Inc. v. Eli Lilly & Co.*,
    456 F. App'x 676 (9th Cir. 2011) .................................................................... 47

*Ardary v. Aetna Health Plans of Cal., Inc.*,
    98 F.3d 496 (9th Cir. 1996) .................................................................... 20

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) .................................................................... 53

*Arizona v. United States*,
    567 U.S. 387 (2012) .................................................................... 17, 24, 31

*Ass'n for Accessible Medicines v. Frosh*,
    887 F.3d 664 (4th Cir. 2018) .................................................................... 41

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

iii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

*Ass'n for Accessible Medicines v. Ellison*,
140 F.4th 957 (8th Cir. 2025) ........................................................................................ 41

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011).................................................................................................. 6, 19

*Astrazenca Pharm. v. Bailey*,
2:24-cv-041430MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) ............................ 44, 47

*AstraZeneca Pharms. LP v. Lopez*,
No. 25-00369 MWJS-WRP, 2026 WL 497141
(D. Haw. Feb. 23, 2026) ............................................... 16, 19, 29, 34, 35, 37

*Avenal Cmty. Health Ctr. v. Baass*,
No. 23-16109, 2024 WL 4441430 (9th Cir. Oct. 8, 2024) ...................................... 16, 21, 25

*Baker Cnty. Med. Servs., Inc. v. U.S. Att'y. Gen.*,
763 F.3d 1274 (11th Cir. 2014) .................................................................................... 43

*Barnett Bank of Marion Cnty. v. Nelson*,
517 U.S. 25 (1996)...................................................................................................... 26

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) ........................................................................................ 36

*Bowers v. Whitman*,
671 F.3d 905 (9th Cir. 2012) ........................................................................................ 43

*Boyle v. United Tech. Corp.*,
487 U.S. 500 (1988)...................................................................................................... 20

*Buckman Co. v. Pls.' Legal Comm.*,
531 U.S. 341 (2001)...................................................................................................... 31

*Califano v. Yamasaki*,
442 U.S. 682 (1979)...................................................................................................... 60

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ................................................................................... 53, 54

*CDK Global LLC v. Brnovich*,
16 F.4th 1266 (9th Cir. 2021) ....................................................................................... 24

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) .............................................................. 42

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980)...................................................................................................... 52

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011)................................................................................................. 17, 25

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

iv

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

*Chinatown Neighborhood Ass'n v. Harris*,
794 F.3d 1136 (9th Cir. 2015) ........................................................................... 22

*City of Los Angeles v. AECOM Servs., Inc.*,
854 F.3d 1149 (9th Cir. 2017) ...................................................................... 22, 25

*Colony Cove Props., LLC v. City of Carson*,
888 F.3d 445 (9th Cir. 2018) ............................................................................. 46

*Davidson v. Sprout Foods, Inc.*,
106 F.4th 842 (9th Cir. 2024),
*cert. denied*, 145 S. Ct. 1922 (2025) ............................................................ 19, 30

*Dawson v. Steager*,
586 U.S. 171 (2019) ............................................................................................ 38

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ............................................................................. 53

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) ............................................................................................ 40

*Eng. v. Gen. Elec. Co.*,
496 U.S. 72 (1990) .............................................................................................. 29

*Erickson v. U.S. ex rel. Dep't of Health & Hum. Servs.*,
67 F.3d 858 (9th Cir. 1995) ............................................................................... 43

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ............................................................................................ 26

*Forest Park II v. Hadley*,
336 F.3d 724 (8th Cir. 2003) ............................................................................. 28

*Full Value Advisors, LLC v. SEC*,
633 F.3d 1101 (D.C. Cir. 2011) ......................................................................... 48

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) .............................................................................................. 17

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) ............................................................................................ 26

*Geo Group, Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) .............................................................................. 36

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) ........................................................................... 55

*Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*,
471 U.S. 707 (1985) ................................................................................. 18, 24, 25

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

v

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015)......................................................................................... 45

*Idaho v. Coeur d'Alene Tribe*,
794 F.3d 1039 (9th Cir. 2015) ................................................................... 53, 54

*Kansas v. Garcia*,
589 U.S. 191 (2020)......................................................................................... 17

*Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*,
469 U.S. 256 (1985)......................................................................................... 26

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)....................................................................................... 47

*M'Culloch v. Maryland*,
17 U.S. 316 (1819)........................................................................................... 34

*Managed Pharmacy Care v. Sebelius*,
716 F.3d 1235 (9th Cir. 2013) ................................................... 43, 44, 45, 47

*Maryland v. King*,
567 U.S. 1301 (2012)................................................................................. 55, 60

*McDaniel v. Wells Fargo Invs., LLC*,
717 F.3d 668 (9th Cir. 2013) .......................................................................... 26

*Nat'l Fed'n of the Blind v. United Airlines Inc.*,
813 F.3d 718 (9th Cir. 2016) .......................................................................... 23

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356, 368 (2023)..................................................................... 40, 41, 42

*Net Choice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .................................................................. 48, 49

*New York v. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) ............................................................................. 59

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................... 15, 60

*North Dakota v. United States*,
495 U.S. 423 (1990)................................................................................... 34, 35

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024)................................................ 11, 22, 30, 33, 54

*Novartis Pharms. Corp. v. Bailey*,
No. 2:24-cv-04131-MDH, 2025 WL 595189 (W.D. Mo. Feb. 24, 2025) ............. 16

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

vi

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

*Novartis Pharms. Corp. v. Frey*,
 No. 1:25-cv-00407-JCN, No. 1:25-cv-00416-JCN,
 2025 WL 2813787 (D. Me. Sept. 23, 2025) ................... 16, 23, 24, 28, 29, 32, 35, 36, 44, 45

*Novartis Pharms. Corp. v. Espinosa*,
 No. 1:21-cv-01479 (D.D.C. July 9, 2021)
 (included as Ex. C to McGinty Decl.) ....................................................... 21

*Novartis Pharms. Corp. v. Espinosa*,
 No. 1:21-cv-01479 (D.D.C. May 31, 2021)
 (included as Exhibit E to the McGinty Decl.) ................................................. 30

*Novartis v. Johnson*,
 No. 21-5299, No. 21-5304 (D.C. Cir. June 15, 2022)
 (included as Ex. D. to the McGinty Decl.) .................................................... 21

*Novartis v. Neronha*,
 1:25-cv-00388-JJM-AEM (D.R.I Sept. 30, 2025)
 (included as Ex. B to the McGinty Decl.) .................................................... 42

*P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*,
 485 U.S. 495 (1988)...................................................................... 22

*Pa. Coal Co. v. Mahon*,
 260 U.S. 393 (1922)...................................................................... 42

*Penn Central Transp. Co. v. City of New York*,
 438 U.S. 104 (1978)................................................................ 43, 46, 47

*Pharm. Care Mgmt. Ass'n v. Rowe*,
 429 F.3d 294 (1st Cir. 2005)............................................................ 48, 49

*Pharm. Rsch. & Mfrs. of Am. v. Walsh*,
 538 U.S. 644 (2003)................................................................ 24, 25, 27

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
 95 F.4th 1136 (8th Cir. 2024) ........................................................... 10, 18

*Pharm. Rsch. & Mfrs. of Am. v. Frey*,
 2026 WL 184504 (D. Me. 2026) ....................................................... 17, 18, 34

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
 645 F. Supp. 3d 890 (E.D. Ark. 2022),
 *aff'd*, 95 F.4th 1136 (8th Cir. 2024),
 *cert. denied*, 145 S. Ct. 768 (2024)......................................... 16, 22, 23, 28, 29, 39

*Pharm. Rsch. & Mfrs. of Am. v. McCuskey*,
 171 F.4th 674 (4th Cir. 2026) ..................................................... 23, 26, 27, 34, 36, 39

*Pharm. Rsch. & Mfrs. of Am. v. Morrisey*,
 760 F. Supp. 3d 439 (S.D.W. Va. 2024)..................................................... 23

| | | |
|---|---|---|
| DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE | vii | ATTORNEY GENERAL OF WASHINGTON<br>Complex Litigation Division<br>800 Fifth Avenue, Suite 2000<br>Seattle, WA  98104-3188<br>206-464-7744 |

*Pharm. Rsch. & Mfrs. of Am. v. Murrill,*
    No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) .................................... 16

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi,*
    153 F.4th 795 (9th Cir. 2025) ................................................ 43, 44, 45, 46, 48, 49, 50, 51, 52

*Rekhter v. Dep't of Soc. & Health Servs.,*
    323 P.3d 1036 (Wash. 2014) ................................................................................................ 54

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947)...................................................................................................... 17, 18

*Sanofi Aventis U.S. LLC v. Dep't Health & Hum. Servs.,*
    58 F.4th 696 (3d. Cir. 2023) ........................................... 5, 10, 11, 20, 22, 24, 25, 29, 30, 60

*Sperry v. Florida ex rel. Fla. Bar,*
    373 U.S. 379 (1963) ............................................................................................................. 26

*St. Luke's Health Sys., Ltd. v. Labrador,*
    782 F. Supp. 3d 953 (D. Idaho 2025) .................................................................................. 27

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
    535 U.S. 302 (2002)............................................................................................................. 42

*Together Emps. v. Mass Gen. Brigham Inc.,*
    32 F.4th 82 (1st Cir. 2022)................................................................................................... 54

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025)............................................................................................................. 60

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) ......................................................................................... 16, 27

*United States v. Locke,*
    529 U.S. 89 (2000)............................................................................................................... 23

*United States v. New Mexico,*
    455 U.S. 720 (1982)............................................................................................................. 35

*United States v. Sindel,*
    53 F.3d 874 (8th Cir. 1995) ................................................................................................. 48

*United States v. Washington,*
    596 U.S. 832 (2022)......................................................................................................... 35, 36

*Valle de Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ............................................................................................. 26

*Washington v. United States,*
    460 U.S. 536 (1983)............................................................................................................. 37

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

viii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

*Winter v. Nat. Res. Def. Council*, Inc.,
  555 U.S. 7 (2008)...................................................................................... 15, 53, 55

*Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
  475 U.S. 282 (1986).......................................................................................... 31

*Wyeth v. Levine*,
  555 U.S. 555 (2009)............................................................................ 17, 18, 19, 26

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024) ........................................................................ 48, 49

*Zango, Inc. v. Kaspersky Lab, Inc.*,
  568 F.3d 1169 (9th Cir. 2009) .............................................................................. 46

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
  471 U.S. 626 (1985)............................................................................................. 50

**Constitutional Provisions**

U.S. Const. amend. V ............................................................................................. 42

**Statutes**

42 U.S.C. § 1395............................................................................................... 20, 39

42 U.S.C. § 1396a .................................................................................................. 20

42 U.S.C. § 1396r-8 .................................................................................................. 4

42 U.S.C. § 256b ................................................................... 4, 5, 6, 7, 24, 31, 38

42 U.S.C. § 1395.................................................................................................... 25

Laws of 2019, ch. 334........................................................................................... 51

**Rules**

Fed. Rule Civ. P. 23(a) ......................................................................................... 54

**Regulations**

340B Drug Pricing Program; Administrative Dispute
  Resolution Regulation (ADR Rule), 89 Fed. Reg. 28643
  (Apr. 19, 2024) ................................................................................................ 7, 32

42 C.F.R. § 10.21................................................................................................... 30

42 C.F.R. § 10.3....................................................................................................... 6

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

ix

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

Final Notice Regarding Section 602 of the Veterans Health
    Care Act of 1992 Entity Guidelines (1994 Guidance),
    59 Fed Reg. 25110 (May 13, 1994)............................................................... 9, 13, 32

Manufacturer Audit Guidelines and Dispute Resolution
    Process 0905-ZA-19, 61 Fed. Reg. 65406 (Dec. 12, 1996)............................... 7, 31

Notice Regarding 340B Drug Pricing Program-Contract
    Pharmacy Services (2010 Guidance), 75 Fed. Reg. 10272
    (Mar. 5, 2010) ................................................................................................ 8, 10

Notice Regarding Section 602 of the Veterans Health Care
    Act of 1992 (1996 Guidance); Contrary Pharmacy Services,
    61 Fed. Reg. 43549 (Aug. 23, 1996) ....................................................... 8, 9, 10, 22

## Other Authorities

Dep't of Health & Hum. Servs. Off. Gen. Couns., Advisory
    Opinion 20-06 on Contract Pharmacies Under the 340B
    Program (Dec. 30, 2020) .......................................................................................... 10

H.R. Rep. No. 102-384, pt. II (1992)........................................................ 3, 4, 5, 57, 60

Health Res. & Serv. Admin., *340B Drug Pricing Program,*
    *Contract Pharmacy Services* .................................................................................. 11

Health Res. & Serv. Admin., *340B Drug Pricing Program,*
    *Program Integrity* .................................................................................................. 10

Senate Bill 5981........................................................ 14, 15, 24, 31, 33, 45, 47, 50, 52

United States Centers for Medicare & Medicaid Services,
    *Medicare Transaction Facilitator (MTF) Overview for*
    *Dispensing Entities* (April 2026) ........................................................................... 34

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

x

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

## I.    INTRODUCTION

The 340B program is a "vital lifeline" for healthcare providers that serve vulnerable and low-income patients. The federal 340B statute requires drug manufacturers that participate in Medicaid and Medicare Part B to offer discounts on certain drugs sold to these providers (i.e., covered entities). Covered entities use these savings to ensure the continued viability of their public health missions, including by providing prescription drug discounts to low-income patients, funding critical healthcare services that would otherwise operate at a loss, providing outreach, transportation, and care coordination for patients, and more.

Federal law controls the price that covered entities pay for discounted 340B drugs. However, as four federal Circuit courts have confirmed, federal law is silent about how the medications are delivered to patients. Drug manufacturers have exploited this silence, restricting covered entities' use of outside pharmacies (contract pharmacies) and requiring burdensome claims data submissions. These restrictive policies have multiplied in recent years, depriving covered entities of millions of dollars in savings and jeopardizing their very existence.

To ensure that vitally important safety-net hospitals and clinics can continue to provide necessary health care to underserved populations, Washington and at least 20 other states have sought to fill this silence in the federal 340B statute. At issue here is Senate Bill (SB) 5981, which prohibits drug manufacturers from restricting covered entities' delivery of 340B drugs via contract pharmacies and from conditioning the delivery of 340B drugs on a covered entity's submission of claims data. Many analogous state laws are already in effect across the country and have survived numerous legal challenges.

Plaintiffs ask this Court to enjoin SB 5981 by advancing far-fetched legal theories that conflict with Supreme Court and Ninth Circuit precedent. The Court should reject all of them, starting with the claim that SB 5981 is preempted by Section 340B of the federal law. The Ninth Circuit has repeatedly confirmed that state laws and regulations concerning the 340B program are *not* preempted, and at least eleven federal courts, including the Fifth and Eighth Circuits,

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

have upheld other states' versions of SB 5981 against preemption challenges.

This Court should do the same. It is well-settled that there is a presumption *against* preemption in this case, which Plaintiffs fail to overcome. First, Plaintiffs cannot show that Congress has a dominant federal interest and has so pervasively regulated this area of law that there is no room left for state legislation. Indeed, this argument is directly contradicted by Plaintiffs' own prior representations and four federal Circuit decisions recognizing that federal law is silent with respect to the delivery of 340B drugs. Moreover, the Supreme Court has held that a dominant federal interest only exists in special cases where the responsibilities of the national government are especially high, such as in the case of foreign affairs.

Nor can Plaintiffs overcome the high bar to show that SB 5981 is preempted because it conflicts with Section 340B by standing as an obstacle to it. Obstacle preemption requires irreconcilability between state and federal law, which is simply not present here. SB 5981 expressly states that nothing in the law should be construed or applied to conflict with federal law or regulations. And its text confirms that it is limited to regulating 340B drug delivery and claims data submissions and in no way regulates 340B drug pricing or other areas of federal concern. SB 5981 likewise does not interfere with Congress's Medicaid and Medicare objectives or invite conflicting enforcement schemes. Plaintiffs' assertions to the contrary are speculative, conclusory, and amount to nothing more than policy arguments.

Neither does SB 5981 violate the intergovernmental immunity doctrine. This doctrine relates to whether a state can directly regulate or discriminate against the *federal government* and its agents, not private drug manufacturers, and no federal court has ever held that state laws like SB 5981 violate the doctrine. The doctrine should not be construed so broadly as to sweep up *any* participant in *any* federal program, as Plaintiffs urge. Nonetheless, this claim also fails because Plaintiffs cannot show that they impose conditions on their 340B offers on behalf of the federal government and that the federal government is financially disadvantaged by SB 5981, two key requirements to show a violation under this doctrine.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

Plaintiffs Novartis and AbbVie's remaining arguments fare no better. SB 5981 does not violate the dormant Commerce Clause because the delivery of 340B drugs in Washington is *intra*state conduct. It does not constitute an unconstitutional "taking" because there can be no taking of private property when premised on participation in a voluntary program. And SB 5981's drug manufacturer reporting requirements do not violate the First Amendment because routine economic disclosures are not subject to strict scrutiny and directly further substantial government interests. In any event, the reporting requirements are not effective until April 2027, so there is no basis to grant preliminary injunctive relief.

Plaintiffs also cannot demonstrate irreparable harm, as their alleged injuries are either speculative or based on a constitutional violation that does not exist. In contrast, the State suffers irreparable harm any time it is enjoined from effectuating its statutes. Moreover, the balance of the equities and public interest strongly weigh in the State's favor. If SB 5981 is enjoined, covered entities will continue to suffer massive financial losses, directly threatening their ability to sustain critical programs for vulnerable and low-income patients throughout the state. Covered entities simply cannot be deprived of essential funding at this precarious time, and it is crucial that they receive the immediate relief and resources that SB 5981 was intended to provide.

The Court should deny Plaintiffs' motions for a preliminary injunction.

## II.    FACTS

### A.    The Federal 340B Program: A Safety Net for Safety-Net Providers

The prescription drug program central to this litigation was enacted by Congress to fix a problem of its own creation. This history is critical for understanding how the 340B program works, who it benefits, and why it exists. Before 1990, drug manufacturers would often offer discounted drugs to healthcare providers and hospitals that served safety-net patients and other marginalized populations. *See* H.R. Rep. No. 102-384, pt. II, at 9–10 (1992). In 1990, Congress created the Medicaid Prescription Drug Rebate Program and required drug manufacturers to give the government the "best price" available in the market. *Id.* Unfortunately, this had the

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

unintended consequence of discouraging manufacturers from offering voluntary discounts to safety-net providers. *Id.* Two years later, Congress established Section 340B of the Public Health Service Act (the 340B program), to expressly address this unintended consequence and statutorily protect drug discounts for these entities. *See id.* at 12 (expecting the 340B program to "remove any disincentive that the Medicaid rebate program creates to discourage manufacturers from providing substantial voluntary or negotiated discounts to these clinics, programs, and hospitals"); *see also* Dkt. # 14 at 12 ("Congress created the 340B Program in 1992 to address that disincentive."). Thus, the intended beneficiaries of Congress's 340B program are hospitals and clinics, not patients—although Congress knew restoring the drug discounts for providers would indirectly benefit patients. H.R. Rep. No. 102-384, pt. II, at 9–10 (1992) (noting that the price increases "have in turn reduced the level of services and the number of individuals that these hospitals and clinics are able to provide with the same level of resources.").

The 340B program requires drug manufacturers that participate in Medicaid and Medicare Part B to agree to offer certain drugs to "covered entities" at a discount. 42 U.S.C. § 256b(a)(1). Both the type of drugs sold and the ceiling price—i.e., the maximum amount for which a 340B drug can be sold—are set out in the statute. *Id.* §§ 256b(a)(1), (3), 1396r-8(a)(1), (5). Congress defined "covered entities" to include fifteen types of government-funded hospitals, community health centers, and clinics that serve low-income patients, ensuring that organizations serving safety-net patients and other marginalized populations benefit from this program. *See* 42 U.S.C. § 256b(a)(4). The 340B program helps covered entities provide healthcare and other critical services to low income and vulnerable populations because the entities earn savings when insurance companies reimburse them at full price for drugs that they bought at the 340B discount. *See* Decl. of William McGinty in Supp. of Defs.' Opp'n to Pls.' Mots. for Prelim. Inj. (McGinty Decl.), Ex. A (Wallack Report) ¶ 30; *see also* Decl. of David Pearson in Supp. of Defs.' Opp'n to Pls.'s Mots. Prelim. Inj. (Pearson Decl.) ¶ 10.

Congress intended the 340B program to support covered entities in stretching "scarce

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

[f]ederal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. II, at 12 (1992). Reality matches this intent: the 340B program has become a critical lifeline to these covered entities, who have razor thin operating margins that are getting thinner. *See* Decl. of Dr. Timothy Dellit in Supp. of Defs.' Opp'n to Pls.'s Mots. Prelim. Inj. (Dellit Decl.) ¶ 25; Pearson Decl. ¶¶ 29–31, 42; *see also* Decl. of Mike Glenn in Supp. of Defs.' Opp'n to Pls.'s Mots. Prelim. Inj. (Glenn Decl.) ¶¶ 6–8; Decl. of Josh Martin in Supp. of Defs.' Opp'n to Pls.'s Mots. Prelim. Inj. (Martin Decl.) ¶¶ 6, 8; Wallack Report ¶¶ 39–44. Covered entities use the savings from the 340B program to provide prescription drug discounts for low-income patients, fund critical healthcare programs that operate at a loss, and provide patient services such as healthcare navigation, transportation, and care coordination, and more. Decl. of Beau Brown in Supp. of Defs.' Opp'n to Pls.'s Mots. Prelim. Inj. (Brown Decl.) ¶ 21; Pearson Decl. ¶¶ 29–30; Glenn Decl. ¶ 8; Martin Decl. ¶ 8.

"Section 340B's substantive requirements and restrictions are few." *Sanofi Aventis U.S. LLC v. Dep't Health & Hum. Servs.*, 58 F.4th 696, 700 (3d. Cir. 2023). The 340B statute does not limit how many discounted drugs a covered entity may purchase. *See* H.R. Rep. No. 102-384, pt. II, at 13. Nor does the statute tell covered entities how to spend the savings they earn as beneficiaries of the 340B program, instead deferring to their judgment of how to best use 340B savings to stretch limited resources to "reach[] more vulnerable patients" and "provid[e] more comprehensive services." *Id.* at 12. Absent from the 340B statute is any requirement that covered entities pass on savings from the discounted drugs to the patients who receive them, although many covered entities do so anyways. In this way, the 340B program is not a patient-discount program but a provider-support mechanism. Within the 340B statute, Congress only imposed two broad limits on covered entities. First, in order to prevent duplicate discounts, covered entities may not request a 340B discount for a drug that is already subject to a Medicaid rebate. 42 U.S.C. § 256b(a)(5)(A). Second, covered entities may not engage in diversion by reselling or transferring the drugs to someone who is not a qualifying patient.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

*Id.* § 256b(a)(5)(B).

For drug manufacturers, the 340B program is voluntary. To be sure, manufacturers are incentivized to participate due to the financial benefit of having their drugs covered by Medicaid and Medicare Part B. But manufacturers must affirmatively opt into the 340B Program by signing Pharmaceutical Pricing Agreements (PPAs) with the United States Department of Health and Human Services (HHS). 42 U.S.C. § 256b(a)(1); 42 C.F.R. § 10.3. PPAs are not "transactional, bargained-for contracts" but rather form agreements that "merely recite the statutory obligations of manufacturers and the HHS Secretary." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011) (citation modified). So, by signing a PPA, a manufacturer agrees to sell 340B drugs at a discounted rate to covered entities as a condition of receiving Medicaid and Medicare Part B reimbursements. 42 U.S.C. § 256b(a)(1).

The Health Resources and Services Administration (HRSA), an agency within HHS, administers the 340B Program. HRSA's rulemaking authority is limited to (1) establishment of an administrative dispute resolution process (ADR); (2) drug-pricing methodology; and (3) imposition of monetary sanctions for violations. *See* 42 U.S.C. § 256b(d)(1)(B)(i), (1)(B)(vi), (3). HRSA's ADR process is circumscribed: covered entities can bring claims regarding overcharges, and manufacturers can bring claims regarding duplicate discounts and diversion. *Id*. § 256b(d)(3)(A). If HRSA finds a covered entity violated the statute by receiving duplicate discounts or engaging in diversion, the entity is liable to the manufacturer for the amount improperly received. *Id.* § 256b(a)(5)(D). In appropriate cases, the Secretary of HHS may also impose sanctions, which could include interest penalties, disqualification of the entity for a period, and/or reference of the matter to other federal authorities. *Id.* § 256b(d)(2)(B)(v). With respect to manufacturers, the Secretary can impose monetary sanctions for charging more than the ceiling price. *Id.* § 256b(d)(1)(B)(vi).

Both HRSA and drug manufacturers are authorized to audit covered entities to ensure compliance with the diversion and duplicate rebate provisions. *Id.* § 256b(a)(5)(C). The program

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

contains enforcement mechanisms and penalties for manufacturers and covered entities that fail to comply with those provisions. *Id.* § 256b(d)(1)(B)(v)–(vi), § (a)(5)(C)–(D). To conduct an audit, HRSA or a drug manufacturer must have "reasonable cause" that a covered entity may have violated the statute. *See* Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19, 61 Fed. Reg. 65406, 65409 (Dec. 12, 1996). This "reasonable cause" standard, however, is "not overly burdensome" and does not "present any barriers to a manufacturer's ability to perform an audit of a covered entity." *See* 340B Drug Pricing Program; Administrative Dispute Resolution Regulation (ADR Rule), 89 Fed. Reg. 28643, 28646 (Apr. 19, 2024). For example, "[s]ignificant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause." *See* 61 Fed. Reg. 65406; *see also* Decl. of Sumona Das Gupta in Supp. of Defs.' Opp'n to Pls.' Mots. Prelim. Inj. (Das Gupta Decl.) ¶ 33; *see also* Wallack Report ¶ 65.

As these provisions demonstrate, participation in the 340B Program carries with it a high level of accountability. HRSA must approve eligible entities, and covered entities must recertify their eligibility every year. *See* Wallack Report ¶ 80. Covered entities routinely invest in dedicated compliance personnel, systems, and internal controls to ensure adherence to program requirements. *Id*.

## B.    Contract Pharmacies Are Necessary for 340B Drug Distribution

Section 340B addresses the sellers (drug manufacturers) and the buyers (covered entities) of the program. But it has always been silent on the delivery of drugs from buyer to patient. When Congress enacted Section 340B in 1992, only a "very small number" of the initial 11,500 covered entities had in-house pharmacies that they could use to dispense drugs to patients. Notice Regarding Section 602 of the Veterans Health Care Act of 1992 (1996 Guidance); Contrary Pharmacy Services, 61 Fed. Reg. 43549, 43550 (Aug. 23, 1996). As a result, most covered entities entered into contracts with external pharmacies to dispense 340B drugs to covered

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

7

entities' qualifying patients. "Contract pharmacies," as they became known, encompass a range of pharmacies located where patients reside, including retail chain pharmacies, independent local pharmacies, and specialty pharmacies. Under contract pharmacy arrangements, covered entities purchase and pay for the 340B drugs from manufacturers, and manufacturers ship them to the contract pharmacies for distribution to eligible patients. Thus, within the 340B landscape the contract pharmacy is a distribution intermediary for the covered entity but is not a buyer itself. Wallack Report ¶ 48.

Covered entities cannot dispense all 340B drugs at their in-house pharmacies. For starters, not all covered entities have in-house pharmacies. *See* 1996 Guidance, at 43550; *see also* Martin Decl. ¶ 11. More importantly, patients have the freedom to choose where to pick up their prescriptions, and covered entities may not restrict this important choice. *See* Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services (2010 Guidance), 75 Fed. Reg. 10272, 10278 (Mar. 5, 2010) ("The covered entity will inform the patient of his or her freedom to choose a pharmacy provider"). Many qualifying patients do not use covered entities' in-house pharmacies for a variety of reasons, including requirements from their insurers mandating the use of particular pharmacies, patients' need for specialty medications from specialty pharmacy networks, and patients' own preferences. Das Gupta Decl. ¶¶ 20, 26–27; Pearson Decl. ¶¶ 13, 23; Wallack Report ¶ 54. And covered entities with sprawling service areas, such as rural hospitals, rely on contract pharmacies to dispense medication near where patients live. Decl. of Sheila Berschauer in Supp. of Defs.' Opp'n to Pls.' Mots. Prelim. Inj. (Berschauer Decl.) ¶ 11; Martin Decl. ¶ 11. Contract pharmacies also can provide services that increase medication adherence (i.e., compliance packaging) and help address limitations in in-house formularies. Pearson Decl. ¶ 13.

The Secretary of HHS lacks rulemaking authority over contract pharmacies' distribution of 340B drugs. However, HRSA has, on several occasions, issued non-binding guidance on the use of contract pharmacies. First, in 1994—just two years after Congress enacted Section

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

340B—HRSA described covered entities' use of "contract pharmacies" as a "customary business practice" and warned that any manufacturer limitations on these transactions could "discourag[e] entities from participating in the program." Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines (1994 Guidance), 59 Fed Reg. 25110, 25113 (May 13, 1994).[1]

Then, in 1996, HRSA issued guidance confirming contract pharmacies' valid place within the 340B landscape:

> The statute *is silent as to permissible drug distribution systems*. There is *no requirement* for a covered entity to purchase drugs directly from the manufacturer or *to dispense drugs itself*. It is clear that *Congress envisioned that various types of drug delivery systems would be used* to meet the needs of the very diversified group of 340B covered entities.

1996 Guidance, at 43549 (emphasis added). The 1996 Guidance recognized that "many covered entities" do not "operate their own licensed pharmacies" and it is "essential" for these covered entities to still be able to "access 340B pricing." *Id.* HRSA stated that it is "the Department's position that if a covered entity using contract pharmacy services requests to purchase a covered drug from a participating manufacturer, the statute directs the manufacturer to sell the drug at the discounted price." *Id.* HRSA also explained that the use of contract pharmacies is not in tension with the statutory prohibition on diversion. Instead, the use of contract pharmacies provides covered entities that otherwise would be unable to participate "a process for accessing 340B pricing" but "does not in any way extend this pricing to entities which do not meet program eligibility." *Id*. Under the 1996 Guidance, HRSA allowed covered entities to each use one contract pharmacy. *Id*.

In 2010, HRSA issued new guidance expanding the use of contract pharmacies further, allowing covered entities to use an unlimited number of them. *See* 2010 Guidance, at 10272–73. HRSA endorsed an expanded use of contract pharmacies because it would allow covered entities

---

[1] Relatedly, the 1994 Guidance also stated that "a manufacturer may not condition the offer of statutory discounts upon an entity's assurance of compliance with section 340B provisions." *Id.*

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

9

"to more effectively utilize the 340B program and create wider patient access." *Id*. This guidance applied to covered entities regardless of whether they had in-house pharmacies. *Id*.

Pharmaceutical manufacturers' opposition to covered entities' use of contract pharmacies is not new, as it results in a greater number of 340B drugs purchased overall, and thus, decreases profits for the manufacturers. Starting in 2020, some manufacturers, including Novartis, began to place limits on covered entities' use of contract pharmacies. Restrictions included limiting the number of pharmacies to which they would deliver drugs, limiting the maximum allowable distance between the covered entity and the pharmacy site, and in some cases requiring covered entities to provide claims data to use contract pharmacies. In at least some instances, these limitations "caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024).

HRSA stepped in. First, it released an Advisory Opinion "declaring that Section 340B unambiguously requires drug makers to deliver 340B drugs to an unlimited number of contract pharmacies." *Sanofi Aventis*, 58 F.4th at 701 (citing Dep't of Health & Hum. Servs. Off. Gen. Couns., Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program (Dec. 30, 2020)). Second, it issued violation letters to several drug manufacturers in May 2021, finding their policies that restricted covered entities' ability to use contract pharmacies and required the production of claims data to be unlawful.[2]

Certain drug manufacturers, including Novartis, brought lawsuits challenging these actions by HHS. The Third Circuit and D.C. Circuit both found HHS's efforts to require manufacturers to allow delivery of 340B drugs to an unlimited number of contract pharmacies to be unlawful. *See Sanofi Aventis*, 58 F.4th at 706; *see also Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 464 (D.C. Cir. 2024). The courts reasoned that because Section 340B is silent

---

[2] Health Res. & Serv. Admin., *340B Drug Pricing Program, Program Integrity*, available at https://www.hrsa.gov/opa/program-integrity

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

regarding delivery to contract pharmacies, HRSA erred in concluding the statute *required* delivery of discounted drugs to unlimited contract pharmacies. *See Sanofi Aventis*, 58 F.4th at 703; *see also Johnson*, 102 F.4th at 461.

Today, HRSA's website states that a "340B covered entity may sign a written contract with one or more pharmacies to provide pharmacy services and 340B drugs to authorized patients."[3]

**C.    Drug Manufacturers' Current Restrictions**

After the rulings from the Third and D.C. Circuits that Section 340B is silent about the use of contract pharmacies, manufacturer-imposed restrictions on their use have proliferated. Currently, at least 40 drug manufacturers limit the use of contract pharmacies by covered entities in Washington and/or require submission of transactional-level claims data. Brown Decl. ¶¶ 16–18; Das Gupta Decl. ¶ 32; Wallack Report ¶ 71. Due to these restrictions, covered entities in Washington have lost a substantial portion of their 340B savings. *E.g.*, Pearson Decl. ¶ 22 ($7 million from 10 FQHQs); Brown Decl. ¶ 18 ($3 million); Martin Decl. ¶ 11 ($2.8 million); Glenn Decl. ¶ 11 ($524,000); Berschauer Decl. ¶ 20 ($845,000). For example, one hospital with a broad, rural service area and no in-house pharmacy has seen its 340B savings slashed by approximately two thirds. Martin Decl. ¶ 11.

Novartis currently refuses to allow covered entities with an in-house pharmacy to use a contract pharmacy and only allows covered entities without an in-house pharmacy to designate one contract pharmacy. Dkt. # 1 ¶ 64. Novartis also requires covered entities to provide claims data, which Novartis only began requiring in 2025. *Id*. ¶¶ 55–66; Dkt. # 1-2 at 7. Novartis only requires certain covered entities—but not all—to comply with its restrictions. Dkt. # 1-2 (exempting federal grantees from restrictions).

AbbVie currently prohibits a covered entity from using any contract pharmacies if it has

_____

[3] Health Res. & Serv. Admin., *340B Drug Pricing Program, Contract Pharmacy Services*, available at https://www.hrsa.gov/opa/implementation-contract

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

11

an in-house pharmacy. Compl. for Declaratory & Injunctive Relief ¶ 78, Dkt. # 1, *Abbvie Inc. v. Brown*, No. 2:26-cv-01018-DGE (W.D. Wash. Mar. 25, 2026). If a covered entity does not have an in-house pharmacy, AbbVie will only send 340B drugs to one designated contract pharmacy, and only if that pharmacy is within 40 miles of the covered entity's parent site and if the covered entity submits certain claims data. *Id.* AbbVie allows certain covered entities (i.e., grantee covered entities) to use an unlimited number of contract pharmacies, but only if they submit claims data. *Id.*

PhRMA's members have imposed similar limitations. *See* Compl. for Declaratory & Injunctive Relief ¶¶ 35, 35 n.1, Dkt. # 1, *Pharm. Rsch. & Mfrs. of Am. v. Brown*, No. 3:26-cv-05374-DGE (W.D. Wash. Apr. 10, 2026). For instance, since March 2022, Bristol Myers Squibb has limited covered entities to using their in-house pharmacy or allows up to four contract pharmacy arrangements, based on the type of drug, for covered entities without in-house pharmacies—but only if the entities share claims data. Decl. of Justin McCarthy (McCarthy Decl.) ¶¶ 10–12, Dkt. # 4, *Pharm. Rsch. & Mfrs. of Am. v. Brown*, No. 3:26-cv-05374-DGE (W.D. Wash. Apr. 10, 2026). As another example, PhRMA member UCB only allows covered entities without an in-house pharmacy to use contract pharmacies, and even then, only allows designating one pharmacy location, within 40 miles of the covered entity's parent site, and on the condition of submitting claims data. Decl. of Jay Janco (Janco Decl.) ¶ 12, Dkt. # 5, *Pharm. Rsch. & Mfrs. of Am. v. Brown*, No. 3:26-cv-05374-DGE (W.D. Wash. Apr. 10, 2026). For the reasons described above related to patients' freedom to choose a pharmacy, these restrictions result in diminished 340B savings for covered entities in Washington. *E.g.*, Brown Decl. ¶ 18.

Manufacturers' claim data requirements are burdensome. Das Gupta Decl. ¶¶ 31–32. They each have different requirements and systems that necessitate processing very large amounts of data, which often exceeds the capacity of covered entities' employees. *Id.*; *see also* Pearson Decl. ¶¶ 36–37. While manufacturers claim that the purpose of this data collection is to avoid duplicate discounts, the manufacturers' terms establish that the claims data may be used

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

broadly by manufacturers beyond the purpose of identifying duplicate discounts on Medicaid claims, and that much of the data can be used effectively in perpetuity. Pearson Decl. ¶ 38. Drug manufacturers have significant financial incentives to obtain covered entities' claims data that are unrelated to covered entities' Section 340B compliance, such as manufacturers seeking to deny commercial rebate requests from pharmacy benefit managers (PBMs). Wallack Report ¶¶ 57–60. HRSA's 1994 guidance explicitly stated that "[a] manufacturer may not condition the offer of statutory discounts upon" a covered entity "submitting information related to drug acquisition, purchase, and inventory systems." *See* 1994 Guidance.

**D.    Washington Responds to Restrictive Manufacturer Policies**

In response to the harm caused by manufacturers' restrictions, Washington and at least 20 other states have attempted to fill the "silence" recognized by the Third and D.C. Circuits by passing laws that prohibit drug companies from limiting the number of contract pharmacies that covered entities can use to deliver 340B drugs. Many of these statutes, including Washington's, also prohibit drug companies from conditioning the delivery of 340B drugs on covered entities providing burdensome and far-reaching claims-data to the pharmaceutical companies.

On March 25, 2026, Washington enacted SB 5981, which will go into effect on June 11, 2026. The bill contains three important provisions:

- **Delivery restriction:** A manufacturer may not "deny, restrict, or prohibit the acquisition … or delivery of a 340B drug to, a covered entity, a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity, or any location authorized by a covered entity to receive such 340B drug, unless federal law prohibits receipt of the 340B drug." SB 5981 § 3.1;

- **Claims data restriction:** A manufacturer may not "require a covered entity to submit any claims, utilization, purchasing, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a covered entity," contract

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

13

pharmacy, or other authorized location "unless federal law requires such data sharing." *Id.* § 3.2; and

- **Reporting requirement:** Manufacturers must report certain information regarding their participation in the 340B program before April 1 of each year including the number of units of 340B drugs distributed to each covered entity and contract pharmacy in Washington, the aggregate discounts provided on those drugs, and the average 340B discount on each of the top 25 340B drugs dispensed in the state by each manufacturer (including the percentage of the discount imposed due to inflationary rebate and the discount if it were not capped with a maximum rebate amount). *Id.* § 9.[4]

SB 5981 allows a covered entity to file a civil action and the Attorney General's Office to bring an action for violations. *See* SB 5981 § 4. The Health Care Authority may also assess a fine for manufacturers' failure to comply with the statute's reporting requirements. *Id.* § 10.

SB 5981's legislative findings confirm that its purpose is complementary to Section 340B's purpose. As a few examples, SB 5981 states that:

- "[T]he legislature finds that the federal 340B drug pricing program is essential for providing health care access to low-income and uninsured populations." *Id.* § 1.1;

- "Congress created the 340B drug pricing program in 1992, stating that the program's benefits enable covered 'entities to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.' (H.R. Rep. No. 102-384 (II), at 12 (1992))." *Id.* § 1.2;

- HRSA "permits 340B covered entities to contract with pharmacies to enable access to life-saving drugs and drugs that preserve quality of life to eligible patients, including for those who otherwise have limited access." *Id.* § 1.3; and

- "The 340B drug pricing program and contract pharmacies are crucial to Washington's

---

[4] SB 5981 also includes additional provisions, such as new reporting requirements for certain 340B covered entities, that are not relevant to this litigation.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

safety net providers by ensuring patients can access their prescribed medications, while providing additional resources to 340B covered entities to serve vulnerable and underserved populations." *Id.* § 1.4.

Without SB 5981, some covered entities will be forced to consider reductions of critical services and staff and may be at risk of closure, which would immediately impact low-income and vulnerable patients. *E.g.*, Glenn Decl. ¶ 8; Pearson Decl. ¶ 42.

### III.    LEGAL STANDARD

A "preliminary injunction is an extraordinary remedy never awarded as of right" and the movant must make a "clear showing" it is entitled to such relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22–24 (2008). The movant must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Id*. at 20. The third and fourth factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

### IV.    ARGUMENT

**A.    Plaintiffs Are Not Likely to Succeed on the Merits**

**1.    SB 5981 does not violate the Supremacy Clause**

Whether SB 5981 violates the Supremacy Clause is not a close question. The Ninth Circuit has *repeatedly concluded* that state laws and regulations concerning the 340B program are not preempted and that states may impose additional 340B program requirements. *See Avenal Cmty. Health Ctr. v. Baass*, No. 23-16109, 2024 WL 4441430, at *2–3 (9th Cir. Oct. 8, 2024); *see also AIDS Healthcare Found. v. Douglas*, 457 F. App'x 676, 678 (9th Cir. 2011). In two cases analyzing both field preemption and obstacle preemption, the Ninth Circuit concluded that a state may impose additional 340B program requirements.

Other courts have held similarly. The Fifth Circuit, the Eighth Circuit, and district courts in nine states have held that state laws similar to SB 5981 likely do not (or do not) violate the

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

Supremacy Clause. *See Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024), *aff'd sub nom. AbbVie Inc. v. Murrill*, 166 F.4th 528 (5th Cir. 2026); *see also Pharm. Rsch. & Mfrs. of Am. v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022), *aff'd*, 95 F.4th 1136 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 768 (2024); *AbbVie Inc. v. Fitch*, No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024), *aff'd*, 152 F.4th 635 (5th Cir. 2025); *AbbVie Inc. v. Weiser*, 811 F. Supp. 3d 1264 (D. Colo. 2025); *AbbVie Inc. v. Skrmetti*, No. 3:25-cv-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025); *Novartis Pharms. Corp. v. Frey*, No. 1:25-cv-00407-JCN, No. 1:25-cv-00416-JCN, 2025 WL 2813787 (D. Me. Sept. 23, 2025); *AstraZeneca Pharms. LP v. Lopez*, No. 25-00369 MWJS-WRP, 2026 WL 497141 (D. Haw. Feb. 23, 2026); *Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131-MDH, 2025 WL 595189 (W.D. Mo. Feb. 24, 2025); Tr. of Oral Arg. on Mot. of Prelim. Inj., *AbbVie Inc. v. Neronha*, No. 1:25-cv-00388-JJM-AEM (D.R.I. Sept. 30, 2025) (included as Ex. B to McGinty Decl.).

Plaintiffs fail to establish a likelihood of success on the merits of either Supremacy Clause doctrine: preemption or intergovernmental immunity. As described below, AbbVie and PhRMA wrongly confuse the separate doctrines of preemption and intergovernmental immunity by blurring their analyses of these issues together, which ignores the controlling tests for these different doctrines. *See, e.g.*, *United States v. California*, 921 F.3d 865, 880, 884 n.9 (9th Cir. 2019) (explaining that the doctrines of intergovernmental immunity and preemption are "distinct" and apply in different circumstances); *see also Pharm. Rsch. & Mfrs. of Am. v. Frey*, 2026 WL 184504, at *5 (D. Me. 2026) (rejecting PhRMA's effort to combine the "distinct" doctrines of intergovernmental immunity and preemption with respect to a state law similar to SB 5981).

Courts presume that federal law does not override "the historic police powers of the States," unless that was the "clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

It is Plaintiffs' burden to establish preemption, which is a "high threshold." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J. concurring in part)); *Wyeth v. Levine*, 555 U.S. 555, 569 (2009). When there is doubt about preemption, the "tie goes to the state." *Fitch*, 152 F.4th at 645. Additionally, there is also a "presumption against preemption" in "areas of law traditionally reserved to the states," including public health, which courts have found to apply when analyzing laws similar to SB 5981. *E.g.*, *Murrill*, 166 F.4th at 539; *Fitch*, 152 F.4th at 648.

And even though over 20 states have passed laws like SB 5981, *no* federal court has ever held that state laws like SB 5981 violate the intergovernmental immunity doctrine. *Infra* at 33–39. Under this doctrine, the *federal government* and its agents (not private drug manufacturers) are immune from regulation by the states.

### a.    Plaintiffs have failed to establish field preemption

First, Plaintiffs are unlikely to succeed on their field preemption claim. Field preemption is "rare." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, (1) there is no federal interest so dominant that the federal system precludes enforcement of state laws on the same subject; and (2) federal law does not create a framework of regulation so pervasive that Congress left no room for states to supplement it. *See Arizona*, 567 U.S. at 399 (describing field preemption standard).

### (1)    The field is the distribution of drugs by pharmacies

As an initial matter, the relevant field at issue is the distribution of drugs by pharmacies (i.e., the practice of pharmacy), which is consistent with other courts' analyses of similar state laws. *See McClain*, 95 F.4th at 1143 (examining the field of the "practice of pharmacy"); *see also Murrill*, 166 F.4th at 539 (evaluating the field of "the distribution of drugs to patients" and "the role of pharmacies in this distribution"); *see also Frey*, 2025 WL 2813787, at *8 (same).

However, as described below, even if the Court adopts one of Plaintiffs' field definitions,[5]

---

[5] Novartis defines the field as "manufacturers' 340B obligations" and AbbVie and PhRMA refer to it as "the 340B program." Dkt. # 14 at 22–23; Pls.' Mot. for Prelim. Inj. at 22, Dkt. # 7 (AbbVie MPI), *AbbVie Inc. v.*

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

it will reach the same result: Congress has not preempted the relevant field. *E.g.*, *Frey*, 2025 WL 2813787, at *7–8 (finding that regardless of how field is defined, there is no field preemption of similar state law).

### (2)   The field does not implicate dominant federal interests

As the Supreme Court has instructed, a court must be exceedingly cautious in finding preemption due to a dominant federal interest, as "every subject that merits congressional legislation is, by definition, a subject of national concern," but "[t]hat cannot mean, however, that every federal statute ousts all related state law." *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985). Therefore, a court must assess "special features warranting pre-emption": (1) whether the "supremacy of the national power" is "made clear by the Constitution," such as in the case of foreign affairs; and (2) whether regulation of the field is "intimately blended and intertwined with responsibilities of the national government." *Id.*

Here, neither factor is applicable: there is no exclusive federal power over pharmacies' distribution of drugs (or even the 340B program), nor are these issues intimately blended and intertwined with a national government's responsibilities. Instead, "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Id.* (citing *Rice*, 331 U.S. at 230); *see also Wyeth*, 555 U.S. at 578–79 (the federal government has "traditionally regarded state law as a complementary form of drug regulation" and has "long maintained that state law offers an additional, and important, layer of consumer protection that complements [federal] regulation").

Courts analyzing other states' versions of SB 5981 agree. *E.g.*, *Fitch*, 152 F.4th at 646 (finding "no dominant federal interest" because the law "implicates two traditional general areas of state regulation and police power: public health and consumer protection"); *see also Frey*, 2025 WL 2813787, at *7. In fact, Defendants are entitled to a presumption *against* preemption

*Brown*, No. 2:26-cv-01018-DGE (W.D. Wash. Mar. 25, 2026); Pls.' Mot. for Prelim. Inj. at 23, Dkt. # 2 (PhRMA MPI) *Pharm. Rsch. & Mfrs. of Am. v. Brown*, No. 3:26-cv-05374-DGE (W.D. Wash. Apr. 10, 2026).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

18

given how squarely SB 5981 fits within public health laws traditionally reserved for states. *Supra* at 17; *see also Wyeth*, 555 U.S. at 564 n.3 (presumption against preemption applies even if "the Federal Government has regulated [in that field] for more than a century"). Plaintiffs' cited cases concern areas of traditional national power that are inapplicable here. *See* Dkt. # 14 at 23 (citing cases relating to immigration and nationwide air travel); Abbvie MPI at 22 (citing immigration case); PhRMA MPI at 23 (citing cases relating to immigration and fraud against federal agencies).

Nor is Plaintiffs' citation to *Astra*—which Plaintiffs concede is "not a preemption case"—instructive. *See* Dkt. # 14 at 24; *see also Astra*, 563 U.S. 110. *Astra* merely addressed whether private parties may bring lawsuits regarding "manufacturers' [340B] price calculations" when HRSA enforces 340B "drug-price prescriptions." *Id*. at 114. But whether private parties may sue to enforce a federal provision regarding 340B drug pricing is irrelevant. *See Davidson v. Sprout Foods, Inc*., 106 F.4th 842, 850 (9th Cir. 2024) (explaining that a federal statute's "prohibition of private enforcement" is not evidence of any intent to preempt "private enforcement of [a] state law" that incorporated federal standards), *cert. denied*, 145 S. Ct. 1922 (2025). Additionally, "while Congress sought national uniformity with respect to the pricing obligations imposed by Section 340B" there is no evidence that Congress sought uniformity "for matters of delivery and distribution." *Lopez*, 2026 WL 497141, at *15. Nor have Plaintiffs cited any case law that any such uniformity would even qualify as a traditional or historical dominant federal interest in this field. It would not. *E.g.*, *Fitch*, 152 F.4th at 646–47.

Novartis also incorrectly claims that increased costs to the federal government, in the form of lost Medicaid drug rebates, is a dominant federal interest. Dkt. # 14 at 24–25. As an initial matter, this assertion ignores (and fails) the *Hillsborough* test described above. Moreover, SB 5981 merely concerns the delivery of 340B drugs; it is the *federal* statute that mandates 340B discounts rather than Medicaid rebates in certain circumstances. Additionally, Novartis wrongly relies on *Boyle* for the proposition that a federal interest is demonstrated any time a state law

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

19

might increase costs to the federal government. *See Boyle v. United Tech. Corp.*, 487 U.S. 500, 503 (1988) (involving unrelated issue of state torts claim concerning design feature on military helicopter). *Boyle*'s finding of preemption was not based solely on the risk of higher federal government costs, but also that the state claim would mandate changes in the "reasonably precise specifications" of military equipment that the United States had approved. *Id.* at 511–12. *Boyle* is obviously a bad fit for preemption principles applicable to federal statutes instead of federal contracts, but applying them here there is no dispute that the 340B program contains no "reasonably precise specifications" with respect to the distribution of discount drugs to patients. *See*, *e.g.*, *Sanofi Aventis*, 58 F.4th at 703.

Novartis also speculates that a dominant federal interest is implicated because drug manufacturers might withdraw from Medicaid and Medicare if their costs of participating in the 340B program increase. But this argument fails for the same reasons discussed above, and also because the federal government has not preempted the field with respect to either of those programs. This is obvious as it relates to Medicaid, since Medicaid is a cooperative state-federal program in which the state bears significant control and discretion. *See* 42 U.S.C. § 1396a (describing Medicaid state plans). And with respect to Medicare, Congress has specifically forbidden federal interference in "the manner in which medical services are provided" such as how drugs are distributed to patients. *See id.* § 1395; *see also Ardary v. Aetna Health Plans of Cal., Inc.*, 98 F.3d 496, 501 (9th Cir. 1996) (holding that state law claims for wrongful death predicated on a denial of Medicare benefits were not preempted by federal law). Therefore, states already affect manufacturers' costs of participating in Medicaid and Medicare.

### (3)    Federal law does not pervasively regulate the field

Plaintiffs' general assertion that federal law pervasively regulates the field is contradicted by Plaintiffs' own statements, multiple Ninth Circuit cases, four other Circuit court decisions, and district court orders in nine states. *Supra* at 15–16.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

Although Novartis now claims that "[f]ederal law governs the 340B Program from soup to nuts," Novartis recently represented to the D.C. District Court that the statute is "completely silent" on "contract pharmacy arrangements." *See* Reply in Supp. of Pl.'s Mot. for Prelim. Inj. & Mot. for Summ. J. at 7, *Novartis Pharms. Corp. v. Espinosa*, No. 1:21-cv-01479 (D.D.C. July 9, 2021) (included as Ex. C to McGinty Decl.). Likewise, PhRMA represented to the D.C. Circuit that Section 340B does "not speak to what distribution systems" can be used and the statute "does not compel any particular outcome with respect to covered entities' use of pharmacies." *See* Br. of Amicus Curiae Pharm. Rsch. & Mfrs. of Am. in Supp. of Appellees at 34, *Novartis v. Johnson*, No. 21-5299, No. 21-5304 (D.C. Cir. June 15, 2022) (included as Ex. D. to McGinty Decl.). Therefore, even if the Court were to adopt one of Plaintiffs' definitions of the relevant field, Plaintiffs' own statements demonstrate there has not been pervasive federal regulation of the 340B program or manufacturers' 340B obligations that leave no room for state supplementation.

Additionally, the Ninth Circuit has confirmed the lack of pervasive federal regulation of the 340B program. In *Avenal*, the Court squarely rejected the argument that HRSA has "*exclusive jurisdiction* over the 340B program" and held that Congress did not "occupy the field" of 340B duplicate discount regulations. *Avenal*, 2024 WL 4441430, at *2–3. Likewise, the Ninth Circuit in *AIDS Healthcare* affirmed dismissal of a claim alleging Section 340B preempted a California law that imposed additional requirements on 340B covered entities. 457 F. App'x at 678 (explaining "there is no indication that Congress intended to occupy the whole field"). Critically, both *Avenal* and *AIDS Healthcare* concerned a much closer question than here. Federal law specifically addresses duplicate discounts, and the Ninth Circuit *still concluded* that states are not preempted from imposing additional requirements in that field. Therefore, states are undoubtedly not preempted from regulating topics the Section 340B never mentions: the distribution of the drugs by contract pharmacies and the submission of claims data to manufacturers.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

This conclusion is further supported by decisions from four other Circuits, which have held that Section 340B is "silent about delivery" of the drugs to contract pharmacies. *Sanofi Aventis*, 58 F.4th at 703; *Johnson*, 102 F.4th at 460; *McClain*, 95 F.4th at 1143; *Fitch*, 152 F.4th at 646. And the fact that "Congress chose not to regulate distribution to patients . . . indicat[es] that it did not intend to occupy the entire field in this area." *Fitch*, 152 F.4th at 646. There cannot be pervasive regulation of the distribution of 340B drugs by pharmacies if the relevant federal statute is completely silent on the subject.

"Silence, without more, does not preempt—a clear and manifest purpose of pre-emption is always required." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1143 (9th Cir. 2015) (quoting *P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)). Novartis's claim that Section 340B's silence is a decision by Congress not to mandate certain actions "turns the presumption against preemption on its head" because "absent an affirmative indication to the contrary, a federal regulation will not preempt state law." *City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1160 (9th Cir. 2017). Here, "Congress was aware of the role of pharmacies and state pharmacy law in implementing 340B. Therefore, Congressional silence on pharmacies in the context of 340B indicates that Congress did not intend to preempt the field." *McClain*, 95 F.4th at 1144; *see also* 1996 Guidance, at 43550 (when Congress enacted Section 340B, "only a very small number of the 11,500 covered entities used inhouse pharmacies (approximately 500)").

It is no surprise, then, that the vast majority of courts analyzing state laws similar to SB 5981 have found there is not pervasive regulation. *E.g.*, *Fitch*, 152 F.4th at 646; *McClain*, 95 F.4th at 1143; *Weiser*, 811 F. Supp. 3d at 1274–77; *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *12–13; *Frey*, 2025 WL 2813787, at *7. Although Plaintiffs cite two cases that found a likelihood of field preemption, these two cases are outliers whose reasoning has been overwhelmingly rejected by other courts and are based on legal and factual inaccuracies. *See AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1276–77 (W.D. Okla. 2025) (improperly

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

characterizing the state law as "expand[ing] the definition of 'covered entity' to include contract pharmacies[.]"); *see also Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 457 (S.D.W. Va. 2024) (incorrectly focusing its analysis on "the price . . . the manufacturer can charge" rather than the delivery of drugs by contract pharmacies), *aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v. McCuskey*, 171 F.4th 674 (4th Cir. 2026). Following the reasoning of those cases would be erroneous because pharmacies do not receive 340B discounts; instead, covered entities purchase 340B-discounted drugs and contract pharmacies merely dispense the drugs to the covered entities' patients. *McClain*, 95 F.4th at 1144. And SB 5981 concerns contract pharmacies and claims data requirements, not the pricing of 340B drugs.

Plaintiffs' case citations are inapposite, as they involve fields with historically dominant federal interests that are exhaustively regulated. *See Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718 (9th Cir. 2016) (preemption is more likely "in the field of aviation" and there is an "exhaustive" federal regulation on the precise issue); *see also United States v. Locke*, 529 U.S. 89 (2000) (finding a "comprehensive federal regulatory scheme" in "an area where the federal interest has been manifest since the beginning of the Republic"). By comparison, HHS has rulemaking authority for only limited aspects of the 340B program that do not include contract-pharmacy arrangements, which is an area of local concern. *See* 42 U.S.C. § 256b(d)(1)(B)(i), (1)(B)(vi), (3); *see also Sanofi Aventis*, 58 F.4th at 703.[6]

### b.    Plaintiffs have failed to establish obstacle preemption

Plaintiffs are also unlikely to succeed on the merits of their obstacle preemption claim. Specifically, Plaintiffs argue that SB 5981 is preempted because it "conflicts with federal law" by "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives" of Section 340B. *Arizona*, 567 U.S. at 399. However, Plaintiffs have failed to

---

[6] Additionally, even if HHS had comprehensive regulations regarding the use of contract pharmacies (it does not), states should not be barred from "identifying additional needs or imposing further requirements in the field." *Hillsborough*, 471 U.S. at 717.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

establish any such obstacle. In fact, SB 5981 explicitly states that "[n]othing in this chapter is to be construed or applied to conflict with federal law and related regulations." SB 5981 § 4.3.

A plaintiff claiming obstacle preemption "faces a high bar[,]" *CDK Global LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021), because "[t]he mere fact that there is tension between federal and state law is not enough." *Id*. (citation omitted). Instead, there must be a showing of "irreconcilability between state and federal law." *Id*. (citation omitted). Additionally, the Court's presumption against the preemption of a state statute designed to foster public health "has special force" in this case because "it appears, and the Secretary has not decided to the contrary, that the two governments are pursuing common purposes." *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 646 (2003). The purpose of Section 340B is to "provide a subsidy to healthcare entities caring for underserved patients." *Frey*, 2025 WL 2813787, at *9. SB 5981 seeks to protect this subsidy to these covered entities. *See* SB 5981 §§ 1.2, 1.9 (enacting requirements based on "the original intent set forth by congress" and citing federal statute's purpose of ensuring that covered entities "reach[] more eligible patients and provid[e] more comprehensive services").

Most courts have rejected Plaintiffs' obstacle preemption claims against similar state laws. *Supra* at 15–16. A state law regulating the distribution of 340B drugs by pharmacies is not an obstacle because the federal and state laws "can both easily be complied with[,]" and the state rules would not "hinder" the federal law's implementation. *AIDS Healthcare*, 457 F. App'x at 678; *Avenal*, 2024 WL 4441430 at *3. Ultimately, obstacle preemption requires more than a "modest" impediment or harm to a federal statutory goal, and none exists here. *Walsh*, 538 U.S. at 667.

### (1)    SB 5981 may regulate activities that federal law does not

Plaintiffs incorrectly argue that Section 340B's silence on delivery somehow preempts states from regulating 340B drug delivery. However, Plaintiffs' argument fundamentally misunderstands the "basic premise" of preemption, in which statutory silence is insufficient. *See*

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

*Los Angeles*, 854 F.3d at 1160; *see also supra* at 22. A state law is not preempted when it merely imposes requirements "beyond those contained" in the Public Health Service Act (like Section 340B) or its accompanying regulations. *E.g.*, *Hillsborough*, 471 U.S. at 710.

This is not a close question. For example, even when a federal statute *explicitly prohibits* the federal agency's imposition of a particular requirement—which is surely not the case here—a state is not preempted from imposing the same requirement. *Whiting*, 563 U.S. at 608–09 (rejecting obstacle preemption challenge to a state law requiring the use of a federal "E-Verify" program even when the federal law prohibits the federal agency from requiring participation, because the law "contains no language circumscribing state action"). Here, the issue is much simpler: Section 340B is entirely silent on the issues of contract pharmacies and providing claims data to manufacturers. In addition, the state law is not an obstacle to the federal law because HRSA "has consistently expanded and encouraged" covered entities' use of contract pharmacies. *Id*. at 609; *supra* at 7–11.

In fact, PhRMA and the United States both concede that "silence about the role of states" in legislation typically "*defeats* a claim of preemption." PhRMA MPI at 27–28; *see also* Dkt. # 37 at 14. For decades, Congress has been aware of the role of contract pharmacies—which have facilitated the distribution of 340B discounted drugs from the start—and "chose not to" regulate distribution. *Sanofi Aventis*, 58 F.4th at 704. Given that over twenty states have enacted laws similar to SB 5981 and Congress has not enacted any new legislation, "[t]he case for federal pre-emption is particularly weak" because Congress is aware of the operation of state law in this field "and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Wyeth*, 555 U.S. at 940 (citation omitted).

In arguing otherwise, Plaintiffs cite inapposite cases in which a federal statute or regulation *explicitly permitted* the conduct at issue, which is not the case here. *See, e.g.*, *Sperry v. Florida ex rel. Fla. Bar*, 373 U.S. 379, 385 (1963) (federal statute "expressly permits" and federal Commissioner "explicitly granted" authority); *Barnett Bank of Marion Cnty. v.*

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

*Nelson*, 517 U.S. 25, 31 (1996) (federal statute expressly "provid[ed], without . . . qualification" that national banks "may" act as agents); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154–55 (1982) (federal regulation "plainly provides" that the entity "continues to have the power" the state seeks to restrict); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (federal regulation imposed a gradual phase-in of passive restraints, which state torts claim contradicted); *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 673 (9th Cir. 2013) (federal law imposed "affirmative, supervisory duties" whereas state law eliminated those "supervisory methods"); *Valle de Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013) (Congress "explicitly" provided safe harbor for activities the state sought to punish); *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260–61 (1985) (federal law directly granted the authority that the state law restricted).

The Fourth Circuit's decision that a state law similar to SB 5981 is preempted is unpersuasive. *McCuskey*, 171 F.4th at 675–97. *McCuskey* is a stark outlier that deviates from Ninth Circuit cases and at least eleven other courts evaluating analogous state laws. *Supra* at 15–16. Importantly, *McCuskey* applied an inaccurate legal standard in which the Court conceded that "the intergovernmental-immunity doctrine does not control here" for multiple reasons, but nevertheless applied those principles to its separate preemption analysis. *Id*. at 689–96. Strangely, *McCuskey* concluded the state law is preempted because it specifically targets a federal program (which concerns a separate doctrine that the court agreed is not satisfied) and because Section 340B is spending-power legislation. *Id*. at 695 n.12. However, the Supreme Court employs the same preemption analysis regardless of whether a federal statute was enacted under Congress's Spending Clause power or some other authority, and there is no basis for this Court to stray from that approach here. *E.g.*, *Walsh*, 538 U.S. at 666–67 (conducting a standard preemption analysis and not mentioning the Spending Clause as relevant); *see also St. Luke's Health Sys., Ltd. v. Labrador*, 782 F. Supp. 3d 953, 978–79 (D. Idaho 2025) (collecting cases and describing "the Supreme Court's long-held understanding that ordinary preemption

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

principles apply to Spending Clause legislation"). In fact, the *McCuskey* majority ignored the parties' briefing and four amicus briefs, none of which addressed the Spending Clause. 171 F.4th at 696–98 (DeAndrea, J., dissenting). Importantly, *McCuskey*'s flawed analysis is also inconsistent with the Ninth Circuit's instruction that the doctrines of preemption and intergovernmental immunity are "distinct" and apply in different circumstances, which should be "accurately distinguish[ed]." *California*, 921 F.3d at 880, 884 n.9. For these reasons, the Court should not follow *McCuskey*.

### (2)    SB 5981 is not an obstacle to Medicaid and Medicare

Plaintiffs claim that Congress wanted to avoid state-level 340B requirements because manufacturers might opt out of Medicaid and Medicare Part B due to the costs of participating in federal healthcare programs. Not only is this claim entirely speculative, but it is also contradicted by the fact that Congress *already allows* states to affect manufacturers' costs of participating in federal healthcare programs, and states already do so. Indeed, Congress subjects Medicaid participants "not just to its own conditions, but to special state-law obligations or enforcement actions too." PhRMA MPI at 29. In any event, Plaintiffs' argument is, at its core, a policy argument, not a basis for a constitutional violation. The appropriate method for Plaintiffs to advance this argument is through lobbying Congress or the Washington Legislature, not by vaguely alleging that the State has somehow violated the Supremacy Clause.

Novartis and PhRMA cite an Eighth Circuit case about an unrelated issue as "instructive," but Plaintiffs fail to disclose that the Eighth Circuit has ruled against them on *this precise issue*. *Compare McClain*, 95 F.4th at 1139–40 (rejecting all of PhRMA's preemption arguments with respect to a state law similar to SB 5981) *with* Dkt. # 14 at 31 (citing *Forest Park II v. Hadley*, 336 F.3d 724, 728 (8th Cir. 2003) (concerning construction loan subsidies)). There is no need for this Court to consider an Eighth Circuit case about a different issue when the Eighth Circuit has explicitly opined on the same question presented here. Additionally, as other courts upholding laws like SB 5981 have explained, *Forest Park II* is distinguishable because it

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

involved state requirements that were inconsistent with federal rules and that sought to regulate the relationship between the federal agency and the regulated entity. *E.g.*, *Frey*, 2026 WL 184504, at *15. Neither of those circumstances are present here.

The United States's preemption arguments contain the same fatal flaws as Plaintiffs' motions. *See* Dkt. # 37. Moreover, the federal government's Statement of Interest is a complete about-face from its positions over the last two decades that: (1) Section 340B permits or requires covered entities to have the option of using contract pharmacies for 340B drug distribution; and (2) manufacturers cannot condition the offer of 340B statutory discounts upon a covered entity submitting claims information. *See supra* at 7–13. The Court should not find the Statement of Interest persuasive when it sharply departs from the federal government's otherwise consistent positions since the 340B program's inception. Additionally, the Statement is speculative and vague, claiming that its argument about Medicaid and Medicare holds true "regardless of whether Washington's regulations are significant enough to alter any manufacturer's cost-benefit analysis," suggesting this might not even be the case. Dkt. # 37 at 17. The Statement's analysis is also inherently flawed because it inappropriately suggests that the intergovernmental immunity doctrine is the basis for preemption here even though those are distinct analyses with different factors (neither of which are met here). *See supra* at 16; *see also infra* at 33–39.

### (3)    SB 5981 does not invite conflicting adjudications

Plaintiffs' claim that SB 5981 would result in conflicting enforcement schemes also lacks merit. Put simply, enforcement of SB 5981 is "aimed at activity that falls outside the purview of 340B." *McClain*, 95 F.4th at 1145. SB 5981 does not impose penalties for Section 340B violations, such as "failing to offer discounted drugs to covered entities or engaging in diversion." *Fitch*, 152 F.4th at 647–48. Rather, SB 5981 imposes penalties for *state* law violations, which is when manufacturers "interfer[e] with the distribution of Section 340B drugs" by "contract pharmacies." *Id*. In other words, SB 5981 "creates state law obligations" that "operate[] alongside, rather than in place of, the federal enforcement regime." *Lopez*, 2026 WL

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

497141, at *13–15. Therefore, SB 5981 is not an obstacle to the Section 340B enforcement scheme. *Id*.; *McClain*, 95 F.4th at 1145; *Murrill*, 166 F.4th at 541; *Weiser*, 811 F. Supp. 3d at 1277–80; *Frey*, 2025 WL 2813787, at *8–12. This is consistent with the Supreme Court's instruction that there is ordinarily no preemption solely because a state "impose[s] liability over and above that authorized by federal law." *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 89 (1990).

In fact, "[f]ar from frustrating § 340B's objectives, the two laws work in tandem to advance Congress's central aim: ensuring that manufacturers participating in Medicaid . . . offer discounted drugs to covered entities, dominantly, local facilities that provide medical care for the poor." *Murrill*, 166 F.4th at 542. In other words, SB 5981 "assists in fulfilling the purpose of 340B . . . [the State] is simply deterring pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements. There is no obstacle for pharmaceutical manufacturers to comply with both [SB 5981] and Section 340B." *McClain*, 95 F.4th at 1145. Section 340B requires Plaintiffs to sell their covered outpatient drugs *in unlimited quantity* to covered entities at or below federal ceiling prices, which is exactly what SB 5981 seeks to protect. *Sanofi Aventis*, 58 F.4th at 703.

Importantly, Plaintiffs' argument that HRSA would police the same conduct as the State and infringe upon the 340B statute's enforcement mechanism *explicitly contradicts* Plaintiffs' prior positions and four Circuit court holdings that HRSA lacks this exact authority. *See Johnson*, 102 F.4th at 464 (rejecting HRSA's efforts to require Novartis and other manufacturers to deliver 340B drugs to an unlimited number of contract pharmacies and to refrain from requiring claims data); *see also supra* at 20–22. HRSA's authority over 340B "overcharge claims" does not include contract pharmacy restrictions. *Johnson*, 102 F.4th at 459, 464; *Sanofi Aventis*, 58 F.4th at 701, 706. Novartis itself previously stated that: "[u]nder Novartis's policy, when an order is made through a non-qualifying contract pharmacy arrangement, the order is declined" such that a "*covered entity is not charged any price, let alone overcharged*." *See* Compl. ¶¶ 48, 71, *Novartis Pharms. Corp. v. Espinosa*, No. 1:21-cv-01479 (D.D.C. May 31, 2021) (included as

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

Ex. E to McGinty Decl.) (emphasis added). Thus, HRSA's jurisdiction over overcharges is inapplicable here.[7]

Plaintiffs attempt to distract from the separate enforcement schemes by arguing that the state law would only apply to covered entities and 340B drugs, as those terms are defined by the federal statute. *See* Dkt. # 14 at 32. But a state law's incorporation of federal definitions does not, on its own, establish conflicting enforcement schemes. *See AbbVie Inc. v. Skrmetti*, No. 3:25-cv-00519, 2026 WL 542712, at *11 (M.D. Tenn. Feb. 26, 2026) ("[T]he fact that the Act may" involve states "constru[ing] terms used in federal statutes and regulations does not suggest preemption"); *see also Davidson*, 106 F.4th at 844 (finding no preemption of state law that simply "incorporates by reference all federal food labeling standards"). Ultimately, the State enforces certain discrete requirements and the federal government enforces distinct—and complementary—requirements. There is no conflict.

The cases cited by Plaintiffs do not compel a different conclusion. AbbVie's citation to a case in which a state sought to prosecute fraud against the FDA is entirely inapplicable, as Washington is not seeking to prosecute fraud against a federal agency. *See Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001). Similarly, Plaintiffs and the United States's citations to *Astra* are not relevant here for the same reasons described above. *Supra* at 19.

And Novartis's citation to cases where "two separate remedies are brought to bear *on the same activity*" is equally inapplicable. *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (emphasis added); *see also Arizona*, 567 U.S. at 387–91 (federal and state laws both included penalties for unauthorized employees). As discussed above, SB 5981's remedies do not apply to an activity also regulated by the federal government.[8]

---

[7] Whether a manufacturer has "limited [a] covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price[,]" is only considered in HRSA's ADR process in the context of whether there has been an overcharge. 42 C.F.R. § 10.21(a)(1). And in any event, as described above, Plaintiffs and multiple Circuit courts have already concluded that HRSA's authority does not include the distribution of 340B drugs.

[8] Separately, PhRMA vaguely speculates that SB 5981's reporting requirements could be an obstacle to Section 340B because Washington could "potentially reverse engineer" its pricing information. Even if this concern was more than pure speculation (it is not), a State is entitled to impose reporting requirements on drug

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

30

**(4)     SB 5981 does not obstruct 340B audits**

Plaintiffs also speculate that SB 5981's claims data provision could interfere with their ability to conduct audits of covered entities under Section 340B. *See* Dkt. # 14 at 28–29; *see also* AbbVie MPI at 20–21; *see also* PhRMA MPI 30–32. However, SB 5981 cannot be an obstacle to Section 340B because its claim data provision applies "unless federal law requires such data sharing." SB 5981 § 3.2. For this reason, there can be no obstacle with federal law.

In any event, manufacturers can easily establish reasonable cause for an audit in the absence of a covered entity's claims data. For example, HRSA (the agency that approves audit requests) has published guidance that "[s]ignificant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause." Manufacturer Audit Guidelines and Dispute Resolution Process 0905–ZA–19, 61 Fed. Reg. 65406; *see also AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *16; *see also* Wallack Report ¶ 65 (explaining that it is common for good-faith inquiries from drug manufacturers to be "based on changes in purchasing volume, not claims data").

According to HRSA, the "reasonable cause" necessary for an audit is "not overly burdensome" and does not "present any barriers to a manufacturer's ability to perform an audit of a covered entity." *See* ADR Rule, 89 Fed. Reg. at 28646; *see also AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *15; *see also* Wallack Report ¶¶ 66, 69. Recent history confirms as much: as of 2024 HRSA had not denied a request for a manufacturer audit of a covered entity in the preceding five years. ADR Rule, 89 Fed. Reg. at 28646. Even without the far-reaching claims data manufacturers want, they received sufficient information to initiate audits. Aside from their conclusory assertions belied by the facts, Plaintiffs "have not demonstrated that claims data are

---

manufacturers. *See infra* at 47-52. Nor is there any obstacle with Section 340B, which discusses the confidentiality of HHS's 340B pricing *website* and focuses on access by covered entities (not the State) and whether website information could be redisclosed. 42 U.S.C. § 256b(d)(1)(B)(iii). In any event, SB 5981 directs the State to aggregate data so as to avoid revealing information from specific manufacturers in reports. *See* SB 5981 § 11(1)(b)(i).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

necessary to obtain an audit or that the proof necessary to obtain an audit is particularly onerous . . . Plaintiffs have not identified cases where a manufacturer had requested but been denied an audit due to a lack of relevant claims data." *Frey*, 2025 WL 2813787, at *12. Instead, drug manufacturers have significant financial incentives for obtaining covered entities' claims data that are unrelated to covered entities' Section 340B compliance, such as manufacturers seeking to deny commercial rebate requests from PBMs. Wallack Report ¶¶ 57–60. And manufacturers continue to expand the scope of their claims data requirements in real time. *E.g.*, Pearson Decl. ¶ 37. In its 1994 Guidance, HRSA explicitly stated that a "manufacturer may not condition the offer of statutory discounts upon" a covered entity "submitting information related to drug acquisition, purchase, and inventory systems." *See* 1994 Guidance.

Historical context about the audit process further confirms that claims data is not necessary for HRSA to approve a manufacturer's audit request. Plaintiffs only started requiring covered entities to provide claims data in 2020 or later, but the 340B program and audits have existed since the 1990s. *See* 1996 Guidance (discussing manufacturer audit guidelines in 1996); Dkt. # 1 ¶¶ 55–66, Dkt. # 1-2 (Novartis only began *requiring* covered entities to provide claims data in 2025); McCarthy Decl. ¶¶ 10–12 (PhRMA member Bristol Myers Squibb only began requiring claims data in March 2022); *Johnson*, 102 F.4th at 458 (manufacturers began requiring claims data in 2020). Moreover, the fact that Novartis only requires certain covered entities— but not all—to provide claims data underscores the point that claims data is unnecessary for manufacturers to justify audits in the first place. *See* Dkt. # 1-2 (exempting federal grantees from restrictions). As another example, PhRMA member Gilead Sciences only started requiring the submission of claims data in March 2022, but Gilead acknowledges that HRSA has "approved audits" that Gilead requested before 2022 and instead takes issue with the 340B "audit process" as a whole, which is an issue best left for Congress. *See* Decl. of Joyce Chan ¶¶ 10, 19, Dkt. # 3, *Pharm. Rsch. & Mfrs. of Am. v. Brown*, No. 3:26-cv-05374-DGE (W.D. Wash. Apr. 10, 2026). Thus, the ADR system has "been in place and functioning adequately for many years" without

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

any requirement that covered entities provide claims data to drug manufacturers "on demand." *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *16.

Moreover, SB 5981 does not prevent manufacturers from asking covered entities for claims data for disputed drug reimbursement claims. Instead, SB 5981 simply prevents manufacturers from requiring covered entities to provide claims data "as a condition for allowing the acquisition" of 340B drugs. SB 5981 § 3.2. In any event, claims data is "more likely to be precisely the documentation that would be reviewed *in the course of conducting an audit*" rather than what precipitates the audit. *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *16 (emphasis added); *see also* Wallack Report ¶ 63.

PhRMA's related (and brief) suggestion that manufacturers need to require claims data to avoid duplicate Medicare price reductions under the Inflation Reduction Act also lacks merit. The Center for Medicare & Medicaid Services already requires pharmacies to provide drug manufacturers with the specific data that manufacturers use to avoid duplicate Medicare discounts.[9] Therefore, there is no reason why manufacturers would need to require covered entities to submit broad claims data for this same purpose.

### c.    SB 5981 does not violate the intergovernmental immunity doctrine

No federal court has ever held that state laws like SB 5981 violate the intergovernmental immunity doctrine. *See, e.g.*, *Weiser*, 811 F.Supp.3d at 1275–76 (explaining that state law similar to SB 5981 "is also unlike *M'Culloch v. Maryland*"); *see also Lopez*, 2026 WL 497141 at *16 (upholding law like SB 5981 against intergovernmental immunity challenge); *Frey*, 2026 WL 184504 at *6–7 (same). In fact, the case that PhRMA relies on for its intergovernmental immunity argument explicitly held that "the intergovernmental-immunity doctrine does not control here." *McCuskey*, 171 F.4th at 689.

---

[9] *See* United States Centers for Medicare & Medicaid Services, *Medicare Transaction Facilitator (MTF) Overview for Dispensing Entities* (April 2026), available at https://www.cms.gov/files/document/pharmacy-dispensing-entity-mtf-fact-sheet.pdf

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

Under the intergovernmental immunity doctrine, the federal government is immune from regulation by the states. "[I]t is essential to the existence and preservation of the government, that congress should be able to exercise its constitutional powers, at its own discretion, without being subject to the control of state legislation." *M'Culloch v. Maryland*, 17 U.S. 316, 330 (1819). But that does not mean "that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality op.). Instead, the Supreme Court has "adopted a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *Id.* at 435.

Under this approach, a state law is invalid under the intergovernmental immunity doctrine "*only if*" it: (1) "regulates the United States directly" or (2) "discriminates against the Federal Government or those with whom it deals" such that the federal government is disadvantaged "with regard to the economic burdens that result." *Id*. (emphasis added). Plaintiffs have not established a likelihood of success on the merits for either argument.

**(1)    SB 5981 does not directly regulate the federal government**

Here, SB 5981 clearly does not regulate the federal government, nor do Plaintiffs make this argument. No federal official, agency, or employee needs to do anything or refrain from doing anything in order to comply with SB 5981. *See Lopez*, 2026 WL 497141 at *15 (finding that a similar state law does not directly regulate the United States); *see also Frey*, 2026 WL 184504 at *6 (same).

**(2)    SB 5981 does not discriminate against the federal government or those with whom it deals**

Plaintiffs argue that they have been discriminated against as manufacturers who deal with the federal government (i.e., by electing to participate in the 340B program), but this argument fails for three independent reasons. In order to establish discrimination against "those with

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

whom" the federal government "deals," Plaintiffs must show that: (1) 340B drug manufacturers are contractors or suppliers to the federal government; (2) 340B drug manufacturers are acting on behalf of the federal government when they impose the conditions on covered entities that are at issue in SB 5981; *and* (3) the federal government has been disadvantaged "with regard to the economic burdens that result" from the supposed discrimination in SB 5981. *E.g.*, *United States v. Washington*, 596 U.S. 832, 833–39 (2022) (finding law discriminates when it applies "only" to federal government "contractors" working on behalf of United States and "imposes upon the Federal Government costs that state or private entities do not bear."); *see also North Dakota*, 495 U.S. at 429–39. However, Plaintiffs cannot establish *any* of these requirements. They do not show "a likelihood of success on—*or even serious questions going to*—the merits of this argument." *Lopez*, 2026 WL 497141 at *15 (describing similar state law) (emphasis added); *see also United States v. New Mexico*, 455 U.S. 720, 737 (1982) (explaining that the immunity of federal contractors has "narrow constitutional limits").

First, drug manufacturers that impose conditions on their offers of 340B drugs to covered entities are not federal contractors or suppliers. *See McCuskey*, 171 F.4th at 689 ("A manufacturer that participates in the 340B program is not strictly a federal contractor or supplier, as the Pharmaceutical Pricing Agreements between HHS and manufacturers 'are not transactional, bargained-for contracts' … [n]or do the manufacturers supply drugs to the federal government"); *see also Frey*, 2026 WL 184504 at *6 (holding that drug manufacturers participating in the 340B program, including PhRMA's members, are not federal contractors because they "do not agree to perform any function of the federal government or provide any goods or services to the federal government"). Instead, 340B drug manufacturers provide "discounts in the marketplace to certain other private entities[.]" *Id.* at *6. Plaintiffs' "mere participation in a regulatory program or receipt of government incentives" is insufficient to confer "contractor status with the federal government." *Id*. The intergovernmental immunity doctrine, therefore, simply has no application at all to SB 5981.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

35

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

Second, even if 340B drug manufacturers were federal contractors (they are not), drug manufacturers are not working on *behalf of* the federal government such that they are entitled to constitutional protections. In other words, manufacturers were not acting at the direction of the federal government when they imposed the restrictive policies that SB 5981 now prohibits. Therefore, this is not like cases applying the intergovernmental immunity doctrine to federal contractors who were engaged in furthering federal government operations under the control of, and at the direction of, the federal government. *See Washington*, 596 U.S. at 839 (state law regarding worker's compensation law that applied to those performing work "either directly or indirectly, for the United States"); *see also Geo Group, Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022) (intergovernmental immunity barred law that would prevent Immigrations and Custom Enforcement from contracting with private detention facilities); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839–43 (9th Cir. 2014) (intergovernmental immunity barred state law setting standards for environmental cleanup at federal site performed by federal contractor). For this reason, SB 5981 does not regulate the federal government directly in contravention of intergovernmental immunity. *See Lopez*, 2026 WL 497141 at *15 ("when states regulate manufacturers' efforts to do what federal law does not instruct them to do, the state laws are not regulating any act compelled or directed by the federal government, but instead the private conduct (and choices) of the manufacturers themselves").

Third, SB 5981 also does not impose costs on the federal government in a discriminatory way. Indeed, it does not impose costs on the federal government *at all*. The federal government does not pay for the 340B drugs that covered entities purchase, so it is no additional burden on the federal government even if, as Plaintiffs assert, SB 5981 results in more 340B drugs being sold. *E.g.*, *id.* at *16 (explaining that it is not the federal government who bears the costs of a law similar to SB 5981, but rather the "manufacturers themselves," which is "precisely the reason [plaintiff] argues that it faces irreparable injury"). For this reason, the Court does not need to consider whether SB 5981 generally applies to the distribution of all drugs. "[B]ecause the

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

36

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

question of general applicability is not implicated if the federal government does not bear the financial burden of the state law in the first place," it does not matter that SB 5981 applies only to drug manufacturers that participate in the 340B program. *Id.*; *see also Washington v. United States*, 460 U.S. 536, 544 (1983) (holding that for purposes of intergovernmental immunity what matters is whether the state law "is discriminatory with regard to the economic burdens that result.").

Plaintiffs essentially argue that any state law that touches upon participants in a federal program is preempted as a matter of law. Dkt. # 14 at 27–28; AbbVie MPI at 11; PhRMA MPI at 15. But this cannot be right, because the Supreme Court has upheld taxes targeting federal contractors so long as the resulting burden to the federal government was not greater than that imposed on anybody else. *See Washington v. United States*, 460 U.S. at 546. It necessarily follows that if there is *no* resulting burden to the federal government, intergovernmental immunity is not implicated. Neither is the suggestion that Medicaid costs might rise persuasive. *See* Dkt. # 14 at 24–25. While it is true that if a drug is subject to a 340B discount, then it cannot be subject to a duplicative Medicaid discount, that's a feature of the federal 340B program itself, not Washington's law. 42 U.S.C. § 256b(a)(5). The 340B program places no limits on the amount of 340B drugs that covered entities may purchase, and there is no dispute that each of the drugs subject to 340B discounts fully qualify for them under federal law. *See supra* at 29.

### (3)    The United States's statement of interest is unpersuasive

The United States also fails to make a compelling case that SB 5981 is barred by intergovernmental immunity. It, too, fails to identify any *cost* borne by the federal government as a result of the law, relying instead on the same wrong principle that any state law triggered by participation in a federal program is facially unconstitutional even if it does not impede the operations of the United States one iota. *See* Dkt. # 37 at 13. To support its claim that obstruction is not required, and discrimination alone is enough, it cites *Dawson v. Steager*, 586 U.S. 171 (2019), but that case did not apply the constitutional doctrine of intergovernmental immunity.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

*See id.* at 173. It applied 4 U.S.C. § 111, which permits state taxes on the compensation of federal officers or employees "if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation." *Dawson* is thus doubly distinguished. It had to do with the express preemptive language of a statute, not the implied preemption the Supremacy Clause imposes on regulation of the federal government. Further, it dealt with taxes on compensation paid directly to a federal employee, not regulation of private enterprise.

Trying to make up for its inability to show any obstruction with federal government operations, the United States relies on speculation that Washington's law might prompt manufacturers to withdraw from Medicaid. Dkt. # 37 at 16–17. This is just a rehash of the argument, refuted above, that Spending Clause legislation deserves heightened protection under the Supremacy Clause to protect the terms of a Congressional bargain. Even courts that have accepted arguments that laws like SB 5981 are unconstitutional under this theory have rejected the notion that they violate intergovernmental immunity precisely because they cause no impediment to the federal government itself. *E.g.*, *McCuskey*, 171 F.4th at 689 ("To be sure, the intergovernmental-immunity doctrine does not control here."). And, moreover, the Medicaid program is an exercise in state-federal cooperative governance. *See*, *e.g.*, *Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985) ("Medicaid is a joint state-federal funding program for medical assistance[.]"). Washington has "substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage" included in its Medicaid state plan. *Id.* at 303. The United States' attempt to paint Medicaid participation as a uniquely federal interest that Washington cannot interfere with ignores the very structure of the Medicaid program.[10]

Finally, the United States attempts to undermine decisions upholding laws like SB 5981 but fails to offer any good reason that this Court should disregard their reasoning. It first attacks the Eighth Circuit opinion in *McClain*, arguing that laws like SB 5981 "do not regulate the safety

[10] The United States does not cite Medicare participation as a basis to find intergovernmental immunity here, and with good reason. Congress has expressly kept "the manner in which medical services are provided" up to the states, despite anything else Medicare does. 42 U.S.C. § 1395.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

38

of prescription drugs or pharmacy operations or even state contracts" and so the Eighth Circuit's application of the presumption against preemption for state laws regulating health and safety was in error. Dkt. # 37 at 18; *see also McClain*, 95 F.4th at 1140. But, as established above and below, *supra* 11–15, *infra* 54–59, SB 5981 is directly related to ensuring that healthcare in Washington remains accessible to underserved populations and areas and is straightforwardly a health and safety regulation. With regard to the Fifth Circuit's opinions, the United States takes issue with its precedent-bounded approach to preemption arguing that Congressional silence ought to preempt a law that imposes costs on drug manufacturers. *See* Dkt. # 37 at 19. Of course, controlling United States Supreme Court precedent says the opposite. *See supra* 16–25.

**2.    SB 5981 does not violate the dormant Commerce Clause**

SB 5981 does not directly regulate any out-of-state conduct and therefore does not violate the dormant Commerce Clause.

Only Novartis moves for an injunction on this basis, claiming that SB 5981 attempts to regulate the price at which it sells drugs to its wholesalers in out-of-state transactions and therefore has an impermissible extraterritorial effect. *See* Dkt. # 14 at 29. This argument fails for several reasons, both factual and legal. First, SB 5891 does not directly regulate drug pricing at all: the federal 340B statute and regulations do that. Second, the conduct that SB 5891 *does* regulate—the dispensing and delivery of 340B covered drugs in Washington—is *intrastate* conduct and plainly within the legitimate sweep of the state's police powers. And finally, to the extent Novartis argues SB 5981 violates the dormant Commerce Clause *per se* because it might have indirect effects on out-of-state conduct, its theory runs headlong into the very precedent it cites: *National Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023).

The dormant Commerce Clause is not an express constitutional provision, but is instead an inference that Article I, Section Eight, Clause Three's affirmative grant of power to "regulate interstate trade; the Clause contains a further, negative command, one effectively forbidding the enforcement of certain state economic regulations even when Congress has failed to legislate on

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

39

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

the subject." *Id*. (citation modified). The "core" of this doctrine—an antidiscrimination principle—applies when state legislation discriminates against out-of-state commerce (i.e., when a state law burdens out-of-state competitors in order to benefit in-state economic interests). *Id.* at 369.

Novartis does not rely on this "core" application of the dormant Commerce Clause, instead arguing that SB 5981 is unlawful because it regulates "wholly out-of-state conduct." *Id*.; Dkt. # 14 at 37. But Novartis glosses over a critical piece of this analysis: the cases applying this "extraterritoriality doctrine" have involved state laws that *directly* regulated out-of-state commerce, not laws with mere incidental extraterritorial impacts. For example, in *Edgar v. MITE Corp.*, 457 U.S. 624 (1982), the Court invalidated an Illinois law regulating take-over offers for corporations with a qualifying presence in Illinois, even where the offeror and majority of shareholders were outside of Illinois, because it was a "direct restraint on interstate commerce." Similarly, in *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 671 (4th Cir. 2018) (citation modified), the court enjoined a Maryland law that prohibited price gouging on "essential [medications] . . .made available for sale in [that state]" because a manufacturer could be held liable even if it did not sell its drugs directly to anyone in Maryland. *See also Ass'n for Accessible Medicines v. Ellison*, 140 F.4th 957 (8th Cir. 2025) (applying same rationale and enjoining Minnesota's anti-drug price gouging law). SB 5981 is easily distinguished from the laws challenged in those cases.

Novartis is wrong that SB 5981 "order[s] Novartis to charge no more than a certain price" in transactions between it and its out-of-state wholesalers. Dkt. # 14 at 37. SB 5981 contains no language purporting to regulate drug pricing, either in Washington or anywhere else. Novartis's real argument is that SB 5981 violates the dormant Commerce Clause by *indirectly* influencing out-of-state conduct. *Id*. (describing an attenuated "chain of transactions" by which SB 5981 supposedly "attempts to regulate" out-of-state transactions). But this is virtually indistinguishable from the dormant Commerce Clause argument the Court rejected in *National*

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

*Pork Producers*. There, the Court affirmed a California law prohibiting the sale of pork products derived from pigs raised in certain conditions. The challengers argued for a broad application of the "extraterritoriality doctrine," one that would forbid state laws having the "practical effect of controlling commerce outside the State." 598 U.S. at 371. The Court roundly rejected this argument, noting that it would lead to "strange places" considering that "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *Id.* at 374. Insofar as SB 5981 may influence out-of-state conduct, that is allowed by our system of federalism, and not a violation of the dormant Commerce Clause.

Several courts have also rejected the exact argument Novartis makes here when analyzing other states' analogous versions of SB 5981. For example, in *Novartis v. Neronha*, the court denied Novartis's motion for a preliminary injunction, finding that Novartis was unlikely to succeed on the merits of its claims, including its claim that a Rhode Island law regulated out-of-state conduct. In an oral ruling, the judge noted that "Rhode Island law does not dictate . . . what Novartis charges for the drugs . . . Novartis voluntarily participates in the 340B program, and the discounts they provide is as function of that federal program, not the Rhode Island law." Tr. of Oral Arg. on Mot. of Prelim. Inj. at 9:7–12, *Novartis v. Neronha*, 1:25-cv-00388-JJM-AEM (D.R.I Sept. 30, 2025) (included as Ex. B to the McGinty Decl.). Likewise, in *AbbVie v. Skrmetti*, the court found AbbVie was unlikely to succeed on the merits of a very similar dormant Commerce Clause claim, noting "the dormant Commerce Clause does not prohibit laws solely because they have extraterritorial reach, absent protectionist intent or effect." 2025 WL 1805271 at *23 (citing *Nat'l Pork Producers*, 598 U.S. at 373).

Novartis is unlikely to succeed on its dormant Commerce Clause claim and is not entitled to a preliminary injunction on that basis.

### 3.    SB 5981 does not effect unconstitutional takings

AbbVie is the only plaintiff to lob a Takings Clause challenge at SB 5981, and it is unlikely to succeed on the merits. The Fifth Amendment prohibits the government (including

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

the States, through the Fourteenth Amendment) from taking private property for public use without just compensation. U.S. Const. amend. V; *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). Government conduct running afoul of the Takings Clause can come in the form of a physical taking or a regulatory taking. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002). SB 5981 is neither.

AbbVie only challenges SB 5981 as a physical, *per se* taking. AbbVie MPI at 23. A physical taking is just as it sounds. It occurs when the government physically occupies, acquires, appropriates, or takes possession of private property for public use. *Cedar Point*, 594 U.S. at 147–49. Courts apply a *per se* rule: if a physical taking occurred, just compensation is needed. *Id.* A regulatory taking, by contrast, is a restriction on an owner's use of their property that "goes too far[.]" *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Regulatory takings are evaluated under the fact-intensive, flexible balancing test announced in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).

AbbVie's claim fails for three reasons: (1) there cannot be a taking at all because AbbVie's participation in the 340B program is voluntary; (2) there is no physical taking; and (3) AbbVie waived any regulatory taking argument, but even still, there is no regulatory taking.

### a.    There is no taking in a voluntary program

AbbVie's takings claim depends on the premise that SB 5981 somehow forces AbbVie to make discounted sales. But there are no "compelled" sales in a voluntary program. At the outset, the voluntary nature of AbbVie's participation in the 340B program negates its likelihood of success on its takings claim, whether analyzed as a physical or regulatory taking. Thus, there is no need for the Court to delve into the fact-intensive inquiries of takings analyses.

To have a viable takings claim, a party needs a constitutionally protected and vested property interest. *See Bowers v. Whitman*, 671 F.3d 905, 912 (9th Cir. 2012). However, entities do not have a property interest contemplated by the Takings Clause when they voluntarily participate in a heavily regulated program or activity subject to changing conditions. *See*

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

42

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

*Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1241 (9th Cir. 2013); *see also Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 837 (9th Cir. 2025) ("Access to highly regulated markets has not historically been conceived as a constitutional right."); *Erickson v. U.S. ex rel. Dep't of Health & Hum. Servs.*, 67 F.3d 858, 862 (9th Cir. 1995) ("[P]laintiffs do not possess a property interest in continued participation in Medicare, Medicaid, or the federally-funded state health care programs."). This is so even when regulations are imposed after the party elects to participate. *See Managed Pharmacy Care*, 716 F.3d at 1241 (concluding that Plaintiffs who decided to participate in Medicaid can "hardly expect" that aspects of the program will never change). A regulation affecting a group's property is simply not a taking when the regulated group is not required to participate in the regulated program. *See Baker Cnty. Med. Servs., Inc. v. U.S. Att'y. Gen.*, 763 F.3d 1274, 1276–77 (11th Cir. 2014) (compiling circuit cases holding that voluntary participation in a regulated program precludes a takings claim).

When assessing the impact of a regulatory program's voluntariness on a party's takings claim, the Ninth Circuit does not use the tit-for-tat approach AbbVie advocates for in its motion, drawing on out-of-circuit caselaw. AbbVie MPI at 25. Instead, the Ninth Circuit looks at the level and complexity of regulation in the program or market as a whole, as well as the foreseeability of the conditions for participating in it changing. *See, e.g.*, *Stolfi*, 153 F.4th at 835 (contrasting the "highly regulated" pharmaceutical market with the "materially different" market of raisin growing); *see also Managed Pharmacy Care*, 716 F.3d at 1252 (evaluating likelihood of program requirements changing).

Under this approach, AbbVie's Takings Clause claim fails. "[T]he pharmaceutical industry is unquestionably an industry with a long history of government regulation." *Stolfi*, 153 F.4th at 835. State regulation regarding the distribution of 340B drugs and the use of contract pharmacies was foreseeable, especially given Section 340B's silence on the issue. Many courts evaluating other states' versions of SB 5981 have reached the same conclusion about the voluntariness of manufacturers' participation negating any takings claim. *See, e.g.*, *Astrazenca*

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

*Pharm. v. Bailey*, 2:24-cv-041430MDH, 2025 WL 644285, at *5–6 (W.D. Mo. Feb. 27, 2025); *see also Murrill*, 2024 WL 4361597, at *15; *Frey*, 2025 WL 2813787, at *14; *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *19 (rejecting AbbVie's takings "analogy" due to voluntariness of participation but ruling on standing grounds).

AbbVie attempts to shift the focus of the voluntariness inquiry away from 340B and to SB 5981 by claiming that AbbVie never agreed to comply with requirements from future state laws. But this focus is far too narrow. AbbVie elected to participate in the 340B program as a whole, which necessarily includes accompanying state regulations. The Ninth Circuit recently made this clear when it rejected PhRMA's takings challenge to a drug price transparency law in Oregon. *Stolfi*, 153 F.4th at 837. Instead of looking for an incremental bargained-for exchange relating to the newly enacted state law, the court assessed the benefit as "the ability to sell a highly regulated product in a government-regulated market" writ large. *Id.* For purposes of a takings claim, each new regulatory condition does not need to be "accompanied by a separate benefit" to preserve the "voluntary nature of the program." *Frey*, 2025 WL 2813787, at *14. Similar to its analysis in *Stolfi*, the Ninth Circuit in *Managed Pharmacy Care* did not look for an incremental bargained-for exchange when evaluating a California law that changed certain Medicaid reimbursement rates within the state. Instead, it evaluated whether it was foreseeable for program conditions and requirements to change "regardless of when providers decide[d] to participate" in the program. 716 F.3d at 1252.

Here, AbbVie's voluntary participation in the 340B program defeats its takings claim. AbbVie is not faced with the decision of whether to exit the drug-making market altogether and is free to cease participating in the 340B program. *Stolfi*, 153 F.4th at 837.

### b.    There is no physical taking

AbbVie's takings claim also fails because SB 5981 does not "take" anything from anyone. The State is not physically acquiring AbbVie's drugs for itself or others. Nor is the State compelling AbbVie to make any sales. *See Fitch*, 152 F.4th at 643 (rejecting takings challenge

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

44

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

to analogous state law because it "does not impose on drug manufacturers a positive obligation to directly transfer or sell their drugs to anyone"); *see also Murrill*, 166 F.4th at 543 (same). The primary case AbbVie relies on, *Horne v. Department of Agriculture*, 576 U.S. 350, 361 (2015), only serves to highlight the lack of a physical taking in this case. In *Horne*, "[a]ctual raisins" had to be set aside by all raisin growers and "physically segregated" for the government to do with them what it wished. *Id.* No physical action is occurring here.

Critically, SB 5981 does not require AbbVie to sell its drugs to contract pharmacies. That is, the State is not changing the pool of buyers in the 340B program, dictating who AbbVie should sell to, or demanding AbbVie sell its drugs to more entities than those authorized under the federal program. Instead, SB 5981 merely prevents AbbVie from restricting *how* covered entities in Washington can arrange for 340B drugs to be distributed and dispensed to patients, including through the use of contract pharmacies "on behalf of the covered entity." SB 5981 § 3(1). Attempting to circumvent this truth, AbbVie's motion conspicuously uses "transfer" instead of "sell." AbbVie MPI at 23 ("S.B. 5981 effects a *per se* physical taking of AbbVie's property by forcing AbbVie to transfer its drugs to private third parties at discounted prices."). But the drugs are sold to covered entities, even if dispensed to patients at contract pharmacies. *See supra* at 7–8. SB 5981 does not amount to a physical taking.[11]

### c.    There is no regulatory taking

AbbVie does not challenge SB 5981 as a regulatory taking, so the Court need not evaluate its likelihood of succeeding on an argument it did not raise. *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("[A]rguments not raised by a party in an opening brief are waived"); *see also Weiser*, 811 F. Supp. 3d at 1281 (declining to evaluate Colorado's similar law as a regulatory taking because AbbVie did not raise it). As a further barrier, the Ninth Circuit has "repeatedly" suggested the fact-intensive nature of the test for regulatory takings

_____

[11] Given that there is no physical taking to begin with, the Court need not evaluate whether SB 5981 serves a public use. However, SB 5981 undoubtedly serves a public use, as described in detail below. *See infra* at 47-59.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

45

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

forecloses facial, pre-enforcement challenges like AbbVie's. *Stolfi*, 153 F.4th at 834 (collecting cases). Therefore, for multiple reasons, the Court need not assess SB 5981 as a regulatory taking.

However, if the Court chooses to *sua sponte* analyze SB 5981 as a regulatory taking, AbbVie still cannot demonstrate a likelihood of success on the merits. The *Penn Central* test requires balancing the "economic impact" of the regulation, its interference with reasonable "investment-backed expectations," and the "character of the governmental action." 438 U.S. at 124. All three factors weigh in favor of the State.

As to the first factor, it is well settled that the "mere loss of some income because of regulation does not itself establish a taking." *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018) (noting a decrease in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking). Accordingly, even if AbbVie relied on its allegations of lost profits, its lack of specificity about the alleged financial loss is insufficient to establish that this factor weighs in its favor.

Second, SB 5981 does not significantly interfere with AbbVie's reasonable investment-backed expectations in the 340B program. As a participant in the closely regulated pharmaceutical industry, AbbVie cannot reasonably have investment-backed expectations that rely upon a legislative and regulatory status quo. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027–28 (1992) (owner of property subject to "high degree" of regulation "ought to be aware of the possibility that new regulation might even render his property economically worthless"). Contract pharmacies have long been part of the 340B landscape. Thus, regulation regarding contract pharmacies' distribution of 340B drugs was reasonably foreseeable. *See Managed Pharmacy Care*, 716 F.3d at 1252; *see also Bailey*, 2025 WL 644285, at *6.

The third factor, the character of the government action, also weighs in the State's favor. This inquiry examines whether the government regulation's interference with property resembles a "physical invasion" or instead merely "arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

46

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

U.S. at 124. Undoubtedly, Washington's law resembles the latter. As described in detail below, it furthers important public interests, like expanding vulnerable patients' access to care and facilitating covered entities' ability to serve safety-net populations. *Infra* at 54–59.

### 4.   SB 5981 does not violate the First Amendment

Finally, SB 5981's reporting requirements do not violate the First Amendment. As a threshold matter, SB 5981's reporting requirements do not go into effect until April 1, 2027. *See* SB 5981 § 9(7); Decl. of Annette Schuffenhauer in Supp. of Defs.' Opp'n to Pls.' Mots.' for Prelim. Inj. (Schuffenhauer Decl.) ¶ 4. Thus, AbbVie's challenge to this portion of the law is both premature and insufficient to establish the need for injunctive relief. *See Amylin Pharms., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011) (harm "must be imminent" to warrant injunctive relief). This claim can be resolved through the ordinary course of litigation without extraordinary relief, and AbbVie's request to enjoin these requirements can be resolved on this basis alone. In any event, the reporting requirements are best categorized as commercial speech and easily pass the corresponding level of scrutiny.

### a.   Strict scrutiny does not apply

Contrary to AbbVie's assertion, SB 5981 is not automatically subject to strict scrutiny. AbbVie MPI at 25–26. AbbVie relies on two cases for this argument, *X Corp. v. Bonta*, 116 F.4th 888, 898 (9th Cir. 2024) and *Net Choice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) but neither are controlling. Indeed, the Ninth Circuit recently distinguished both cases in *Stolfi*, 153 F.4th at 809—a case that directly controls here.

*Stolfi* involved PhRMA's First Amendment challenge to Oregon's Prescription Drug Price Transparency Act, which, among other things, imposed a reporting requirement that pharmaceutical manufacturers disclose to a state agency information related to the costs, revenues, and prices of certain prescription drugs. *Id.* at 805. The Ninth Circuit observed that such "government reporting requirements" are a "common feature of modern government." *Id.* at 809–10 (citing examples). And it expressly rejected PhRMA's argument that such

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

47

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

requirements are presumptively content-based compelled speech subject to strict scrutiny. *Id.* at 811. Instead, it noted that there were "several compelling reasons" to adopt the approach taken by two sister circuits, which have concluded that government reporting requirements are not subject to strict scrutiny unless they "mandate[] that a covered entity or individual make a political or ideological statement." *Id.* at 811, 815 (citing *United States v. Sindel*, 53 F.3d 874 (8th Cir. 1995); *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101 (D.C. Cir. 2011)).

As the Ninth Circuit also noted, this approach is likewise consistent with a First Circuit decision upholding a state law that required pharmacy benefit managers to disclose conflicts of interest and certain financial information to third parties. *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005). As the controlling concurrence in that case explained, "[w]hat is at stake here" is "simply routine disclosure" of economic information for "ordinary regulatory purposes—in this case, protecting covered entities from questionable [pharmacy benefit manager] business practices. There are literally thousands of similar regulations on the books . . . The idea that these thousands of routine regulations require an extensive First Amendment analysis is mistaken." *Id.* (citations omitted).

*Stolfi* acknowledged that the two cases cited by AbbVie—*Net Choice* and *X Corp.*— applied strict scrutiny to analyze government reporting obligations. But it explained that:

> In both *NetChoice* and *X Corp.*, our application of strict scrutiny ultimately turned on the subjective and political or ideological nature of the information that the regulations required. Specifically, in both cases, we concluded that the government reporting requirement at issue forced regulated entities to opine on fraught political issues, such as what online content is 'harmful to children' or what content constitutes 'hate speech or racism.'"

153 F.4th at 817 (citing *NetChoice*, 113 F.4th at 1117–18; *X Corp.*, 116 F.4th at 901–02).

Nonetheless, *Stolfi* also concluded that the Oregon reporting requirement was not subject to strict scrutiny because it constituted commercial speech. 153 F.4th at 819–26. It recognized that the Ninth Circuit "has characterized speech as commercial" where the speech "'communicates the terms of an actual or potential [commercial] transaction.'" *Id.* at 901

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

48

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

(citation omitted). And it concluded that Oregon's reporting requirements "communicate the terms of potential commercial transactions" including product-specific economic information about prescription drugs that are available for purchase on the market. *Id.* at 821, 822.

Here, as in *Stolfi*, SB 5981's reporting obligations are appropriately categorized as commercial speech. They are "closely tethered to the sale of a product and 'assist[] consumers and further[] the societal interest in the fullest possible dissemination of information[.]'" *Id.* at 822. They require manufacturers to disclose three categories of information: (1) "The number of units, by drug, of 340B drugs distributed to each covered entity and contract pharmacy in Washington"; (2) "The aggregate discounts, by drug, provided to each covered entity and contract pharmacy on 340B drugs reported in [the prior] subsection;" and (3) "The average 340B discount on each of the top 25 340B drugs dispensed in the state by each manufacturer, including the percentage of the discount imposed due to inflationary rebate . . . and the discount if it were not capped with a maximum rebate amount." SB 5981 § (9)(7)(a)–(c). As this is "product-specific economic information about prescription drugs that are available for purchase on the market[,]" the requirement thus "improves the 'free flow of commercial information' for all drug purchasers—both public and private." *Stolfi*, 153 F.4th at 821, 822. Also as in *Stolfi*, outside the context of commercial transactions, the information required by SB 5981 has "no independent expressive meaning." *Id.* at 822 (citing *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985), which noted that the "interests at stake" in regulating commercial transactions are not of the "same order" as those where a speech regulation "prescribes what shall be orthodox in politics, nationalism, religion, or other matters of opinion.") (citation modified). Strict scrutiny does not apply.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

49

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

### b.    SB 5981 easily withstands intermediate scrutiny

Moreover, SB 5981 withstands the level of scrutiny applicable to commercial speech. Even assuming intermediate scrutiny applies,[12] which the State does not concede, the reporting requirements easily pass muster. To survive intermediate scrutiny, the State "must establish that the law directly advances a substantial governmental interest, and that the means chosen are not . . . more extensive than necessary." *Stolfi*, 153 F. 4th at 826 (cleaned up). Here, the State's interest in the reporting requirements is substantial. When the Legislature enacted prescription drug reporting requirements in 2019, it found that Washington state is "a major purchaser" of prescription drugs and has a substantial public interest in: (1) the price and cost of prescription drugs, (2) notice and disclosure of information relating to the cost and pricing of prescription drugs in order to provide accountability to the state for prescription drug pricing, (3) rising drug costs and consumer ability to access prescription drugs, and (4) containing prescription drug costs. Laws of 2019, ch. 334 § 1. To further these interests in transparency, it imposed broad reporting requirements on health carriers, pharmacy benefit managers, manufacturers, and others. *See id.* at §§ 2–9. Additionally, it required the Health Care Authority to compile the data (aggregated, so as not to reveal specific information) and "prepare an annual report for the public and the legislature synthesizing the data to demonstrate the overall impact that drug costs, rebates, and other discounts have on health care premiums." *Id.* § 10.

The reporting requirements in SB 5981 supplement these pre-existing requirements and are similarly intended to serve these purposes. The data—which is provided by both covered entities and manufacturers—provides crucial insight into the opaque 340B program, allowing for more informed policy and decision-making at the state level. Specifically, the state will be

---

[12] The State assumes for purposes of this motion that intermediate scrutiny applies. But the reporting requirements here arguably only implicate a form of rational basis review, as they require disclosure of "purely factual and uncontroversial" commercial speech. *Zauderer*, 471 U.S. at 651; *see also Stolfi*, 153 F.4th at 842 (Bea, J, dissenting) (information such as the length of time that the drug has been marketed, its introductory price, its price increases over time, its sales revenue, and its prices in other countries "compels factual and uncontroversial commercial information and probably does not violate the First Amendment.").

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

50

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

better positioned to assess safety net-provider revenue and unmet need when making budget decisions, deciding how to allocate state resources, and targeting future state investments and healthcare program reforms. Schuffenhauer Decl. ¶ 6. The data will also inform the state's health care purchasing, including how it contracts and pays for prescription drugs in Medicaid and Public and School Employee Benefits programs. *Id.* The state annually expends millions of dollars in taxpayer funding towards prescription drug expenditures, with little current insight into how payment aligns with provider and facility expenses. *Id*. The manufacturer data is also necessary for the state to validate reporting from covered entities when ensuring compliance with its own laws. *Id.* Further, Washington residents enrolled in non-governmental health coverage will also benefit from this transparency, as consumers lack insight into how their spending on premiums, deductibles, and out-of-pocket spending is impacted by 340B pricing and incentive structures today. *Id.*; *see also Stolfi*, 153 F.4th at 826 ("the State has a substantial interest in reducing "information asymmetries" in the pharmaceutical drug market, as well as "facilitating informed commercial transactions, and improving the efficiency of the pharmaceutical market."). Overall, as in *Stolfi*, the "State's asserted interests here are not limited to transparency for its own sake[,]" 153 F.4th at 826 (citation modified), nor are they based on "curiosity alone." *See* AbbVie MPI at 26 n. 3. On the contrary, they are concrete and substantial.

The reporting requirements also directly advance these substantial interests. To meet the "direct advancement" requirement, the State must demonstrate that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Stolfi*, 153 F.4th at 827 (internal quotation marks omitted). That requirement is met here, as "[i]t is common sense that collecting and publishing information about drug pricing, costs, and pharmaceutical market conditions 'directly advances' [the] goal [of reducing asymmetries in the pharmaceutical market and providing drug purchasers with leverage]." *Id.* And finally, the reporting requirements are "[not] more extensive than necessary to further the State's interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 569–70 (1980). The information is limited

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

51

to disclosures about the 340B program and does not seek unrelated information about manufacturer discounts or profits more generally. The law protects this information from public disclosure and requires that reports use aggregated data and not reveal information specific to an individual manufacturer. SB 5981 § 9(8), § 11(2). AbbVie claims the law is overbroad because it could be limited to requesting information only after a covered entity has alleged a violation of the statute. *See* AbbVie MPI at 26–27. But requiring manufacturers to report information only in limited circumstances does not ensure transparency of the 340B program as a whole, nor does it assist the State with validating reporting by covered entities or with the policy and decision-making described above. For these reasons, AbbVie cannot show a likelihood of success on its First Amendment claim.[13]

## B.   Plaintiffs Will Not Suffer Irreparable Harm Absent Relief

In addition to failing to establish a likelihood of success on the merits, Plaintiffs have also failed to establish irreparable harm. "Irreparable harm is 'harm for which there is no adequate legal remedy, such as an award for damages.' For this reason, economic harm is not generally considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)); *see also Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) ("Purely economic harms are generally not irreparable, as money lost may be recovered later, in the ordinary course of litigation."). Likewise, "speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation modified); *see also Winter*, 555 U.S. at 21–22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our

---

[13] As explained, strict scrutiny does not apply. But even if this Court were to conclude that it does, the reporting requirements also satisfy strict scrutiny for the same reasons they pass intermediate scrutiny.

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

52

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

Plaintiffs' asserted injuries do not satisfy this standard. Plaintiffs first claim that the deprivation of constitutional rights constitutes irreparable injury. AbbVie MPI at 27; *see also* PhRMA MPI at 35–36 (claiming that being forced to comply with an unconstitutional law is an irreparable injury); Dkt. # 14 at 38 (asserting that risk of enforcement of "unconstitutional act" is an irreparable harm). But as discussed above, SB 5981 easily withstands Plaintiffs' constitutional challenges and thus cannot serve as a basis for irreparable harm.

Plaintiffs next argue that complying with SB 5981 will force them to provide additional 340B discounts, resulting in unrecoverable financial losses and unspecified "compliance costs." Dkt. # 14 at 38–39; AbbVie MPI at 27; PhRMA MPI at 35–36. But Plaintiffs fail to explain why these alleged financial losses would be unrecoverable, beyond baldly asserting that the State has sovereign immunity and that pursuing numerous recovery actions would be "practically impossible." PhRMA MPI at 35. Plaintiffs have the freedom to contract, and drug manufacturers have contracts with covered entities. *See Johnson*, 102 F.4th at 461 (referencing "manufacturers, in their contracts with covered entities"). But even if manufacturers are unable to show breach of any particular contract term, Plaintiffs may have an unjust enrichment claim or other legal remedies. *See, e.g.*, *Rekhter v. Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014) (permitting class relief on a claim of breach of the duty of good faith fair dealing following invalidation of a state rule impacting the contract); *see also* Fed. Rule Civ. P. 23(a) (permitting certification of a defendant class). Plaintiffs have failed to show that they have no way to recoup 340B costs incorrectly granted to covered entities.

For the same reason, Plaintiffs also fail to show irreparable harm stemming from noncompliance with SB 5981. Plaintiffs assert that noncompliance would also result in financial losses, such as financial penalties and the costs associated with defending employees. Dkt. # 14 at 39. But they similarly fail to show that these losses would be unrecoverable. Indeed, Novartis

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

53

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

asserts only that these costs "likely" can never be recovered if SB 5981 is found unconstitutional. Dkt. # 14 at 39. This is plainly insufficient. *See Caribbean Marine Servs. Co.*, 844 F.2d at 674 (A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury. . . .").

Nor can Plaintiffs show irreparable harm by asserting that they will be forced to "divert resources" from research and development for new drugs. *See, e.g.*, Dkt. # 14 at 39. While Plaintiffs might prefer to reinvest that money into research and development, this argument is merely a repackaging of the "financial losses" argument. It is thus an "entirely economic" harm that cannot be an irreparable injury. *Idaho*, 794 F.3d at 1046; *see also Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 86 (1st Cir. 2022) ("Appellants attempt to classify their injuries as irreparable by reframing the harm they suffer as the loss of things they can no longer afford. But artful pleading cannot not transform ordinary harm into the basis for an injunction.").

Plaintiffs' reliance on reputational harms fares no better. Dkt. # 14 at 39. "Although preliminary relief may be ordered to prevent harm to a movant's reputation and goodwill, a finding of reputational harm may not be based on 'pronouncements [that] are grounded in platitudes rather than evidence.'" *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013). Here, the allegations of harm are conclusory and speculative and are not grounded in any evidence in the record. The fact that Plaintiffs' reputation *might* be harmed does not establish that such harm is *likely*. *See Winter*, 555 U.S. at 22.

Plaintiffs will not suffer any irreparable harm in the absence of an injunction. But enjoining the law *will* inflict an irreparable harm on the State. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Further, covered entities and vulnerable patient populations throughout Washington will suffer numerous harms, as detailed below. This factor weighs in favor of the State.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

54

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

## C.    The Equities and the Public Interest Weigh Against an Injunction

The final two *Winter* factors also weigh heavily against Plaintiffs. Washingtonians will suffer significant harm if the Court grants the preliminary injunction sought by Plaintiffs, as SB 5981 is critical to protecting the integrity of the 340B program and ensuring healthcare access to low-income and uninsured populations throughout the state.

Washington's covered entities include critical access hospitals, safety-net hospitals, rural healthcare clinics, and federally qualified health centers. *See, e.g.*, Glenn Decl. ¶ 3; Martin Decl. ¶ 4; Decl. of Kelly Hughes in Supp. of Defs.' Opp'n to Pls.' Mots. for Prelim. Inj. (Hughes Decl.) ¶ 2; Berschauer Decl. ¶ 3. Many are located in remote areas of the state, including in regions with federally designated Health Professional Shortage Areas, and are the only accessible source of care for isolated populations. *E.g.*, Hughes Decl. ¶¶ 3, 7, 9; *see also* Berschauer Decl. ¶¶ 4, 8, Glenn. Decl. ¶ 5. In addition to providing care in rural areas, covered entities serve many patients who are underinsured, uninsured, or reliant on public assistance for health insurance. Glenn Decl. ¶ 5; Martin Decl. ¶ 5; Brown Decl. ¶ 5; Pearson Decl. ¶¶ 4, 25; Das Gupta Decl. ¶ 6; Hughes Decl. ¶ 9; Berschauer Decl. ¶¶ 4, 24. They also provide care to underserved and marginalized populations. *See, e.g.*, Hughes Decl. ¶¶ 3, 5, 14 (serving tribal members); Berschauer Decl. ¶¶ 4, 24 (serving migrant and seasonal farmworkers).

The 340B program is a "vital lifeline for safety-net providers." Berschauer Decl. ¶ 22. Covered entities rely on 340B savings to fund a broad array of services for rural, poor, and underserved patients. For example, UW Medicine uses 340B savings to fund services for individuals experiencing homelessness; to provide trauma-informed care to unhoused women and street-based sex workers; and to provide primary and mental healthcare for refugees, immigrants, asylum seekers, and survivors of trafficking. Dellit Decl. ¶¶ 12–14. Jefferson Healthcare uses 340B savings to fund the only dental office in the county that regularly accepts Medicaid or charity care patients and to fund a reproductive care program with obstetrics labor and delivery services in a remote area. Glenn Decl. ¶ 8. Summit Pacific uses 340B savings to

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

55

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

fund several gastroenterology, cardiology, podiatry, and outpatient infusion services, as well as a treatment clinic for behavioral health and substance use disorder. Martin Decl. ¶ 8. Coulee Medical Center uses 340B funds for obstetric services (where 65% of births are tribal members) and for surgical and anesthesia services and an outpatient infusion program. Hughes Decl. ¶14. And federally qualified health centers (FQHCs) use 340B funds in a variety of ways to meet community needs, including for diabetes education and tobacco cessation programs, support programs for patients with complex behavioral health needs, and mobile medical care teams for elderly patients and individuals in rural areas. Pearson Decl. ¶ 30.

Covered entities also provide millions of dollars in uncompensated care and charity care annually. *E.g.*, Das Gupta Decl. ¶ 6 ($502 million in uncompensated care in fiscal year 2025); Glenn Decl. ¶ 5 (over $10 million in unfunded services and over $5 million in charity care in fiscal year 2025); Martin Decl. ¶ 5 ($10,684,406, in unfunded medical services including $4,502,279 in charity care); Hughes Decl. ¶ 10 ($1,748,694 in unfunded medical services including $682,757 in charity care in 2025). And they use 340B funds to help offset the cost of providing this care too. *E.g.*, Brown Decl. ¶ 22; Das Gupta Decl. ¶ 28 (UW Medicine uses 340B savings to reduce financial barriers for patients and improve access to medications and provides more than 158,000 prescriptions annually to patients at no cost); Berschauer Decl. ¶¶ 25–26 (Moses Lake Community Health Center uses 340B savings to offset the cost of providing uncompensated or sliding scale services and dispenses approximately 10,500 prescriptions annually on the Sliding Fee Discount Program). These uses are consistent with the purpose of the 340B program to "stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. II, at 12 (1992).

Many FQHCs also pass on 340B discounts to patients. *E.g.*, Brown Decl. ¶ 21 (FQHC "discounted prescriptions by $531,000 passing them along at the 340B price for qualified

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

56

patients"). A 2011 study found that almost three quarters of 340B hospitals with an outpatient pharmacy used 340B savings to reduce patients' drug prices. Wallack Report ¶ 100.

Plaintiffs' restrictive contract pharmacy policies have already harmed covered entities and the patient populations they serve. Contract pharmacies are essential to ensuring access to medications for patients in remote areas. *See* Pearson Decl. ¶ 13 ("Contract pharmacies play a critical role in expanding patient access to affordable, lifesaving medications, particularly for patients in remote or underserved areas."); Berschauer Decl. ¶ 11 (Grant County covers a total area of 2,791 square miles and thus "it is imperative to utilize contract pharmacies to extend our reach into the community"). They are also crucial for patients who are prevented from using in-house pharmacies due to requirements imposed by their insurers or because they need a specialized compounding pharmacy for specialty drugs. Das Gupta Decl. ¶¶ 20, 27; Hughes Decl. ¶ 17; Berschauer Decl. ¶ 21. And contract pharmacies fill a critical need for patients who cannot travel or access in-house pharmacies during business hours. *See* Berschauer Decl. ¶ 11. Plaintiffs' contract pharmacy conditions impede patient access to medications.

Plaintiffs' policies also drastically reduce the amount of revenue to covered entities, which directly impacts their ability to serve their patients. *See, e.g.*, Brown Decl. ¶¶ 16–18, 23 (policies have resulted in a loss of at least $3 million since 2020, which has "erode[d] the savings intended to support patient care" and "result[ed] in limited growth and difficulty addressing our highest need patients' barriers to care); Pearson Decl. ¶ 22 (data from 10 FQHCs indicates a decrease in revenue of more than $7 million annually); Martin Decl. ¶ 11 (contract pharmacy restrictions are reducing Summit Pacific's savings by 66%, depriving it of an estimated additional $2.8 million per year).

The financial losses from Plaintiffs' policies are untenable for most covered entities, which typically operate on razor thin margins or at a loss. Glenn Decl. ¶ 6 (operating margin is negative 0.1%); Martin Decl. ¶ 6 (operating margin is 3.4%); Pearson Decl. ¶ 32 (most FQHC core services "operate at a loss"); Hughes Decl. ¶ 11, 14 (operating margin is negative 2.3%, and

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

57

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

identifying services that operate at a loss of over $1 million annually); Berschauer Decl. ¶ 29 (there has been "a deep decline in its pharmacy line of business which has had a cascading effect on the entire organization" caused by the contract pharmacy restrictions). Those losses pose a particularly acute threat now, where rising drug costs, upcoming changes in the Medicaid program, and "unprecedented inflation" will increase financial strain on covered entities. *See e.g.*, Pearson Decl. ¶ 28 (approximately 430,000 Washingtonians will lose health insurance coverage by 2034, likely leading to increases in uncompensated care and financial strain for FQHCs); Glenn Decl. ¶¶ 5, 7 (predicting loss of $4–6 million annual revenue due to changes in Medicaid coverage); Martin Decl. ¶ 6 (predicting loss of up to $4 million per year); Berschauer Decl. ¶ 20 (noting loss of $845,000 in last five years due to rising drug costs and contract pharmacy restrictions). Simply put, covered entities "need[] reprieve from manufacturer restrictions." Berschauer Decl. ¶ 33. As one rural hospital explained, "expenses are at their highest levels ever, yet payments are less predictable and harder to collect—we are essentially having to fight for every dollar we earn, which puts sustained pressure on already narrow margins and threatens long-term financial viability." Hughes Decl. ¶ 13.

If this Court enjoins SB 5981, these financial losses will continue—or worsen—jeopardizing covered entities' ability to sustain critical programs. *E.g.*, Wallack Report ¶ 37 (covered entities' inability to use contract pharmacies jeopardizes covered entities' financial stability and ability to fund certain programs for at-risk or low-income populations); Dellit Decl. ¶¶ 22–23 (SB 5981 protects $85 million in 340B savings annually, the loss of which would threaten UW Medicine's "ability to sustain key programs and services"); Brown Decl. ¶ 29 (North Olympic Healthcare Network will be "ultimately forced" to reduce or eliminate healthcare services and discounts meant to limit challenges to patients in accessing care); Pearson Decl. ¶ 42 ("Without S.B. 5981, some health centers located in rural areas will be forced to consider service reductions to remain solvent"); Berschauer Decl. ¶ 33 (health center will "be in a position to reduce services and staff."). This poses a dire and immediate threat to vulnerable

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

58

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

patient populations. Indeed, "[p]atients with chronic diseases could see immediate impacts, as health centers will struggle to sustain outreach and specialized pharmacy programs that help people access care, find affordable medications, and remain adherent to those medications." Pearson Decl. ¶ 42; *see also* Hughes Decl. ¶ 20 (an injunction "could mean an inability to maintain some hospital services which means decreased access for patients").

Because SB 5981 helps ensure covered entities' financial viability and the provision of essential health services, enjoining it is not in the public interest. *See New York v. Dep't of Homeland Sec.*, 969 F.3d 42, 88 (2d Cir. 2020) (rule that would result in "worse health outcomes" was not in public interest). Plaintiffs attempt to undercut this argument by claiming that SB 5981 "would not change anything" about patient access to drugs or drug pricing and that enjoining SB 5981 would not harm the public because covered entities are not required to use 340B revenue on charity, uncompensated care, or other altruistic purposes. Dkt. # 14 at 40; *see also* AbbVie MPI at 27–28. But these claims are directly contradicted by nine declarations submitted by healthcare providers explicitly detailing how they use 340B savings to increase patient access, expand programs, and reduce the cost of prescription drugs and other services for patients. The 340B program is functioning exactly as Congress intended, and Plaintiffs' quarrels with the program's design do not prove otherwise. *See Sanofi Aventis*, 58 F 4th at 699 (describing 340B as helping covered entities care for underserved patients by giving them "extra revenue").

Finally, Plaintiffs' argument that an injunction is in the public interest because SB 5981 is unconstitutional (Dkt. # 14 at 42; PhRMA MPI at 36; AbbVie MPI at 27) fails because SB 5981 is constitutional. Nor would enjoining SB 5981 further the public interest by respecting Congress's policy judgment, preserving the status quo, and ensuring the integrity of the 340B program without state interference. Dkt. # 14 at 39, 41; PhRMA MPI at 36; AbbVie MPI at 27–28. It is the drug manufacturers' restrictive policies that undercut Congress' intent, and it is SB 5981 that furthers Congress' goals in stretching federal resources "as far as possible, reaching

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION – NO. 3:26-cv-05302-DGE

59

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. II, at 12 (1992). The equities and the public interest weigh against an injunction.

**D.    Any Injunction Should be Narrowly Tailored and Stayed Pending Appeal**

Any injunction should extend only to the parties in this case and no farther than necessary to remedy proven irreparable injury. The equitable power of federal district courts does not extend beyond the parties in a particular case. *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) ("The equitable tradition has long embraced the rule that courts generally may administer complete relief *between the parties*.") (citation modified). Further, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the [parties]." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). PhRMA only provided declarations concerning three of its members. Any relief should extend only to entities with proven irreparable injury.

Also, any injunction should be stayed pending appeal. The test for a stay pending appeal generally tracks the test for the grant of a preliminary injunction. *See Nken*, 556 U.S. at 434. For the same reasons that this Court should deny injunctive relief, any injunction should be stayed pending appeal. *See generally supra*. An injunction would irreparably injure Washington State by depriving it of the ability to enforce its laws. *Maryland*, 567 U.S. at 1303. It would likewise disrupt the State's healthcare system and substantially injure other parties. *See supra* 54–59.

**V.    CONCLUSION**

The Court should deny Plaintiffs' motions for preliminary injunction.

DATED this 8th day of May 2026.

NICHOLAS W. BROWN
Attorney General

*s/ Aliana Knoepfler*
ALIANA KNOEPFLER, WSBA #64738
JULIE MORONEY, WSBA #59017
FREEMAN HALLE, WSBA #61498
Assistant Attorneys General
WILLIAM MCGINTY, WSBA #41868
KELLY A. PARADIS, WSBA #47175
Deputy Solicitors General

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

60

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Aliana.Knoepfler@atg.wa.gov
Julie.Moroney@atg.wa.gov
Freeman.Halle@atg.wa.gov
William.McGinty@atg.wa.gov
Kelly.Paradis@atg.wa.gov

*Counsel for Nick Brown and Ryan Moran*

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION –
NO. 3:26-cv-05302-DGE

61

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744